**No. 23-1767**

# United States Court of Appeals for the Federal Circuit

HORIZON GLOBAL AMERICAS INC.,
*Appellant*

v.

NORTHERN STAMPING CO.,
*Appellee*

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in IPR2021-01411 before Administrative Patent Judges William V. Saindon, Scott B. Howard, and Matthew S. Meyers

## APPELLANT HORIZON GLOBAL AMERICAS INC.'S OPENING BRIEF

**BAKER & HOSTETLER LLP**
Stephanie Hatzikyriakou
Phillip D. Wolfe
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501
(215) 568-3100

Christina J. Moser
Brendan E. Clark
Key Tower
127 Public Square
Suite 2000
Cleveland, OH 44114-1214
(216) 621-0200

*Attorneys for Appellant*

October 16, 2023

## PATENT CLAIMS AT ISSUE

16. A hitch mounting system comprising:

a pair of tubular members each having a cross-sectional shape a substantial portion of which is defined by an enclosed peripheral wall with a generally hollow section;

a mid rail attached to each of and between said pair of tubular members spacing said pair of tubular members apart, said mid rail having a socket capable of accepting a gooseneck hitch ball; and

a pair of receiving members attached with each of said pair of tubular members, said receiving members configured to engage a leg of a fifth wheel hitch.

17. The hitch mounting system of claim 16, wherein at least a pair of the receiving members are configured to accept a safety chain tie down.

18. The hitch mounting system of claim 16 further comprising a plurality of fasteners attaching said mid rail between said pair of tubular members.

19. The hitch mounting system of claim 16, wherein the pair of tubular members are configured to attached with a frame of a vehicle.

20. The hitch mounting system of claim 19, further comprising an attachment bracket attached with the pair of tubular members, the attachment bracket capable of attaching the pair of tubular members to the frame of the vehicle.

## PROPOSED SUBSTITUTE CLAIMS

21. (Proposed Substitute for Claim 16) A hitch mounting system comprising:

a pair of tubular members each having a cross-sectional shape a substantial portion of which is defined by an enclosed peripheral wall with a generally hollow section, said pair of tubular members having a first, second, third and fourth end;

a mid rail attached to each of and between said pair of tubular members spacing said pair of tubular members apart, said mid rail is permanently attached to said pair of tubular members as a one piece assembly, and said mid rail having a socket capable of accepting a gooseneck hitch ball; ~~and~~

a pair of receiving members attached with each of said pair of tubular members, said receiving members configured to engage a leg of a fifth wheel hitch;

a first mounting flange attached to said first end, a second mounting flange attached to said second end, a third mounting flange attached to said third end, and a fourth mounting flange attached to said fourth end;

each of said mounting flanges extend along a same axis as said tubular member to which said mounting flange is attached; and

a mounting aperture on each of said mounting flanges, said mounting flanges and mounting apertures configured to attach directly to a frame of a vehicle.

22. (Proposed Substitute for Claim 17) The hitch mounting system of claim [[16]] 21, wherein at least a pair of the receiving members are configured to accept a safety chain tie down.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-1767

**Short Case Caption** Horizon Global Americas Inc. v. Northern Stamping Co.

**Filing Party/Entity** Appellant Horizon Global Americas Inc.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/04/2023

Signature: s/ David B. Cupar

Name: David B. Cupar

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Horizon Global Americas Inc. | | First Brands Group, LLC (Parent Company) |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| David Cupar (McDonald Hopkins LLC) | Matthew Cavanagh (McDonald Hopkins LLC) | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**I. INTRODUCTION** .......... 1

**II. JURISDICTIONAL STATEMENT** .......... 2

**III. STATEMENT OF THE ISSUES** .......... 3

**IV. STATEMENT OF THE CASE** .......... 4

A. The'585 patent Technology .......... 4

1. Background of Hitch Styles .......... 4

2. The '585 patent .......... 8

3. Commercializing the '585 Patent and Its Subsequent Success. .......... 9

B. The IPR Proceeding and the Board's Final Written Decision .......... 11

1. Northern Stamping's Petition Contended, *Inter Alia*, that the Challenged Claims Would Have Been Obvious but Presented Only Conclusory Evidence and Explanation as to Why the Cited References Would Have Been Combined to Achieve the Claimed Invention. .......... 11

2. The Prior Art References Applied to the Challenged Claims. .......... 12

3. The Board's Institution Decision Admonished Northern Stamping's Explanation of its Motivation Rationale .......... 14

4. Northern Stamping Petitioner's Reply Added No Relevant Substantive Evidence Notwithstanding the Board's Admonishment of Northern Stamping's Motivation Rationale. .......... 15

5. Horizon Proposed "Substitute Claims" With its Contingent Motion to Amend. .......... 16

6. The Board's Final Written Decision .......... 19

**V. SUMMARY OF THE ARGUMENT** ........................................................ 22

**VI. STANDARD OF REVIEW** ........................................................ 25

**VII. ARGUMENT** ........................................................ 27

A. The Board's Motivation to Combine Finding Was Legally Erroneous and Not Supported by Substantial Evidence. .................... 27

1. The Board Failed to Consider the References from the Perspective of a Skilled Artisan at the Time of Invention and Instead Inserted its Own Interpretation of the References. ........................................................ 28

2. Northern Stamping Failed to Articulate a Proper Motivation to Combine Rationale and the Board Ignored Northern Stamping's Failure. ........................................................ 34

3. The Board Improperly Focused on the "Gist" of the Claimed Invention and Failed to Consider it as a Whole in Determining that the Claimed Invention Would Have Been Obvious. ........................................................ 39

4. The Board's obviousness determination was not based on substantial evidence. ........................................................ 42

B. The Board Wrongly Shifted the Burden to Horizon, Reduced Northern Stamping's Burden to Prove Obviousness, and Found a Motivation to Combine Despite Northern Stamping's Failure to Provide One. ........................................................ 44

C. Like the Board's Analysis of the Challenged Claims, Its Analysis of the Substitute Claims is Legally Erroneous and Not Supported by Substantial Evidence. ........................................................ 48

D. The Board's Evaluation of Horizon's Evidence of Objective Indicia of Non-Obviousness Was Legally Erroneous. ........................ 56

1. The Law Concerning Objective Indicia of Non-Obviousness. ........................................................ 56

2. The Claims are Coextensive with the Commercial Product. .... 58

3. The Board Improperly Discounted Horizon's Evidence of Industry Praise....................61

4. The Board Improperly Discounted Horizon's Evidence of Commercial Success. ....................62

5. The Board Improperly Discounted Horizon's Evidence of Copying. ....................63

**VIII. CONCLUSION** ....................64

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ActiveVideo Networks Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ....................38, 39, 41

*Adidas AG v. Nike, Inc.*,
963 F.3d 1355 (Fed. Cir. 2020) ....................54, 56

*Apple Inc. v. Samsung Elecs. Co.*,
839 F.3d 1034 (Fed. Cir. 2016) (en banc) ....................56

*Aqua Prods., Inc. v. Matal*,
872 F.3d 1290 (Fed. Cir. 2017) ....................31, 51

*Brand v. Miller*,
487 F.3d 862 (Fed. Cir. 2007) ....................*passim*

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*,
229 F.3d 1120 (Fed. Cir. 2000) ....................60, 62

*Consol. Edison Co. v. N.L.R.B.*,
305 U.S. 197 (1938)....................27, 28

*Crocs, Inc. v. Int'l Trade Comm'n*,
598 F.3d 1294 (Fed. Cir. 2010) ....................30, 31, 49, 59

*Dynamic Drinkware, LLC v. Nat'l Graphic, Inc.*,
800 F.3d 1375 (Fed. Cir. 2015) ....................28, 49, 51

*In re Elsner*,
381 F.3d 1125 (Fed. Cir. 2004) ....................27

*Fox Factory, Inc. v. SRAM, LLC*,
944 F.3d 1366 (Fed. Cir. 2019) ....................60

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) ....................27, 28

*Gemtron Corp. v. Saint-Gobain Corp.*,
572 F.3d 1371 (Fed. Cir. 2009) ....................50, 51

*In re Huai-Hung Kao*,
639 F.3d 1057 (Fed. Cir. 2011) ....................................................................29

*Hulu v. Innovations*,
No. IPR2018-01039, 2019 WL 7000067 (P.T.A.B. Dec. 20, 2019)..................47

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
751 F.3d 1327 (Fed. Cir. 2014) ..............................................................37, 45

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
688 F.3d 1342 (Fed. Cir. 2012) ....................................................................37

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)..........................................................................*passim*

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
941 F.3d 1133 (Fed. Cir. 2019) ....................................................................66

*Loctite Corp. v. Ultraseal Ltd.*,
781 F.2d 861 (Fed. Cir. 1985), *overruled on other grounds by Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059 (Fed. Cir. 1998) ..............................................................................................42

*In re Magnum Oil Tools Int'l, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016) ..............................................................31, 46

*Medtronic, Inc. v. Cardiac Pacemakers, Inc.*,
721 F.2d 1563 (Fed. Cir. 1983) ....................................................................41

*Medtronic, Inc. v. Teleflex Innovations S.a.r.l.*,
70 F.4th 1331 (Fed. Cir. 2023) ....................................................................66

*Mintz v. Dietz & Watson, Inc.*,
679 F.3d 1372 (Fed. Cir. 2012) ..............................................................59, 67

*In re Nuvasive*, Inc.,
842 F.3d 1376, 1382 (Fed. Cir. 2016) ..........................................................51

*Ortho-McNeil Pharm., Inc. v. Mylan Lab'ys, Inc.*,
520 F.3d 1358 (Fed. Cir. 2008) ....................................................................59

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*,
806 F.2d 1565 (Fed. Cir. 1986) ..............................................................16, 48

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
678 F.3d 1280 (Fed. Cir. 2012) ....................................................41, 43, 44

*Pers. Web Techs., LLC v. Apple, Inc.*,
848 F.3d 987 (Fed. Cir. 2017) ..........................................................................65

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
882 F.3d 1056 (Fed. Cir. 2018) ................................................................*passim*

*In re Preda*,
401 F.2d 825 (C.C.P.A. 1968)..........................................................................31

*Randall Mfg. v. Rea*,
733 F.3d 1355 (Fed. Cir. 2013) ...................................................................28, 31

*Regents of Univ. of Cal. v. Broad Inst., Inc.*,
903 F.3d 1286 (Fed. Cir. 2018) .........................................................................28

*Ruiz v. A.B. Chance Co.*,
357 F.3d 1270 (Fed. Cir. 2004) ................................................................*passim*

*In re Stepan Co.*,
868 F.3d 1342 (Fed. Cir. 2017) .........................................................................29

*In re Taylor Made Golf Co.*,
589 F. App'x 967 (Fed. Cir. 2014).......................................................30, 31, 35

*TQ Delta, LLC v. CISCO Sys., Inc.*,
942 F.3d 1352 (Fed. Cir. 2019) .........................................................................46

*Trivascular, Inc. v. Samuels*,
812 F.3d 1056 (Fed. Cir. 2016) ...................................................................47, 50

*Volvo Penta of the Americas, LLC v. Brunswick Corp.*,
81 F.4th 1202 (Fed. Cir. 2023) ..........................................................................60

*WBIP, LLC v. Kohler Co.*,
829 F.3d 1317 (Fed. Cir. 2016) .........................................................................60

**Statutes**

28 U.S.C. § 1295(a)(4)(A) ...................................................................................3

35 U.S.C. § 103 ........................................................................ 4, 7, 10, 12, 30, 41, 46

35 U.S.C. § 141(c) ....................................................................................3

35 U.S.C. § 311 ..........................................................................................2

35 U.S.C. § 314(a) ....................................................................................47

35 U.S.C. § 316(e) ....................................................................................47

35 U.S.C. § 319 ..........................................................................................3

Administrative Procedure Act...................................................................30

**Other Authorities**

37 C.F.R. § 42.121 ....................................................................................18

## STATEMENT OF RELATED CASES

No other appeal from this IPR has previously been before this or any other appellate Court. The civil action in which the patent was asserted, *Horizon Global Americas Inc. v. Northern Stamping, Inc.*, Case No. 1:20-cv-00310 (N.D. Ohio), will directly affect or be affected by this Court's decision in the pending appeal. Counsel is aware of no other cases pending in this or any other court that will directly affect or be directly affected by this Court's decision here.

## I. INTRODUCTION

The Board's obviousness determination rested on various incorrect legal standards as well as Northern Stamping's conclusory and speculative testimony that there was a motivation to combine the cited references. For the Challenged Claims, the Institution Decision characterized Northern Stamping's motivation rationale as having "little development" and each reading "nearly identically," warning that Northern Stamping "***still must***" provide motivation rationale with "rational underpinnings." Northern Stamping's motivation rationale for the Substitute Claims was no better, riddled with buzzwords but not substance. And specific to the Substitute Claims, the proposed combination would have destroyed the very essence of the primary reference. Notwithstanding the Institution Decision's admonishment, the Board filled in the expertise gaps for Northern Stamping, in violation of the APA, and found a motivation to combine for both the Challenged and Substitute Claims. This effectively lowered Northern Stamping's burden of proof and shifting the burden to Horizon. Being based on Northern Stamping's conclusory evidence and attorney argument, the Board's findings were not based on substantial evidence.

Legally, the Board failed to consider the Challenged Claims from the perspective of a skilled artisan at the time of invention. Had it done so, the Board should have concluded that each of the main cited references functions similarly—

both accommodating the same two hitch types contemplated by the claims—and that therefore there would have been no reason to combine the references. Additionally, the Board improperly focused on the "gist" of the invention, and failed to consider the invention "as a whole." Northern Stamping and its expert only considered the Challenged and Substitute Claims on a limitation-by-limitation basis, also failing to present evidence of the claimed invention "as a whole."

Lastly, the Board ignored Horizon's unrebutted evidence on nexus and then viewed the objective indicia of nonobviousness through a no-nexus lens. The evidence shows, however, that the claims are coextensive with the commercial product, and that the product was successful, praised, and ultimately copied by Northern Stamping.

This Court should reverse the Board's decision, or at least vacate and remand so that the Board may properly consider evidence in the first instance consistent with this Court's opinion.

## II. JURISDICTIONAL STATEMENT

On February 22, 2022, the Patent Trial and Appeal Board instituted *inter partes* review ("IPR") of claims 16-20 (the "Challenged Claims") of U.S. patent no. 10,589,585 ("the '585 patent"). Appx3118-3149. The Board had jurisdiction over the IPR under 35 U.S.C. § 311.

On February 9, 2023, the Board issued a final written decision in IPR2021-01411 concluding in relevant part that "[Northern Stamping] has shown by a preponderance of the evidence that claims 16-20 of the '585 patent are unpatentable" and denying "[Horizon]'s Motion to Amend . . . as to proposed substitute claims 21 and 22." Appx1-49. Horizon timely appealed on April 10, 2023. Dkt 1-2 at 1-4. This Court has jurisdiction under 35 U.S.C. §§ 141(c), 319 and 28 U.S.C. § 1295(a)(4)(A).

## III. STATEMENT OF THE ISSUES

Whether the Board's motivation to combine finding was legally erroneous and lacking in substantial evidence where: (1) the Board failed to interpret the prior art references in the context of a skilled artisan at the time of invention; (2) the prior art references, when viewed in the proper context, could accommodate both features of the claimed invention, there would have been no reason to combine them, and Northern Stamping presented no sufficient rationale for doing so; and (3) the Board focused on the "gist" of the claimed invention in determining that the claims would have been obvious.

Whether the Board erred in holding that the Challenged Claims would have been obvious where Northern Stamping failed to present a sufficient motivation to combine, the Board shifted the burden to Horizon to prove the lack of one, and the

Board effectively lowered Northern Stamping's burden to prove obviousness by a preponderance of the evidence.

Whether the Board erred in holding that the Substitute Claims would have been obvious where Northern Stamping failed to present a sufficient motivation to combine and the Board shifted the burden to Horizon to prove the lack of one.

Whether the Board erred in holding the claims would have been obvious where the Board erred in finding a lack of nexus, and then reviewing Horizon's objective indicia evidence through this lens to find no objective indicia of non-obviousness.

## IV. STATEMENT OF THE CASE

Horizon, which owns the '585 patent, "is one of the world's leading manufacturers of towing and trailering equipment." Appx3268 (¶38). "For decades, Horizon has invented, engineered, manufactured, and marketed a wide array of high-quality products and accessories for trailer equipment in North America, Australia, and Europe." *Id.* Horizon markets products and accessories using the REESE® brand among others. *Id.*

### A. The'585 patent Technology

#### 1. Background of Hitch Styles

Prior to 2009, underbed hitch systems were almost exclusively an aftermarket "add on." Appx3268 (¶40). Hitch styles include the gooseneck hitches and the fifth-wheel hitches. "The difference [between the two hitch types] is that

the gooseneck uses a ball and coupler verses a kingpin and pin receiver" used by the fifth-wheel hitch. Appx151 (2:16-17).

Pictured in the example below, "[t]ypically gooseneck balls/hitches receive tubular long-neck gooseneck couplers extending from a trailer that connect to a hitch ball in the bed of a truck." Appx3268 (¶41); *see also* Appx151 (2:17-22).




Conversely, typical "fifth wheel hitches accept a 'king pin' on the neck of the trailer that fits within the top opening of the fifth wheel hitch." Appx3269 (¶42); *see also* Appx151 (1:62-64). One such example is depicted below:



Appx3269 (¶42).

“Fifth wheel hitches can mount to truck beds in at least two ways: by attaching legs to rails or by mounting to a single hitch ball or hitch ball location:”







Appx3270 (¶43).

“Prior art mounting rails created problems because, as shown below, they are permanently attached above the bed and interfere with use of the bed when the hitch is removed (e.g., preventing drywall from lying flat in the bed).” Appx3270 (¶44).







Appx3271 (¶44).

Because of the pervading problems in the art, Ford approached Horizon's predecessor—Cequent Performance Products—to develop "factory-installed underbed hitch mounting system." Appx3342 (¶18). *See also* Appx3271 (¶47). Richard McCoy and Eric Stanifer together developed an underbed hitch mounting system that led to the '585 patent. Appx3956-3957 (59:17-60:1). Ford provided specifications, like "the SAE J2638 testing requirements, as well as all of the Ford design requirements for heat zones, clearance areas, mounting to the frame, and fitting . . . to [Ford's] frame system." Appx3943-3944 (46:22-47:1). Ford, however, "had zero say in the design . . . The only information [Ford] had the final

say in was if it fit in their package." Appx3939 (42:2-5); Appx3958 (61:6-20). The design "was all Mr. McCoy and [Mr. Stanifer]." Appx3958 (61:6-20).

### 2. The '585 patent

The hitch system developed by Mr. Stanifer and Mr. McCoy led to the '585 patent, entitled "Underbed Hitch Mounting System." Appx3271-3272 (¶¶47-48). It was filed on December 4, 2017, and claimed the benefit of the filing date of application U.S. provisional patent application no. 61/197,732 filed on Oct. 30, 2008. Appx151 (1:14-18). The '585 patent is describes an "underbed hitch mounting system" that "may be utilized for towing vehicles" either via "a fifth wheel hitch or a gooseneck hitch," as shown in Figure 6 and corrected 7, below. Appx151 (2:46-49).



FIG. 6



FIG. 7

Appx149-150.

The ’585 patent generally describes a hitch mounting system having a pair of tubular members (20); a mid rail (40) with a socket (42) to mount a hitch ball; and receiving members (44) for mounting legs of a fifth-wheel hitch. The Challenged Claims, however, are more specific, defining the structure of, and relationship between, those features.

Each of the claimed features is shown in the ’585 patent’s Figure 4, which is “nearly identical” to the drawing of the product sold to Ford, both of which are shown below. Appx3281-3284 (¶¶81-86) (Walstrom); Appx3343-3346 (¶¶22-23) (Stanifer); Appx3973 (76:13-24), Appx3980 (83:16-20) (Stanifer).




FIG. 4



Appx147 (Fig. 4); Appx3501 (snippet of drawing for product sold to Ford).

### 3. Commercializing the ’585 Patent and Its Subsequent Success.

The underbed hitch system Mr. Stanifer and Mr. McCoy developed for Ford, and claimed in the ’585 patent, hit the market with Ford’s 2011 F-series heavy-

duty pickup line under Horizon's brand Reese®. Appx3300 (¶126). The product was well-received. Per Horizon's director of commercial sales, Horizon "sold hundreds of thousands of its products" and "received millions of dollars in revenue," "from launch to the present," for the underbed hitch system sold to Ford. Appx3379 (¶25) (Guthard); Appx4056-4057 (17:11-15, 17:25-18:1) (Guthard). Horizon's expert, Mr. Walstrom, concurred stating the underbed hitch "was a very commercially successful product for the partnership that Horizon Global had with Ford and a very significant part of the Horizon Global Business." Appx4347 (201:6-9).

Ford praised Horizon for the product, including by featuring the hitch system in an advertisement and by referencing Horizon's brand name, Reese®. Specifically, the advertisement showed and described Ford offering Horizon's OEM hitch system that is "compatible with [both] the Ford Custom Accessory 5th-Wheel ***and*** Gooseneck Hitch Kits by Reese®." Appx32 (emphasis added); *see* Appx3300 (¶¶124-25); Appx4349 (203:3-9), Appx4350 (204:10-15).

The product was successful enough that competitors copied Horizon's product. Specifically, as Horizon alleges, Northern Stamping's design sold to General Motors is an underbed hitch system for the Chevy Silverado reads on the Challenged Claims. *See* Appx3013-3015, Appx3048 (District Court Complaint); Appx3301-3302 (¶127) (Walstrom); Appx4351-4352 (205:15-206:5) (Walstrom).

Even though there were many other systems to choose from, as noted in Northern Stamping's explanation of the crowded technology field, Northern Stamping designed a hitch system just like Horizon's. *Id.*; *see* Appx62-69.

### B. The IPR Proceeding and the Board's Final Written Decision

#### 1. Northern Stamping's Petition Contended, *Inter Alia*, that the Challenged Claims Would Have Been Obvious but Presented Only Conclusory Evidence and Explanation as to Why the Cited References Would Have Been Combined to Achieve the Claimed Invention.

On August 20, 2021, Northern Stamping filed an IPR petition with the Board challenging claims 16-20 of the '585 patent as obvious and anticipated. Appx53-140. In relevant part, Northern Stamping asserted two separate combinations that allegedly rendered the claims obvious: (1) Works (US 6,969,090), Fandrich (US 6,467,791), and Lindenman (US 7,121,573); and (2) Lindenman, Fandrich, and Works. Appx3124. Fandrich, however, was only cited for "avoidance of doubt," and was not material to Northern Stamping's obviousness allegations. Appx4777 (5:9-22); Appx24-26.

Northern Stamping provided no sufficient motivation for the proposed combinations. Its motivation rationale included "little development," with each reading "nearly identically." Appx3145 (citing Appx92-93). In support of its rationale, Northern Stamping copied nearly word-for-word the conclusory declaration of its expert, Mr. Becker. *Compare* Appx89-93 & Appx111-14

(Petition) *with* Appx2752-2756 & Appx2775-2778 (¶¶82-87, ¶¶124-29) (Becker declaration).

Additionally, neither Northern Stamping nor its expert contended that the invention as a whole would have been obvious before the date of invention. Instead, both only contended that "Each Element" of the claims "is Rendered Obvious." Appx95-109, Appx116-125 (Petition); Appx2758-2773, Appx2780-2789 (Becker declaration).

#### 2. The Prior Art References Applied to the Challenged Claims.

The prior art that Northern Stamping relied on to argue the unpatentability of the inventions are discussed below.

##### (a) The Works Reference

Works, entitled "System for Mounting Hitches to Hydroformed Frames," was filed on July 31, 2003 and is assigned to B&W Custom Truck Beds, Inc. Appx2807. To a skilled artisan at the time of invention, Works was understood to be able to accommodate "both types of hitches, fifth wheel and gooseneck." Appx4212-4213 (66:24-67:1, 67:18-20), Appx4273 (127:6-9). Though Works was understood to accommodate a fifth-wheel hitch, it did so in a different manner than the claimed invention: by mounting to the center. Appx4213 (67:2-6).

B&W's website confirms that Works was known to be able to accommodate fifth-wheel hitches in the 2008-2009 time period (*i.e.*, the time of invention for the

’585 patent). B&W’s website states that a “few years” after the development of its Turnoverball hitch—at least one version being on sale before July 31, 2002—, B&W “applied the same concepts to fifth-wheel hitches. Using the same under-bed mounting hardware and hole in the bed, [B&W] designed a Companion with a single point attachment that was removable when not towing.” Appx3276-3277 (¶67) (Walstrom declaration citing B&W website https://www.bwtrailerhitches.com/our-story); Appx2807.

**(b) The Lindenman Reference**

Lindenman, entitled “Vehicle Accessory Mounting System,” was filed on August 13, 2004, and is assigned to Cequent Towing Products, Inc. (now Horizon). Appx2816. Lindenman describes an aftermarket underbed mounting system allowing the user to “mount a number of different vehicle accessories,” including “a fifth wheel hitch assembly” or “a gooseneck hitch assembly.” Appx2836 (1:46-51). Horizon’s Reese® Signature Series line, cited during the prosecution of the ’585 patent, shows the accessories Lindenman would have used to accommodate gooseneck and fifth-wheel hitches. Appx3293-3294 (¶¶106-07) (citing Appx2273 & Appx2408). Northern Stamping’s expert, Mr. Becker, indeed testified that Lindenman could accommodate a gooseneck hitch using “a structure that went into the four receivers and then suspended a goose ball”—the same type of structure shown in the Reese® catalogs. Appx3399 (73:9-14); *see also* Appx2408.

**(c) The Fandrich Reference**

Fandrich, entitled "Under-bed Fifth Wheel Mounting System," was filed on November 27, 2000. Appx2842. Fandrich was cited as part of Northern Stamping's backup position, for "avoidance of doubt," to show that "tubular-shaped cross members" were known in the prior art. Appx10, Appx24.

**3. The Board's Institution Decision Admonished Northern Stamping's Explanation of its Motivation Rationale.**

On February 22, 2022, the Board determined that "based on the evidentiary record developed thus far," Northern Stamping "demonstrated a reasonable likelihood that at least one claim of the '585 patent is unpatentable," and instituted an IPR of claims 16-20 of the '585 patent. Appx3119. In relevant part, as to the obviousness challenge in view of Works, Fandrich, and Lindenman, the Board noted that the dispute "turns on the reason for combining Lindenman with Works-Fandrich." Appx3142. Notably, the Board stated that "[a]lthough Petitioner nominally articulates six different rationales, there is little development of them in the Petition, and each reads nearly identically." Appx3145. The Board cautioned, however, that Northern Stamping "***still must*** provide a reason with rational underpinning as to why a person of ordinary skill, without the benefit of hindsight, would have considered the claimed invention obvious." Appx3145 (emphasis added) (citing *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1575 (Fed. Cir. 1986)).

Moreover, the Board explained that "[a] rationale is an *explanation* as to why the claimed invention is obvious, however explained, not a rote recitation of formulaic, canned statements." Appx3145 (emphasis in original) (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 415 (2007)). The Board noted that "the prior art of record supports a desire to have both types of mounting styles on one device, without having to use an adapter to convert one to another." Appx3146 (citing Appx2864 at 1:25–35, stating that "[t]here is a need for an integrated support structure that is disposed beneath the bed of a pick-up truck so that the bed of the truck is not obstructed and to which either a fifth wheel hitch or a gooseneck hitch can be easily assembled"). Therefore, the Board was persuaded based on the preliminary record "that Petitioner ha[d] established sufficient rationale ***for purposes of institution***." Appx3146 (emphasis added). The Board in conclusion, however, did not institute based on Northern Stamping's obviousness contentions. Instead, it instituted on a separate ground: whether the "claims 16, 17, and 19 [were] anticipated by Withers." Appx3148.

#### 4. Northern Stamping Petitioner's Reply Added No Relevant Substantive Evidence Notwithstanding the Board's Admonishment of Northern Stamping's Motivation Rationale.

In response to the Institution decision and Horizon's Patent Owner Response filed on May 17, 2022, Northern Stamping filed its Reply. Appx3166-3227 (Patent Owner Response); Appx3791-3827 (Northern Stamping's Reply).

Notwithstanding the Board's admonishment for failure to sufficiently explain a motivation-to-combine rationale, and Horizon's pointing-out of the same, Northern Stamping failed to supplement the record. *See* Appx3145-3146 (Petition); Appx3207-3210 (Patent Owner Response). Instead, Northern Stamping sought to shift the burden to Horizon to prove patentability. *See*, *e.g.*, Appx3813-3819 (Northern Stamping titling section "Horizon Has Not Established Nonobviousness" and asserting "Horizon Has Not Established a Lack of Motivation to Combine . . . ."). The only additional evidence of motivation-to-combine offered by Northern Stamping in its Reply was deposition testimony from its expert, Mr. Becker. Appx3818 (quoting Appx3396 (60:1-17); Appx3820 (quoting Appx3399-3400 (73:15-74:2)). But that testimony was immaterial because it was untethered to the time of invention. *Id.*

As Horizon pointed out in its Surreply, Northern Stamping did not meet ***its*** burden of proving obviousness including because Northern Stamping presented only conclusory arguments supported by conclusory evidence. Appx4512-4522.

**5. Horizon Proposed "Substitute Claims" With its Contingent Motion to Amend.**

Concurrently with Horizon's Patent Owner Response, Horizon filed a contingent Motion to Amend under 37 C.F.R. § 42.121 seeking substitution of independent Challenged Claim 16 with Substitute Claim 21 if the Board were to find claim 16 unpatentable. Appx 3228-3253. The Motion also sought substitution

of Challenged Claim 17 with Substitute Claim 22 if it were to find claim 17 unpatentable, and to cancel claims 18-20 if they were found to be unpatentable. Substitute Claim 21 retained all the features of Challenged Claim 16, while adding additional limitations Horizon contended were not disclosed by the references cited in Northern Stamping's Petition and that were supported by the original application from which the '585 patent claims priority. Appx3236-3246.

In relevant part, Northern Stamping responded to Horizon's Motion contending that the Substitute Claims were obvious over Withers '317 (US 7,828,317) in view of Fandrich. Appx3842. Withers '317, a U.S. patent claiming priority to May 30, 2008, purports to describe an "integrated support structure apparatus . . . provided for attaching either a fifth wheel trailer hitch or a gooseneck trailer hitch to a truck bed." Appx3863. Withers '317 is made from a "stamped-layer construction," with the "[t]ransverse members 28, 30 [being] fabricated as ***one piece*** with central bridging portion 32," as shown in Withers '317's Figure 1. Appx41 (emphasis added), Appx44. This allows Withers '317 to be "easily assembled." Appx3869 (1:38). Northern Stamping contended that a skilled artisan would have found it obvious to modify Withers '317 to include Fandrich's tubular cross members. Appx3844-3845.

Northern Stamping's obviousness analysis, however, only purported to explain how each limitation of the Substitute Claims was taught by either Withers

’317 and/or Fandrich. Appx3844-3853. The limited motivation to combine rationale Northern Stamping provided was the same type of conclusory rationale Northern Stamping provided in its Petition. *See* Appx3844-3845. In conclusory fashion, for example, Northern Stamping stated “tubular members were one of a few finite available options” and “would reflect simple substitution of one known element . . . for another . . . and such a modification would have been ‘obvious to try.’” *Id.* Northern Stamping also generally contended that Fandrich’s tubular cross members provide a “rigid support structure,” though not necessarily in combination with Withers ’317. Appx3845.

Like Northern Stamping itself, its expert Mr. Becker’s analysis focused only on whether each *element* of the Substitute Claims was present in Withers ’317 or Fandrich. Appx4490 (“All Limitations . . . Are Taught By *Withers ’317* In View Of *Fandrich*”). And also like Northern Stamping, Mr. Becker nominally articulated rationale but included no underlying explanation. For example, Mr. Becker submitted that Fandrich’s tubular members that are supposedly “designed to withstand substantial tensile and compressive strength . . . could exhibit sufficient strength compared to solid cross members.” Appx4493 (¶24) (citation omitted). Mr. Becker offered no evidence for this assertion, however, providing no basis for comparing the strength of a tubular member to a solid member. *Cf.* Appx3299 (¶121). Mr. Becker offered further conclusory statements such as “tubular

members have been used . . . for years," tubular members "would be readily available" at the time of invention, the proposed modification would have been a "simple substitution," and therefore it would have been "obvious to try." Appx4493-4494 (¶¶25-27). Finally, Mr. Becker opined that "design incentives" and "market forces" provide the needed motivation to combine, stating "other market forces ***may*** include reducing material and shipping costs achieved by the weight reduction of having a hollow, tubular structure with less material than a solid structure." Appx4494 (¶28) (emphasis added). Mr. Becker presented no evidence that substituting in Fandrich's tubular cross members in Withers '317 ***actually*** results in weight reduction, let alone material and shipping costs. And in contravention to the Northern Stamping's proposed combination, its own expert Mr. Becker testified that the Withers '317-Fandrich combination would unnecessarily complicate the manufacturing process. Appx4566 (30:7-31:22).

In Reply, as with the Challenged Claims, Horizon contended that Northern Stamping failed to meet its burden to prove unpatentability at least because Northern Stamping failed to explain, with evidence, the rational underpinnings for combining Withers '317 and Fandrich. Appx4546-4550.

#### 6. The Board's Final Written Decision

The Board issued its final written decision on February 9, 2023, holding, *inter alia*, the Challenged Claims unpatentable and denying Horizon's Motion to Amend as to the Substitute Claims. Appx46.

In the final written decision, the Board again noted that the "disputed issue is the reason for combining the references." Appx13. For the Challenged Claims, the Board noted four "rational underpinnings" to support its Works-Lindenman-Fandrich combination that supposedly "provide[s] versatility and additional attachment points for other accessories." Appx35.

The Board's *first* rationale was that "Works does not describe receiving kingpin/receiver hitches," and therefore cannot accommodate a fifth-wheel hitch. *Id.* The description of Works, however, does not factor in certain expert testimony putting the teachings of Works in context at the time of invention. *See* Appx14-17.

Its *second* rationale was "that versatility was a known motivation in the art. *Id.* The motivation to increase versatility is not specific, however, and bears no relation to any specific combination. *See* Appx20.

Its *third* rationale was "that the combination eliminates the need to purchase adapters." *Id.* The Board nowhere explains how the claimed system can accommodate a gooseneck (*i.e.*, a gooseneck coupler) or fifth-wheel (*i.e.*, a kingpin) hitch without an adapter. *See* Appx19-20.

And its *fourth* rationale was "that market forces were demanding a combined hitch." *Id.* The Board's "market forces" discussion only focused on the "*notion of combining the two socket types in one hitch*, not to any particular configuration of hitch that had such a combination." Appx22 n.15 (emphasis in original). Indeed, as to the general desire for "versatility," the Board found only "a desire to have a hitch that provides for both types of sockets," but not necessarily one that has the other claimed features. Appx23. Additionally, the Board's "market forces" discussion focused on the inventor's relationship with Ford, *i.e.*, the inventors' path to invention. Appx21-22, Appx35.

As to Horizon's arguments regarding objective indicia of nonobviousness, the Board ignored Horizon's proffered nexus evidence and determined that Horizon "has not established nexus and has not made a meaningful attempt to do so." Appx31 (citing Appx3822-3824). The Board further determined that there was no evidence of praise, commercial success, or copying, notwithstanding Horizon's objective indicia evidence and Northern Stamping's failure to present anything to the contrary. Appx32-34, Appx35.

The Board therefore concluded that "Petitioner has shown by a preponderance of the evidence that the ***subject matter*** of claim 16 would have been obvious in view of Works, Fandrich, and Lindenman." Appx35 (emphasis added).

The Board reached the same conclusion regarding the combination of Lindenman, Fandrich, and Works. Appx36.

The Board further denied Horizon's Motion to Amend to enter proposed substitute claims 21 and 22 based its determination that they would have been obvious over Withers '317 and Fandrich. Appx41, Appx46. The Board agreed with Northern Stamping, stating "Petitioner has shown that a person of ordinary skill in the art had a reason to select tubular-shaped structures [from Fandrich]—they were a known, suitable structure for hitch devices like Withers '317." Appx44.

Indeed, the Board stated Horizon "has not shown that, despite tubular-shaped members being known, a person of ordinary skill in the art would not select tube shapes for Withers '317 due to the specific nature of the alteration." Appx44.

Horizon appeals from the Board's decision in IPR2021-01411.

## V. SUMMARY OF THE ARGUMENT

The Board's obviousness analysis rested on several legal errors, is not supported by substantial evidence, and requires reversal, or at the very least, vacatur and remand.

As to the Challenged Claims, the Board's motivation to combine finding was legally erroneous for three reasons. ***First***, the Board failed to interpret the main references Works and Lindenman in context from the perspective of a skilled artisan at the time of invention. Instead, the Board substituted in its own reading of

the references, and ignored the pertinent expert testimony that each would have been known to accommodate both fifth-wheel and gooseneck hitch types. ***Second***, the Board's rationale focused only on the underlying idea of a hitch that could accommodate both hitch types. But because Works and Lindenman could each independently accommodate both hitch types, there would have been no reason to combine the references to achieve that dual functionality. Northern Stamping presented no sufficient rationale to combine the references and the Board erred in finding multiple rationales existed. ***Finally***, and even assuming the Board's readings of the references was correct, the Board focused on the dual functionality of accommodating both hitch types, but not on a specific configuration, erroneously focused on the "gist" of the claimed invention, and failed to appreciate the other features recited in the Challenged Claims and the invention as a whole. For at least these reasons, substantial evidence does not support the Board's motivation to combine findings.

The Board further erred in finding a motivation to combine where Northern Stamping did not provide one despite the Board's admonition that the Petition's purported rationales contained "little development, read "nearly identically," and that Northern Stamping "***still must***" provide motivation rationale with "rational underpinnings." Instead, the Board shifted the burden to Horizon to prove no motivation to combine and rebutted only Horizon's motivation arguments. In

effect, the Board reduced Northern Stamping's burden to prove obviousness from preponderance of the evidence (the IPR trial standard) to reasonable expectation of success (the institution standard).

As to the Substitute Claims, the Board's decision is likewise legally erroneous and not supported by substantial evidence. Northern Stamping failed to meet its burden to prove unpatentability of the Substitute Claims, presenting only conclusory expert testimony about motivation to combine Fandrich's tubular cross members with Withers '317. Specifically, Northern Stamping and its expert analyzed whether each claim limitation was present, but not whether the claimed invention, "as a whole," was obvious. Northern Stamping's proffered rationale is littered with buzzwords but not substance, throwing around phrases like "simple substitution" and "obvious to try" with no underlying explanation. Its motivation rationale also touts supposed general benefits of Fandrich's tubular members, but presents no underlying evidence that those benefits apply when combined with the structure disclosed in Withers '317. And like with the Challenged Claims, Northern Stamping again points to "market forces" and "design incentives." But those are speculative, and not supported by fact. Also, the Northern Stamping's Withers '317-Fandrich combination would destroy the very essence of Withers '317's, not allowing for fabrication "in one piece or . . . as a layered two-piece

structure." The Board erred in adopting Northern Stamping's reasoning and again shifting the burden to Horizon on motivation

Finally, the Board's decision regarding objective indicia of non-obviousness was legally erroneous. ***First***, the Board erred in finding a nexus did not exist although the claims are coextensive with the commercial product. Both Horizon's expert and named inventor compared the product drawing with the claims and patent figures, and concluded that the commercial product embodied each Challenged Claim limitation. Northern Stamping presented no contrary evidence. ***Second***, viewing each of the presented objective indicia with nexus being "at or near zero," the Board erred in rejecting Horizon's evidence of industry praise, commercial success, and copying.

This Court should reverse the Board, or at a minimum, vacate and remand the case to be decided under the correct legal standards.

## VI. STANDARD OF REVIEW

This Court reviews the Board's legal determinations *de novo* and the Board's factual findings underlying those determinations for substantial evidence. *In re Elsner*, 381 F.3d 1125, 1127 (Fed. Cir. 2004); *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). "Substantial evidence is more

than a mere scintilla" and "[m]ere uncorroborated hearsay or rumor does not constitute substantial evidence." *Gartside*, 203 F.3d at 1312 (quoting *Consol. Edison*, 305 U.S. at 229-30). The substantial evidence standard asks "whether a reasonable fact finder could have arrived at the agency's decision," and "involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *Id.* If there is no evidence on an issue, "the party with the burden loses." *Dynamic Drinkware, LLC v. Nat'l Graphic, Inc.*, 800 F.3d 1375, 1379 (Fed. Cir. 2015) (citation omitted).

Obviousness is a question of law based on factual findings including "the scope and content of the prior art, differences between the prior art and the claims at issue, the level of ordinary skill in the pertinent art, and any objective indicia of non-obviousness." *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013). "An obviousness determination requires finding that a person of ordinary skill in the art would have been motivated to combine or modify the teachings in the prior art and would have had a reasonable expectation of success in doing so." *Regents of Univ. of Cal. v. Broad Inst., Inc.*, 903 F.3d 1286, 1291 (Fed. Cir. 2018). "Whether a person of ordinary skill in the art would have been motivated to modify or combine teachings in the prior art, and whether he would have had a reasonable expectation of success, are questions of fact." *Id.* (quoting *In re Stepan Co.*, 868 F.3d 1342, 1346 (Fed. Cir. 2017)).

Where the Board "relie[s] on erroneous reasoning in making the factual determinations," those factual findings are not supported by substantial evidence. *In re Huai-Hung Kao*, 639 F.3d 1057, 1065 (Fed. Cir. 2011). "[A]gency expertise cannot substitute for record evidence." *Brand v. Miller*, 487 F.3d 862, 868-69 (Fed. Cir. 2007).

## VII. ARGUMENT

### A. The Board's Motivation to Combine Finding Was Legally Erroneous and Not Supported by Substantial Evidence.

The Board's motivation to combine finding was erroneous for three reasons. *First*, as a preliminary matter, the Board failed to interpret the references in context from the perspective of a skilled artisan at the time of invention. *Second*, both main references, Works and Lindenman, as understood by a skilled artisan at the time of invention, could accommodate both fifth-wheel and gooseneck hitch types. Therefore, there would have been no reason to combine the features of both references into a single device, regardless of which reference is the primary reference. Northern Stamping presented no sufficient rationale for doing so, in any event. *Finally*, and even assuming that the Board's readings of the references reflected that of a skilled artisan at the time of invention, the Board erroneously focused on the "gist" of the claimed invention, failing to appreciate the other features recited in the Challenged Claims and the invention as a whole. For at least these reasons, substantial evidence does not support the Board's motivation to

combine findings, and Northern Stamping did not otherwise prove the claims unpatentable as obvious by a preponderance of the evidence.

#### 1. The Board Failed to Consider the References from the Perspective of a Skilled Artisan at the Time of Invention and Instead Inserted its Own Interpretation of the References.

As a preliminary matter, the Board failed to consider the references' teachings from the perspective of a skilled artisan at the time of invention. Instead, the Board relied on its own interpretation of the references, violating the Administrative Procedure Act. *See Brand*, 487 F.3d at 869-71. This is reversible error.

Section 103 requires evaluating the asserted references from the perspective of a person of ordinary skill in the art, and in the context of what is generally known in the art, "at the time of invention." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1310 (Fed. Cir. 2010); *In re Taylor Made Golf Co.*, 589 F. App'x 967, 971 (Fed. Cir. 2014) (nonprecedential). In considering the teachings of a reference, it is proper to consider more than the reference's specific teachings. *In re Preda*, 401 F.2d 825, 826 (C.C.P.A. 1968). Indeed, prior art ***must*** be read "in context, taking account of 'demands known to the design community,' 'the background knowledge possessed by a person having ordinary skill in the art,' and 'the inferences and creative steps that a person of ordinary skill in the art would employ.'" *Randall Mfg.*, 733 F.3d at 1362 (quoting *KSR*, 550 U.S. at 418); *Crocs,*

598 F.3d at 1310. Failure to review the references in context at the time of invention is reversible error. In *Taylor Made*, for example, this Court vacated a decision because the Board did "not consider the prior art in the context of the background knowledge that a person of ordinary skill in the art would have had." *Taylor Made*, 589 F. App'x at 971.

Like in *Taylor Made*, the Board erred here and failed to "take account of all the evidence of record, including that which detracts from the conclusion the agency ultimately reache[d]." *Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1325 (Fed. Cir. 2017). As to Works, the Board ignored how a skilled artisan would have understood Works *at the time of invention*, and instead substituted its own reading of the reference. Appx14-17; *see Brand*, 487 F.3d at 868-69 ("[A]gency expertise cannot substitute for record evidence."); *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1376 (Fed. Cir. 2016). Specifically, the Board ignored and misinterpreted expert testimony about Works' teachings. *E.g.*, Appx4212-4213 (66:24-67:1) (Mr. Walstrom agreeing with Northern Stamping's counsel "that Works allows for the use of both types of hitches, fifth wheel and gooseneck"). Indeed, the final written decision section discussing Works' teaching cites no competing evidence to that put forth by Horizon. Appx13-17. The Board's reading of the references cannot supplant the record evidence. *See Brand*, 487 F.3d at 868-69.

The Board inappropriately criticizes Horizon's evidence. Appx14-17. Horizon used a product catalog from Works' assignee to demonstrate the full context of what was understood in the art at the time of invention. Appx3290-3291. While the catalog itself is not prior art, together with Horizon's expert's testimony, it exemplifies the context in which Works should have been understood. The final written decision does not indicate that the Board's lay-person understanding of Works is consistent with how a skilled artisan would have understood the reference at the time of invention.

As to Lindenman, the Board stated "Lindenman itself does not suggest using both types of sockets"—goosenecks and fifth wheels—ignoring both Lindenman's express language and expert testimony about what it would suggest to a skilled artisan at the time of invention. Appx20. Rather, as explained in greater detail below, Lindenman touts its versatility in being able to connect accessories including "a fifth wheel hitch assembly" and "a gooseneck hitch assembly." Appx2836 (1:46-52). Horizon's expert testimony on this issue is consistent with Lindenman's express teachings. Appx4335 (189:11-16); Appx3293-3294 (¶¶106-08). The Board's analysis is incorrect and its failure to consider the references from the proper perspective is legally erroneous.

**(a) A Skilled Artisan Would Have Understood Lindenman to Accommodate Both Gooseneck and Fifth-Wheel Hitches.**

In context, at the time of invention, a person of ordinary skill in the art would have understood Lindenman as being able to accommodate both gooseneck and fifth-wheel hitches. Appx3278-3279 (¶ 75). Lindenman touts "unparalleled versatility" and Lindenman's supposed "significant advance in the art" is its ability to connect to numerous accessories including "a fifth wheel hitch assembly" and "a gooseneck hitch assembly." Appx2836 (1:46-52). This is further supported by expert testimony and the prosecution history of the '585 patent.

Horizon's Mr. Walstrom testified that Lindenman could accommodate both gooseneck and fifth-wheel hitches. For instance, Mr. Walstrom stated that the "hitch mounting system of Lindenman can accommodate both fifth-and goose type hitches. Therefore, Lindenman can accommodate a variety of accessories already without any modifications or enhancements . . . ." Appx4335 (189:11-16) (discussing Appx3294 (¶108)). In support of this opinion, Mr. Walstrom referenced cataloges advertising Horizon's Reese® Signature Series line, cited during the prosecution of the '585 patent, showing the accessories Lindenman would have used to accommodate gooseneck and fifth-wheel hitches. Appx3293-3294 (¶¶106-07) (citing Appx2273 & Appx2408). These accessories are consistent with Northern Stamping's expert's testimony, where Mr. Becker stated that Lindenman could accommodate a gooseneck hitch by using "a structure that went into the four receivers and then suspended a goose ball"—the same type of

structure shown in the Reese® catalogs during prosecution. Appx3399 (73:9-14); *see also* Appx2408.

The record therefore establishes that a skilled artisan at the time of invention would recognize the Lindenman hitch mounting system as being able to accommodate both fifth-wheel and gooseneck type hitches.

**(b) A Skilled Artisan Would Have Understood Works to Accommodate Both Gooseneck and Fifth-Wheel Hitches.**

Like Lindenman, a skilled artisan would have understood Works in context as being able to accommodate both gooseneck and fifth-wheel hitches. Appx3290 (¶¶97-99). Mr. Walstrom testified to this effect. He was asked if he "agree[s] that Works allows for the use of both types of hitches, fifth wheel and gooseneck." Appx4212-4213 (66:24-67:1). Mr. Walstrom agreed, though acknowledging that it does so in a different way than the Challenged Claims —with "[t]he fifth wheel hitch mount[ing] to the center of the Works patent." Appx4213 (67:2-6). Northern Stamping's counsel again asked Mr. Walstrom, "[s]o Works allows for the use of a gooseneck hitch and a fifth wheel hitch, correct?" to which Mr. Walstrom responded "Yes[.]" Appx4213 (67:18-20). While Mr. Walstrom does refer to the B&W catalog from 2021, the Catalog is not the basis for his testimony. Rather, he was only saying that the catalog exemplified what a skilled artisan would have thought at the time of invention. Appx4213 (67:18-21).

Mr. Walstrom further provided context as to what was generally known in the art at the time of the invention." *See Taylor Made*, 589 F. App'x at 971. In 2006, Mr. Walstrom, like a skilled artisan at the time of invention, was "aware" that a fifth-wheel Companion that could attach to the products shown in Works "existed as a normal course of business." Appx4272 (126:6-25).

This context provided by Mr. Walstrom is supported by the website of Works' assignee, B&W. The Works patent has a 2003 filing date. Appx2807. B&W's website states that a "few years later," after the development of its Turnoverball hitch noted on the face of the Works patent, B&W "applied the same concepts to fifth-wheel hitches. Using the same under-bed mounting hardware and hole in the bed, [B&W] designed a Companion with a single point attachment that was removable when not towing." Appx3276-3277 (¶67) (Walstrom declaration citing B&W website https://www.bwtrailerhitches.com/our-story); Appx2807 (Works patent noting at least one model of B&W's Turnover Ball Gooseneck Hitch was on sale prior to July 31, 2002). Notwithstanding B&W's website, Mr. Walstrom also "understood from [his] experience in the industry, being at shows, understanding the market[] . . ., that these type of products [that allowed Works to accommodate fifth-wheel hitches] were available in the industry prior to 2009." Appx4273 (127:6-9).

The record therefore establishes that Works and Lindenman, as understood by one of ordinary skill in context at the time of invention, could accommodate both fifth-wheel and gooseneck type hitches.

**2. Northern Stamping Failed to Articulate a Proper Motivation to Combine Rationale and the Board Ignored Northern Stamping's Failure.**

Despite Northern Stamping's failure to carry its burden, the Board proffered four rationales for combining the cited references: (1) "that Works does not describe receiving kingpin/receiver hitches," (2) "versatility was a known motivation in the art," (3) "the combination eliminates the need to purchase adapters," and (4) the supposed "market forces were demanding a combined hitch"—one that could accommodate both gooseneck and fifth-wheel hitches. Appx35. None can stand, however, because each is unsupported by evidence and/or not in accord with this Court's precedent.

As to the Board's first rationale, because both Works and Lindenman could each accommodate gooseneck and fifth-wheel hitches, there would have been no motivation to combine the references (including Fandrich) at the time of invention to achieve the dual functionality. That cherry-picked aspects of the references perhaps could have been combined is of no moment. Rather, the obviousness inquiry instead asks whether "[skilled artisans] would have been motivated to do so." *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir.

2014). This Court's precedent does not require that references accomplish the ***same*** functions to dispense with any motivation to combine. The references need only "accomplish ***similar*** functions." *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1369 (Fed. Cir. 2012) (agreeing that there was "no reason to combine the features of [two] devices into a single device" where "both . . . references independently accomplish ***similar*** functions.") (emphasis added).

Here, as explained above, a skilled artisan would have understood Works and Lindenman as able to accommodate both gooseneck and fifth-wheel hitches, and thus have sufficiently similar functions to negate any motivation to combine them to achieve the dual functionality. Mr. Walstrom testified to this effect. When asked whether his opinion was "that there was no motivation to modify Works because Works was already capable of accepting both a fifth wheel hitch and a gooseneck," Mr. Walstrom agreed, stating that it was B&W's solution "which has been successful." Appx4313 (167:19-24). It is therefore only with the benefit of impermissible hindsight, using the claims as a roadmap, that a skilled artisan would have combined Works and Lindenman to achieve the Challenged Claims.

The third reference in the proffered combination is Fandrich. Fandrich, however, was only cited "for avoidance of doubt" as to whether the prior art taught the use of tubular members. Appx4777 (5:9-22). But, as Northern Stamping argued and the Board found, Fandrich was not material to the obviousness inquiry.

Appx4777 (5:9-22); Appx24-26. Therefore, Fandrich is not addressed here, and Horizon submits that if there is no motivation to combine the main references, Works and Lindenman, then adding Fandrich to the mix does not remedy the deficiencies of the Works-Lindenman combination. Northern Stamping failed to proffer a non-conclusory motivation to combine Fandrich with Works and/or Lindenman in any event. *See* Appx3145-3146.

As to the Board's *second* rationale, versatility is no rationale at all and is legally insufficient. In *ActiveVideo*, the accused infringer testified that the claimed invention would have been obvious because a skilled artisan wanted to "build[] something better," "more efficient, cheaper," that "had more features," and was "more attractive to . . . customers." *ActiveVideo Networks Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1328 (Fed. Cir. 2012). This Court ruled the evidence insufficient to support an obviousness determination, characterizing the expert testimony as "generic and bear[ing] no relation to any specific combination of prior art elements." *Id.* As the Court stated, the testimony failed "to explain why a person of ordinary skill in the art would have combined elements from specific references *in the way the claimed invention does*." *Id.* (emphasis in original) (citing *KSR*, 550 U.S. at 418).

The general desire for increased versatility is akin to the desire to "build something better," and is similarly insufficient. Appx20 (citing Appx2836 (1:46-

52)); *ActiveVideo*, 694 F.3d at 1328. Mr. Becker's expert declaration defines "versatile" as being "capable of mounting a variety of different accessories—including fifth-wheel and gooseneck hitches." Appx2753 (¶84); Appx2780 (¶134). But that alone does not explain why a motivation existed to combine the prior art elements from the cited references in the same way as the claimed invention. *ActiveVideo*, 694 F.3d at 1328. The "versatile" language bears no relation to any specific combination of prior art elements.

As to the Board's *third* rationale, the combination of Works and Lindenman does not eliminate the need to purchase adapters. The claimed invention itself contemplates the need for adapters and does not "natively" adapt to gooseneck and fifth-wheel hitches. For example, Claim 16 recites "said receiving members configured to engage a leg of a fifth wheel hitch." Appx154. The fifth-wheel hitch itself, which includes a "head assembly for receiving a king pin on a trailer," is not part of the claimed invention. Appx151 (1:62-64). Rather, it is an adapter that may be secured to the claimed system so that, for example, a truck may tow a trailer having a king pin. *See* Appx150 (FIG. 7 showing fifth-wheel hitch 55 in phantom adapted to fit onto the claimed underbed hitch mounting system 10); *see also* Appx152 (3:8-11& 3:27-29). Likewise, Lindenman, using the term "accessories," requires adapters to achieve its supposed "versatility," including its ability to accommodate fifth-wheel and gooseneck hitch assemblies. Appx2836 (1:46-54).

Additionally, the Board's apparent disdain for adapters cannot be squared with its statement about the desire for increased versatility. The supposed motivation for increased versatility comes from Lindenman, which states that its system offers "unparalleled versatility since one may mount a number of different vehicle accessories to the vehicle through the mounting system." Appx2836 (1:46-49). Such accessories, Lindenman continues, include "a fifth wheel hitch assembly, a gooseneck hitch assembly and an article anchor or carrier such as a bike rack, a motorcycle stand or other useful device." Appx2836 (3:49-54). It cannot plausibly be asserted that the claimed invention, or any of the cited references could accommodate a bike or motorcycle without an adapter to do so. These hitch systems cannot even accommodate a fifth wheel without an adapter. *See* Appx150; *see also* Appx152 (3:8-11 & 3:27-29). Therefore, the supposed motivation to combine the cited references cannot be based on the desire to eliminate the need to purchase adapters.

Finally, the Board's *fourth* rationale based on the supposed "market forces" is inadequate because, as explained further below, it focuses on the inventors' actual path to invention, and the supposed "market forces" only went to the general idea of having a hitch able to accommodate both a fifth wheel and gooseneck. Appx35; *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1296 (Fed. Cir. 2012) ("The inventor's own path itself never leads to a conclusion of obviousness; that is

hindsight."). The supposed "market forces," did not provide "why a person of ordinary skill in the art would have combined elements from specific references *in the way the claimed invention does*." *ActiveVideo*, 694 F.3d at 1328 (emphasis in original) (citing *KSR*, 550 U.S. at 418).

### 3. The Board Improperly Focused on the "Gist" of the Claimed Invention and Failed to Consider it as a Whole in Determining that the Claimed Invention Would Have Been Obvious.

The Board failed to consider the entirety of the invention, and instead improperly focused on only the general underlying idea—a hitch that could accommodate both a gooseneck and fifth wheel. *E.g.*, Appx22 n.15, Appx35.

As the statute commands, obviousness must be determined after considering the invention "as a whole," and the claims in their entirety. *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1567 (Fed. Cir. 1983); pre-AIA 35 U.S.C. § 103. "[W]hen determining obviousness there is no legally recognizable or protected 'essential,' 'gist,' or 'heart' of the invention." Loctite Corp. v. Ultraseal Ltd., 781 F.2d 861, 874-75 (Fed. Cir. 1985), *overruled on other grounds by Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059 (Fed. Cir. 1998). Here, the Board should have, but did not, consider whether it would have been obvious to combine the references to accommodate both gooseneck and fifth-wheel hitches *in the structure defined by the claims*. *Id.*

Analyzing the invention "as a whole," and not its "gist," guards against impermissible hindsight. "[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418. Without the "as a whole" requirement, "an obviousness assessment might break an invention into its component parts (A + B + C), then find a prior art reference containing A, another containing B, and another containing C, and on that basis alone declare the invention obvious." *Ruiz v. A.B. Chance Co.*, 357 F.3d 1270, 1275 (Fed. Cir. 2004). This hindsight-enabled reasoning of using the invention as a roadmap, "would discount the value of combining various existing features or principles in a new way to achieve a new result—often the very definition of invention." *Id.* The "as a whole" assessment requires a showing that the skilled artisan "at the time of invention, confronted by the same problems as the inventor and with no knowledge of the claimed invention, would select the various elements from the prior art and combine them in the claimed manner." *Id.*

The Board here failed to consider the entirety of the invention, and instead focused only on the "*notion of combining the two socket types in one hitch*, not to any particular configuration of hitch that had such a combination." Appx22 n.15 (emphasis in original). The Board explained that the "market forces were demanding a combined hitch," not the combination of elements as claimed.

Appx35. The market forces invoked by the Board are immaterial, however. First, the actual path to invention is irrelevant. Indeed, this Court has cautioned that "[t]he inventor's own path itself never leads to a conclusion of obviousness; that is hindsight." *Otsuka*, 678 F.3d at 1296. And second, the supposed market forces, if anything, only went to the general idea of combining hitch types (*i.e.*, the "gist"), and not the whole invention as claimed. *E.g.*, Appx3958 (61:6-20). The Board, however, ignored the evidence and law on this issue, focusing on Ford's relationship with the inventors and ignoring the limitations of Ford's contributions.

The Board reasoned that "Patent Owner did not come up with the notion of combining the hitch types, and instead it was known market forces that led to Ford asking [Horizon] to design a product with that feature." Appx35. That, however, is an improper, hindsight-driven analysis. *Otsuka*, 678 F.3d at 1296. While Ford may have asked for the combined hitch, Ford did not provide how to achieve it. As Inventor Stanifer testified, "Sean Withers [Ford's liaison to Horizon] had zero say in the design, what it ended up looking like. The only information he had the final say in was if it fit in their package." Appx3939 (42:2-5). *See also* Appx3958 (61:6-20). Rather than dictating the ultimate design, Ford only provided specifications, like "the SAE J2638 testing requirements, as well as all of the Ford design requirements for heat zones, clearance areas, mounting to the frame, and fitting . . . to [Ford's] frame system." Appx3943-3944 (46:22-47:1); *see also* Appx3947

(50:15-22), Appx3956-3957 (59:17-60:1). According to Inventor Stanifer, "[t]hat was all Mr. McCoy and myself." Appx3958 (61:6-20).

The focus on the claimed invention's "gist" becomes more evident in the Board's copying discussion. There, the Board states Horizon "cannot also assert that no one else has thought to combine socket types into one hitch." Appx23. Notably absent, however, is any discussion of the other claim limitations. And the Board's generalization was not Horizon's argument. Rather, as explained above, both Works and Lindenman, understood in context at the time of invention, could both accommodate gooseneck and fifth-wheel hitches and there was therefore no reason to combine them to achieve this dual functionality. Appx3210-3216 (Patent Owner Response); Appx4514-4516 (Patent Owner Surreply). Additionally, the copying referenced in the Board's citation is about a product contended to be sold by Northern Stamping to General Motors for the Chevy Silverado that was developed after GM saw Ford's success with Horizon's product. Appx22-23 (citing Appx3223-3224 and Appx3301-3302 (¶127)). If anything, this copying (of not just the dual functionality, but also, allegedly, the other Challenged Claim limitations) is evidence of *non-obviousness*.

**4. The Board's obviousness determination was not based on substantial evidence.**

The Board's obviousness determination was not based on substantial evidence. *First*, instead of considering the claimed invention as a whole, Northern

Stamping's expert analyzed each *element* of the claims to determine if the element was rendered obvious. Appx2758-2773, Appx2780-2789; *see*, *e.g.*, Appx2758 ("Each ***Element*** of Claim 16 is Rendered Obvious . . .") (emphasis added). Northern Stamping made the same blunder in its Petition. Appx95-109, Appx116-125; *see*, *e.g.*, Appx95 ("Each ***Element*** of Claim 16 is Rendered Obvious . . .") (emphasis added). This Court has repeatedly warned against this type of hindsight-driven analysis. *E.g.*, *Ruiz*, 357 F.3d at 1275; *InTouch Techs.*, 751 F.3d at 1349 (explaining it is improper to combine references "like separate pieces of a simple jigsaw puzzle"). Nowhere, did Northern Stamping or its expert opine or present evidence that a skilled artisan, considering the claimed invention as a whole, would have thought it would have been obvious. *See* pre-AIA 35 U.S.C. § 103.

*Second*, Northern Stamping's expert provided only conclusory expert testimony as to why a skilled artisan at the time of invention would have combined these elements. Appx2752-2756, Appx2775-2778 (¶¶82-87, ¶¶124-29); *see Magnum Oil*, 829 F.3d at 1380 ("To satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements."). And as this Court's precedent makes clear, "[c]onclusory expert testimony does not qualify as substantial evidence." *TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1358-59 (Fed. Cir. 2019) (collecting cases). Indeed, these conclusory statements are near verbatim of the Petition's proffered motivation rationale, which, as discussed

further below, the Board itself characterized as "rote recitation of formulaic, canned statements." Appx89-93, Appx111-14 (Petition); Appx3145 (Institution Decision). Accordingly, Northern Stamping did not meet its burden to prove obviousness and there is no "substantial evidence" on which the Board could have based its motivation finding or obviousness determination. It was improper for the Board to fill in the gaps to make up for Northern Stamping's failure of proof, and to use the challenged patents as a roadmap to create a rationale to combine. *See, e.g.*, *Brand*, 487 F.3d at 869-71.

**B. The Board Wrongly Shifted the Burden to Horizon, Reduced Northern Stamping's Burden to Prove Obviousness, and Found a Motivation to Combine Despite Northern Stamping's Failure to Provide One.**

In finding a motivation to combine where Northern Stamping did not sufficiently provide one, the Board shifted the burden to Horizon to prove no motivation to combine and effectively reduced Northern Stamping's burden to prove obviousness by a preponderance of the evidence to one of reasonable likelihood of success—the same standard as that used at the institution stage. *Compare* IPR Trial Standard 35 U.S.C. § 316(e) to Institution Standard 35 U.S.C. § 314(a).

Institution places a "qualitatively" lower burden on the petitioner than that needed to prevail in a final written decision. *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016) (comparing § 314(a) with § 316(e)); *Hulu v.*

*Innovations*, No. IPR2018-01039, 2019 WL 7000067, at *5 (P.T.A.B. Dec. 20, 2019) (precedential). "[T]here is a significant difference between a petitioner's burden to establish a 'reasonable likelihood of success' at institution, and actually proving invalidity by a preponderance of the evidence at trial." *Trivascular*, 812 F.3d at 1068. Here, the Board failed to appreciate that difference and effectively lowered Northern Stamping's burden to prove unpatentability.

According to the Board, Northern Stamping's IPR Petition provided only a "nominal" articulation of six *KSR* obviousness rationales with "little development" and "each read[ing] nearly identically." Appx3142, Appx3145; Appx92-93. The rationales were insufficient and supported by a conclusory, almost word-for-word duplication of Northern Stamping's expert declaration. Appx2755-2756. While the Board ultimately found Northern Stamping's rationale sufficient for "purposes of institution," it warned, citing this Court's *Orthokinetics* opinion, that Northern Stamping "***still must*** provide a reason with rational underpinning as to why a person of ordinary skill, without the benefit of hindsight, would have considered the claimed invention obvious." Appx3145-3146 (emphasis added) (citing *Orthokinetics*, 806 F.2d at 1575). As the Board further acknowledged, rationales used to explain why there was a motivation to combine certain references cannot be "rote recitation[s] of formulaic, canned statements." *Id*. (citing *KSR*, 550 U.S. at

415). Rather, "[a] rationale is an *explanation* as to why the claimed invention is obvious." *Id.* (emphasis in original).

Notwithstanding the Board's admonition of Northern Stamping's deficient rationale, Northern Stamping did not heed the Board's warning. Northern Stamping's further developments of the record on the motivation to combine issue fell well short of the Board's instructions: Northern Stamping did not provide an *explanation* as to why a skilled artisan would have been motivated to combine the references in the same way as recited in the Challenged Claims. *See Orthokinetics*, 806 F.2d at 1575.

Instead, Northern Stamping sought to shift the burden on motivation to combine to Horizon, focusing its IPR Reply brief on why Horizon had not established a lack of motivation. Appx3813-3820; *see Dynamic Drinkware*, 800 F.3d at 1378-79 (discussing that the burden of persuasion never shifts to Patent Owner in an IPR). With Northern Stamping's attention focused on improper burden shifting, its only additional evidence on motivation was untethered to any time period, and specifically untethered to motivation *at the time of invention*. *See* Crocs, 598 F.3d at 1310. Specifically, the only additional evidence Northern Stamping presented in its Reply, beyond that in its Petition, was two unhelpful stanzas of testimony from its expert, Mr. Becker. Appx3818 (quoting Appx3396 (60:1-17); Appx3820 (quoting Appx3399-3400 (73:15-74:2)). But Mr. Becker's

cited testimony, in which he was asked about how to improve the supposed prior art, did not provide the additional explanation required by the Board because it was untethered to the "***time of invention***." Appx3818 (quoting Appx3396 (60:1-17); Appx3820 (quoting Appx3399-3400 (73:15-74:2)). None of the cited testimony was tied to what a skilled artisan would have thought during the relevant time period (i.e., 2008-2009).

Everything else Northern Stamping included in the motivation to combine sections of its Reply was already considered in the Institution Decision and therefore deemed having only "little development" but enough "for purposes of institution," or was attorney argument that is not evidence at all. Appx3145-3146; *see Gemtron Corp. v. Saint-Gobain Corp.*, 572 F.3d 1371, 1380 (Fed. Cir. 2009) (reasoning that a party's "unsworn attorney argument … is not evidence" and thus cannot rebut record evidence). Thus, Northern Stamping never corrected the deficiencies of its Petition in response to the Board's warning that explanation of its motivation rationale was needed. Yet, the Board failed to hold in its final written decision that Northern Stamping had not met its burden under the "qualitatively" higher standard of preponderance of the evidence. *See Trivascular*, 812 F.3d at 1068. The Board effectively lowered Northern Stamping's burden of proving the claims unpatentable as obvious then substituted its own arguments in lieu of sufficient evidence and explanation from Northern Stamping. Appx18-23.

The final written decision does not rely on any explanation put forth by Northern Stamping beyond that in the Petition. Instead, the Board focused its energy on rebutting Horizon's arguments for why there was no motivation without first finding Northern Stamping met its burden to show unpatentability by "*explain[ing]* . . . why the claimed invention is obvious." Appx3145. This burden-shifting by the Board flies in the face of black letter law and the Board's conclusion in the Institution Decision.

In holding the Challenged Claims unpatentable without a sufficient showing by Northern Stamping, the Board shifted the burden to Horizon and effectively applied the wrong standard (likelihood of success rather than preponderance of the evidence), lowering Northern Stamping's burden to prove unpatentability. This was error and a violation of the Board's mandate under the APA. *See Brand*, 487 F.3d at 868-69 ("[A]gency expertise cannot substitute for record evidence.").

### C. Like the Board's Analysis of the Challenged Claims, Its Analysis of the Substitute Claims is Legally Erroneous and Not Supported by Substantial Evidence.

The Board's obviousness determination of Substitute Claims 21 and 22 was not based on substantial evidence because Northern Stamping presented none. The Board "must make the necessary findings and have an adequate 'evidentiary basis for its findings.'" *In re Nuvasive*, Inc., 842 F.3d 1376, 1382 (Fed. Cir. 2016). Additionally, the Board "'must examine the relevant data and articulate a

satisfactory explanation for its action including a rational connection between the facts found and the choice made.' . . . [I]t is not adequate to summarize and reject arguments without explaining why the [Board] accepts the prevailing argument." *Id*. at 1382-83. And as IPR petitioner, it was Northern Stamping's burden to prove the unpatentability of the Substitute Claims. *Aqua Prods.*, 872 F.3d at 1303. This burden never shifted to patent owner, Horizon. *See Dynamic Drinkware*, 800 F.3d at 1378-79.

The Board here ruled the Substitute Claims unpatentable as obvious over Withers '317 and Fandrich. Appx41-46. Northern Stamping asserted "that it would have been obvious to modify the transverse members of Withers '317 to be tubular, as taught in Fandrich." Appx42. The Board agreed, stating "Petitioner has shown that a person of ordinary skill in the art had a reason to select tubular-shaped structures—they were a known, suitable structure for hitch devices like Withers '317." Appx44. Northern Stamping's motivation-to-combine evidence, however, is not supported by rational underpinnings but rather only conclusory expert testimony with no explanatory or evidentiary support. And the Board's conclusion, having relied on Northern Stamping's deficient evidence, is not supported by substantial evidence.

First, Northern Stamping's expert did even less analysis for the Substitute Claims than for the Challenged Claims. Mr. Becker engaged in a hindsight-driven

analysis, focusing only on whether each *element* of the Substitute Claims was present in Withers '317 or Fandrich. Appx4490-4503 ("All Limitations . . . Are Taught By *Withers '317* In View Of *Fandrich*"). This approach to obviousness, as stated by this Court, discounts "the value of combining various existing features or principles in a new way to achieve a new result—often the very definition of invention." *Ruiz*, 357 F.3d at 1275. While Mr. Becker did attempt to offer rationale for combining the references, they were the same type of "formulaic, canned statements" the Board said were sufficient "for purposes of institution." Appx3145-3146.

Second, Mr. Becker's nominally-articulated rationale included no underlying explanation. For example, Mr. Becker submitted that Fandrich's tubular members that are supposedly "designed to withstand substantial tensile and compressive strength . . . could exhibit sufficient strength compared to solid cross members." Appx4493 (¶24) (citation omitted). He offered no evidence for this assertion, however, providing no basis for comparing the strength of a tubular member to a solid member. *Cf.* Appx3299 (¶121). Mr. Becker left it to the imagination, stating only that it is possible that tubular cross members "***could*** exhibit sufficient strength compared to solid cross members." Appx4493 (¶24) (emphasis added). He also provided no analysis of whether Fandrich's tubular cross members combined with

the remainder of Withers '317 ***would*** "exhibit sufficient strength" when compared with Withers '317 standing on its own.

Third, Mr. Becker offered further conclusory statements such as "tubular members have been used . . . for years," tubular members "would be readily available" at the time of invention, the proposed modification would have been a "simple substitution," and therefore it would have been "obvious to try." Appx4493-4494 (¶¶25-27). These conclusory statements are, however, devoid of explanation and context. While tubular members may have been generally known in the art, there is no evidence that such members were, or would have been, used with the one-piece, stamped structure of Withers '317. *See* Appx44 (the Board describing Withers '317 as having a "stamped-layer construction"). Likewise, there is no explanation regarding the "simple substitution." That is, there is no explanation for why someone would have dismantled a completed, one-piece system such as Withers '317 and replaced the cross members with tubular versions that cannot be stamped along with the remaining portion of Withers '317, unnecessarily complicating the manufacturing process. Appx4566 (30:7-31:22). Mr. Becker's conclusory testimony does not even show Withers '317 ***could*** be combined with Fandrich's tubular members, let alone that a skilled artisan would have been motivated to do so. *See* Appx43 (citing *Adidas AG v. Nike, Inc.*, 963 F.3d 1355, 1359 (Fed. Cir. 2020).

Finally, Mr. Becker opined that "design incentives" and "market forces" provide the needed motivation to combine. Appx4494 (¶28). The only example on this point is, again, based on mere possibilities and is divorced from the realities of the proposed combination: "other market forces ***may*** include reducing material and shipping costs achieved by the weight reduction of having a hollow, tubular structure with less material than a solid structure." Appx4494 (¶28) (emphasis added). Mr. Becker presented no evidence that substituting in Fandrich's tubular cross members in Withers '317 ***actually*** results in weight reduction, let alone material and shipping costs. If one is making this substitution, does one just remove material from Withers '317 cross members to make them "tubular"? Does a tubular cross member need to have a larger perimeter around the cross section, and thus require more starting material than a solid cross member to provide the same strength? *Cf.* Appx3298 (¶¶118-19). These questions are all left unanswered because Mr. Becker's comments about "design incentives" and "market forces" are wholly unsupported.

Mr. Becker also ignored the "design incentives" and "market forces" that cut against using Fandrich's tubular members with the Withers '317 design. For example, Mr. Becker fails to mention potential added manufacturing cost needed to hollow a solid cross member to create the tubular shape, breaking the one-piece design of Withers '317, and then permanently attaching Fandrich's tubular

members to the remainder of Withers ’317. *Cf.* Appx3298 (¶¶118-19). Instead, Mr. Becker speculated only about the potential cost savings from reducing material and shipping costs based on that reduction. Appx4494 (¶28).

The Board blundered in adopting Northern Stamping’s and Mr. Becker’s reasoning. The Board stated that skilled artisans “had a reason to select tubular shaped structures” because “they were a known, suitable structure for hitch devices ***like*** Withers ’317.” Appx44. But as explained above, this statement is only supported by conclusory expert testimony with no explanatory or evidentiary support. *See* Appx4492-4494 (¶¶24-28). In particular, there is no evidence that the tubular cross members were a “suitable structure” for Withers ’317, not just some hypothetical hitch structure “like” it. *See Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1051 n.15 (Fed. Cir. 2016) (en banc) (noting that, even if a reference “does not teach away, its statements regarding users preferring other forms of switches are relevant to a finding regarding whether a skilled artisan would be motivated to combine the slider toggle in” that reference with the invention of a second reference). Indeed, they were not. The evidence the Board relied on – Mr. Becker’s conclusory testimony – does not show Withers ’317 ***could*** be combined with Fandrich’s tubular members. *See* Appx43 (citing *Adidas*, 963 F.3d at 1359). It is not Horizon that read “too much into isolated statements made in the case law,” as the Board contends. Appx43. Rather, it is the Board that extrapolated Northern

Stamping's motivation rationales beyond that presented. *See* Appx3145 (Institution Decision stating that although "there is little development of [the motivation rationales] in the Petition . . . we understand that Petitioner is essentially stating that it would have been obvious to add the mounts of Lindenman to Works . . . .").

Moreover, the "stamped-layered construction of Withers '317" weighs against substitution, particularly with a component like tubular cross members that cannot be stamped along with the rest of the Withers '317 embodiment. *See* Appx4566 (30:7-31:22). As the Board correctly notes, Withers '317 is made from a "stamped-layer construction," with the "[t]ransverse members 28, 30 [being] fabricated as ***one piece*** with central bridging portion 32," as shown in Withers '317's Figure 1. Appx41 (emphasis added), Appx44. This allows Withers '317 to be "easily assembled." Appx3869 (1:38). Changing Withers '317's cross members to a tubular structure – that cannot be stamped – is a massive structural and manufacturing change: it would not permit fabrication "in one piece or . . . as a layered two-piece structure," and would require an entirely different assembly and fabrication process than what is described in Withers '317. Appx3869 (2:65-67); *see* Appx4566 (30:7-31:22). The Board incorrectly dismisses this as a "business consideration," ignoring its own conclusions about the structure of Withers '317 and failing to require Northern Stamping to prove there was indeed, a motivation supported by rational underpinnings to combine Withers '317 with Fandrich's

tubular cross members. Appx44. Instead, the Board shifts the burden to Horizon, stating Horizon "has not shown that, despite tubular-shaped members being known, a person of ordinary skill in the art would not select tube shapes for Withers '317 due to the specific nature of the alteration." Appx44. This was error. The tubular cross members being known, generally, does not satisfy Northern Stamping's burden to prove unpatentability, and Northern Stamping's presentation of evidence amounts to nothing more than the "A + B + C" analysis this Court rejected in *Ruiz*. 357 F.3d at 1275.

This Court has overturned Board decisions in similar circumstances, where the proposed modification eradicates a major benefit of the primary reference. *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1067-69 (Fed. Cir. 2018). In *Polaris*, the technology involved all-terrain vehicles, where the proposed modification included adding a fuel tank under one of the seats that would ultimately "rais[e] the center of gravity and render[] the vehicle less stable." *Id.* at 1069. This Court found the "Board's treatment of this evidence was deficient," and vacated the obviousness determination as to the relevant claims. *Id.*

Similarly, here, the Board's and Northern Stamping's modification of Withers '317 by Fandrich runs contrary to the major benefits and stated purposes in Withers '317. These statements in and purposes of Withers '317 "are relevant to a finding regarding whether a skilled artisan would be motivated to combine"

Withers ’317 with Fandrich. *Polaris*, 882 F.3d at 1069. The Board ignored Withers ’317 for all that it says. *See id.* (stating that “a reference ‘must [be] considered for all it taught, [including] disclosures that diverged and taught away from the invention at hand . . .’”) (citation omitted). The Board’s notion of the seeming simplicity of the present invention is no excuse for the Board’s hindsight-driven determination. *See* Appx44-45; *Polaris*, 882 F.3d at 1068 (“[W]here the art in question is relatively simple, . . . the opportunity to judge by hindsight is particularly tempting.”).

### D. The Board’s Evaluation of Horizon’s Evidence of Objective Indicia of Non-Obviousness Was Legally Erroneous.

#### 1. The Law Concerning Objective Indicia of Non-Obviousness.

In the mechanical arts, objective indicia are often the best indicators of non-obviousness. Just because the patented technology is simple “does not mean that it will satisfy the legal standard of obviousness.” *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012). “In fact, objective consideration of simple technology is often the most difficult because, once the problem and solution appear together in the patent disclosure, the advance seems self-evident.” *Id.*

Further, objective indicia of non-obviousness are part of the overall obviousness analysis. *Polaris*, 882 F.3d at 1071-72 (stating that “it is error to reach a conclusion of obviousness until all [the *Graham*] factors are considered.”). They are “not just a cumulative or confirmatory part of the obviousness calculus but

constitute[] independent evidence of nonobviousness." *Ortho-McNeil Pharm., Inc. v. Mylan Lab'ys, Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008). Moreover, they "***can be the most probative evidence of non-obviousness in the record, . . . enabl[ing] the . . . court to avert the trap of hindsight***." *Crocs*, 598 F.3d at 1310 (emphasis added) (citation omitted).

A presumption of nexus applies for objective indicia when the patent owner "shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Polaris*, 882 F.3d at 1072 (quoting *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000)). Further, "[w]here the allegedly obvious patent claim is a combination of prior art elements, . . . the patent owner can show that it is the claimed combination as a whole that serves as a nexus for the objective evidence; proof of nexus is not limited to only when objective evidence is tied to the supposedly 'new' feature(s)." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1330 (Fed. Cir. 2016). When a nexus is presumed, "the burden shifts to the party asserting obviousness to present evidence to rebut the presumed nexus." *Brown & Williamson Tobacco Corp.*, 229 F.3d at 1130. "The presumed nexus cannot be rebutted with mere argument . . . ." *See id.* However, even absent a presumed nexus, "the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the

unique characteristics of the claimed invention.'" *Volvo Penta of the Americas, LLC v. Brunswick Corp.*, 81 F.4th 1202, 1210 (Fed. Cir. 2023) (quoting *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373–74 (Fed. Cir. 2019)).

**2. The Claims are Coextensive with the Commercial Product.**

The Board here inappropriately rejected Horizon's evidence of nexus between the claimed invention and the commercial product sold to Ford. Appx30-32; *see also* Appx3189-3195 (Patent Owner Response). This Court's precedent demands reversal of the Board's nexus ruling. Appx30-32. In *Polaris*, this Court reversed the Board's denial of a presumption of nexus. 882 F.3d at 1073. There, the patentee's expert reviewed the claims, the products, the product literature, and concluded that the products "embody each element recited in [the claims]," to which the petitioner "presented no contrary evidence." *Id.* The Board found the patentee's expert's statements "conclusory" and entirely rejected the patentee's evidence of commercial success. *Id.* This Court disagreed and reversed: "[W]here the proffered evidence is not rebutted and the technology is relatively simple," this Court's "case law does not require a patentee . . . to go further than Polaris did here . . . to demonstrate that its commercial products are the inventions disclosed in the challenged claims." *Id.*

Here, as shown below, Horizon exceeded the requirements espoused in *Polaris* and is entitled to a presumption of nexus. Both Horizon's expert Mr.

Walstrom and its named inventor Mr. Stanifer analyzed the product drawing for the hitch sold to Ford, determined that it "embod[ies] each element recited in the claims," and testified to that effect. Appx3281-3283 (¶¶81-86) (Walstrom); Appx3343-3346 (¶¶22-23) (Stanifer). Mr. Stanifer confirmed that the product drawing both he and Mr. Walstrom reviewed represented the product "supplied to Ford," and that the product drawing "contains the design . . . ultimately embodied in the '585 patent." Appx3973 (76:13-24), Appx3980 (83:16-20). Mr. Walstrom also noted that the '585 patent's Figure 4 is "nearly identical" to the product drawing he and Mr. Stanifer analyzed. Appx3281 (¶80). There is therefore no doubt that the evidence shows the product drawings depicting the hitches sold to Ford are the inventions disclosed in the claims. *See Polaris*, 882 F.3d at 1073.

Moreover, Northern Stamping's expert Mr. Becker agreed the product drawing is consistent with the '585 patent's Figure 4 and each disclosed all limitations of Challenged Claim 16. Appx3190 (citing Appx3402-3403 (83:19-88:4)). Northern Stamping never presented contrary evidence; instead, it only argued that Horizon had not met its burden to show nexus. Appx3822-3824. Such attorney argument is not, under *Polaris*, "contrary evidence" that can rebut evidence of nexus. *Polaris*, 882 F.3d at 1073. And Northern Stamping's counsel even contended the technology is "simple". *See* Appx4852. Therefore, the Board

erred in ruling that Horizon failed to establish nexus. *See Brown & Williamson Tobacco Corp.*, 229 F.3d at 1130.

The Board dismisses Horizon's nexus evidence because, as it contends, "[t]here is no evidence showing what was sold to ***customers in Ford products***." Appx31 (emphasis added); *see also* Appx32. To the extent the Board required Horizon to show what Ford sold to ***Ford's customers***, and not what Horizon sold to Ford itself, that has no basis in law to establish nexus. Horizon established that its product sold to Ford is coextensive with the claims, and that it was successful in selling that product to Ford. Appx3281-3284 (¶¶81-86) (Walstrom); Appx3343-3346 (¶¶22-23) (Stanifer); Appx3973 (76:13-24), Appx3980 (83:16-20), Appx4347 (201:6-9) (Walstrom); Appx3379 (¶25) (Guthard); Appx4056-4057 (17:11-15, 17:25-18:1) (Guthard). Horizon was not required to show a nexus between Ford's sales to ***its*** customers and the claimed invention, and Ford's sales are not within Horizon's knowledge in any event.

Unequivocally, there is a nexus between the claimed invention and commercial product sold by Horizon to Ford. The objective indicia discussed below evince that the claimed invention would not have been obvious. The Board erred, however, in improperly evaluating each of industry praise by Ford, commercial success of Horizon's product, and copying by others "with the fact in

mind that the nexus to the claimed invention is at or near zero." Appx32. This error improperly permeated the Board's objective indicia analysis.

**3. The Board Improperly Discounted Horizon's Evidence of Industry Praise.**

The Board improperly discounted praise by Ford for the commercial embodiment of the '585 patent. As explained above, the claims are coextensive with the commercial product sold to Ford. Appx3281-3284 (¶¶81-86) (Walstrom); Appx3343-3346 (¶¶22-23) (Stanifer); Appx3973 (76:13-24), Appx3980 (83:16-20) (Stanifer).

Ford praised Horizon (using Horizon's brand name Reese®) in Ford's own advertising when it introduced this underbed system into its F-series heavy duty pickup trucks beginning in 2011. Appx3300 (¶125); Appx4349 (203:3-9) (Mr. Walstrom stating, referencing the advertisement, that "[t]his is a Ford advertisement of the '585 patent that [Horizon] created for Ford. There's no question about that . . . [C]learly, this is a representation of the '585 patent in my opinion, absolutely."); Appx4350 (204:10-15) (same). The features of the product, as claimed, "gave it the ability to be factory installed by an OEM and accommodate both hitch types while allowing for a flat bed when not in use." Appx3300-3301 (¶¶125-26).

In a forest-through-the-trees moment, the Board discounts the praise in surmising that "one can obtain the features of the [Ford] prep package without

purchasing anything from Reese." Appx33. Even if that were true, that is not the point. Rather, what the advertisement is offering is an OEM solution that is "compatible with [both] the Ford Custom Accessory 5th-Wheel ***and*** Gooseneck Hitch Kits by Reese®." Appx32 (emphasis added); *see* Appx3300 (¶124). The Board therefore erred in considering industry praise of the claimed hitch system.

#### 4. The Board Improperly Discounted Horizon's Evidence of Commercial Success.

The Board improperly discounted the success of Horizon's hitch system sold to Ford. The Board contends, without citation to law, that Horizon could not prove commercial success through testimony of someone having first-hand knowledge. Appx33; *see Pers. Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 993 (Fed. Cir. 2017) (remanding in view of the Board's failure to "sufficiently explain and support [its] conclusions"). The evidence, however, points to the unequivocal success of the claimed hitch: Horizon "has sold hundreds of thousands of its products (received millions of dollars in revenues) of its underbed hitch mounting system to Ford from launch to the present." Appx3379 (¶25). This information was relayed from Horizon's director of commercial sales. Appx4056-4057 (17:11-15, 17:25-18:1). Horizon's expert Mr. Walstrom also testified that Horizon's product sold to Ford that embodies the claimed invention was successful, stating "it was a very commercially successful product for the partnership that Horizon Global had with Ford and a very significant part of the Horizon Global Business." Appx4347

(201:6-9). The Board's failure to appreciate the success of Horizon's product was error.

**5. The Board Improperly Discounted Horizon's Evidence of Copying.**

As with industry praise and commercial success, the Board ignored evidence of copying. The Board appears to take issue with Horizon's supposed failure to produce evidence of actual copying – that is, actual knowledge of Horizon's product and an attempt to make a copycat product. Appx33-34. But the law has no such requirement. "'It is well established that copying by a competitor is a relevant consideration in the objective indicia analysis' and therefore 'may be evidence that the patented invention is nonobvious.'" *Medtronic, Inc. v. Teleflex Innovations S.a.r.l.*, 70 F.4th 1331, 1339 (Fed. Cir. 2023) (quoting *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1137 (Fed. Cir. 2019)). "The fact that a competitor copied the patentee's invention, rather than one within the public domain, is probative of nonobviousness because it suggests the competitor saw value in the invention that he could not achieve without copying." *Id.* The category of art to which the claims relate is undoubtedly crowded, as Northern Stamping has contended. *See* Appx62-69. Northern Stamping therefore had many options to choose from in designing its own products. Instead, however, it chose to design, at least according to Horizon, a product that reads on the Challenged Claims. *See* Appx3013-3015, Appx3048 (District Court Complaint); Appx3301-3302 (¶127) (Walstrom); Appx4351-4352

(205:15-206:5) (Walstrom). Flattering though it may be, it is objective evidence that the claims would not have been obvious.

The Board here failed in its hindsight-driven review of the objective evidence of non-obviousness, a pervading problem in the "simple" arts. *See Mintz*, 679 F.3d at 1379. The Court should reverse the Board's obviousness determination, or at the very least, remand to the Board for consideration of the objective evidence through the correct nexus lens, not where nexus is thought to be "at or near zero." Appx32-34; *see Polaris*, 882 F.3d at 1073 (instructing the Board that on remand, it "must assess the import of [the objective] evidence after presuming that a nexus between the claims and the commercial success . . . exists.").

## VIII. CONCLUSION

Northern Stamping presented only conclusory and speculative testimony that there was a motivation to combine the cited references to achieve both the Challenged Claims and Substitute Claims, and therefore did not meet its burden of proving obviousness. The Board's reliance on this evidence, as well as its consideration of it under the wrong legal standards, is reversible error and is not supported by substantial evidence. Moreover, the unrebutted objective indicia shows that the claimed invention indeed would not have been obvious. This Court should therefore reverse the Board's determination of unpatentability as to the

Challenged and Substitute Claims. Alternatively, this Court should vacate the Board's decision and remand to the Board so that it may properly consider evidence in the first instance consistent with this Court's opinion.

Date: October 16, 2023

*/s/ Stephanie Hatzikyriakou*
Stephanie Hatzikyriakou
Phillip D. Wolfe
BAKER & HOSTETLER LLP
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501
(215) 568-3100

Christina J. Moser
Brendan E. Clark
Key Tower
127 Public Square
Suite 2000
Cleveland, OH 44114-1214
(216) 621-0200

*Attorneys for Appellant*

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 23-1767

**Short Case Caption:** Horizon Global Americas Inc. v. Northern Stamping Co.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 13,724 words.
- [ ] the filing has been prepared using a monospaced typeface and includes __________ lines of text.
- [ ] the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 10/16/2023

Signature: /s/ Stephanie Hatzikyriakou

Name: Stephanie Hatzikyriakou

# ADDENDUM

Trials@uspto.gov
571-272-7822

Paper 45
Date: February 9, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

NORTHERN STAMPING CO.,
Petitioner,

v.

HORIZON GLOBAL AMERICAS INC.,
Patent Owner.

---

IPR2021-01411
Patent 10,589,585 B2

---

Before WILLIAM V. SAINDON, SCOTT B. HOWARD, and MATTHEW S. MEYERS, *Administrative Patent Judges.*

SAINDON, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Dismissing Petitioner's Motion to Exclude
Denying Patent Owner's Motion to Amend

*35 U.S.C. § 318(a)*

# I. INTRODUCTION

## *A. Background and Summary*

Northern Stamping Co. ("Petitioner") filed a Petition (Paper 4, "Pet.") requesting *inter partes* review of claims 16–20 ("the challenged claims") of U.S. Patent 10,589,585 B2 (Ex. 1001, "the '585 patent"). Horizon Global Americas Inc. ("Patent Owner") filed a preliminary response (Paper 9). Upon consideration of the arguments and evidence set forth and discussed in those papers, we instituted an *inter partes* review under 35 U.S.C. § 314(b) and 37 C.F.R. § 42.4(a) (2020). Paper 10 ("Decision on Institution" or "Dec. Inst.").

During the trial phase of the proceeding, Patent Owner filed a Response (Paper 20, "PO Resp."), Petitioner filed a (corrected) Reply (Paper 31, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 34, "PO Sur-reply").

Patent Owner also filed a Contingent Motion to Amend (Paper 21, "Mot. Amend"), to which Petitioner filed an (corrected) Opposition (Paper 32, "Opp. Mot. Amend"), Patent Owner filed a Reply (Paper 35, "Reply Mot. Amend"), and Petitioner filed a Sur-reply (Paper 40, "Sur-reply Mot. Amend").

In addition, Petitioner filed a Motion to Exclude Evidence (Paper 39, "Mot. Excl."), to which Patent Owner filed an Opposition (Paper 41, "Opp. Mot. Excl.") and Petitioner filed a Reply (Paper 42, "Reply Mot. Excl.").

We held an oral hearing on November 22, 2022, a transcript of which is available in Paper 44 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of

claims 16–20 of the ’585 patent. For the reasons discussed below, Petitioner has demonstrated by a preponderance of the evidence that claims 16–20 of the ’585 patent are unpatentable. Further, Petitioner has demonstrated by a preponderance of the evidence that proposed substitute claim 21 is unpatentable, and proposed substitute claim 22, which depends therefrom. We dismiss Petitioner’s Motion to Exclude as moot.

### *B. Real Parties in Interest*

The parties each identify themselves as the only real parties in interest. Pet. 75; Paper 7, 2 (Patent Owner’s Mandatory Notice).

### *C. Related Matters*

The parties both identify *Horizon Global Americas Inc. v. Northern Stamping, Inc.*, Case No. 1:20-cv00310 (N.D. Ohio) as a related matter, where Patent Owner asserts that Petitioner infringes the ’585 patent. Pet. 75–76; Paper 7, 2.

### *D. Technology Background and the ’585 Patent*

The ’585 patent generally relates to a trailer hitch mounting system that is located under a bed of a vehicle (e.g., a pickup truck). *See* Ex. 1001, code (57). Mounting a hitch in front of or over the axle of the vehicle allows for improved weight distribution relative to the front and rear axles of the vehicle (versus hitches on or under the rear bumper), allowing the vehicle to tow more weight. Ex. 1009, 1:6–34. In general, there are two main types of in-bed hitch mounting systems.

The first type is a "gooseneck" hitch, where the towing vehicle offers a ball and the trailer has a hitch that couples with the ball. Figure 4 of Withers,[1] reproduced below, shows a gooseneck hitch.




Fig-4

Figure 4 of Withers depicts gooseneck receiver ball 44 in the middle of pickup truck bed 36 approximately over the rear axle. Ex. 1012, 2:35–36.

The second type is a "fifth wheel" hitch, where the towing vehicle offers a receiver plate and the trailer has a kingpin that is captured by the plate. Figure 6 of Withers, reproduced below, shows a fifth wheel hitch.

[1] US 7,793,968 B1, iss. Sept. 14, 2010 (Ex. 1012).




Fig-6

Figure 6 of Withers depicts fifth wheel pedestal 46 in the middle of pickup truck bed 36 approximately over the rear axle. Ex. 1012, 2:40–42. The key distinction between the two is the type of connection, with a gooseneck style of hitch having a ball and coupler, and the fifth wheel style of hitch having a kingpin and receiver.[2] *See* Ex. 1001, 2:16–17; Prelim. Resp. 7.

The ’585 patent states that both gooseneck and fifth wheel hitches were known, but alleges that vehicles were generally configured to accommodate one or the other, not both. Ex. 1001, 2:30–31. Conversion between hitch types was known, but was allegedly time and labor intensive and inefficient. *Id.* at 2:32–34. Thus, the ’585 patent proposes a structure that can accommodate both types of hitches. *Id.* at 2:39–42. Figure 4 is exemplary and reproduced below:

---

[2] Caution is advised when relying on the terms “gooseneck” and “fifth wheel” alone to imply a given connection structure, however, because there is indication in the record (discussed below) that “fifth wheel” may generically refer to any type of hitch in which the trailer connects to a structure inside the bed of the vehicle. To the extent further clarity is required, we will specifically refer to the physical structures involved (i.e., ball/coupler vs. kingpin/receiver).




Figure 4 of the ’585 patent is a perspective view of an underbed hitch mounting system. Ex. 1001, 3:2–3. The system is made of two rails 20 connected by mid rail 40 to form an H-shape. *Id.* at 6:10–18. The ends of each rail 20 are connected to the underbed of the vehicle with mounting flanges 26 and mounting apertures 28. *Id.* at 6:19–29. Mid rail 40 includes socket 42 for receiving hitch ball 18. *Id.* at 5:50–52. Rails 20 include sockets 30 to hold receiving members 44 (also called “pucks”), which secure legs of fifth wheel hitches (not shown). *Id.* at 5:27–45. Because the hitch mounting system is under the bed, and any hitch ball as well as any fifth wheel hitch are removable, if none are installed then the truck bed can be used without obstruction. *See, e.g.*, *id.* at 3:26–31, 5:27–39.

*E. Illustrative Claims*

Claim 16, reproduced below, is the sole independent claim challenged.

16. A hitch mounting system comprising:

a pair of tubular members each having a cross-sectional shape a substantial portion of which is defined by an enclosed peripheral wall with a generally hollow section;

a mid rail attached to each of and between said pair of tubular members, spacing said pair of tubular members apart, said mid rail having a socket capable of accepting a gooseneck hitch ball; and

a pair of receiving members attached with each of said pair of tubular members; said receiving members configured to engage a leg of a fifth wheel hitch.

*F. Prior Art and Asserted Grounds*

Petitioner asserts that claims 16–20 would have been unpatentable on the following grounds:

| Claim(s) Challenged | 35 U.S.C. §[3] | Reference(s)/Basis |
|---|---|---|
| 16–20 | 103(a) | Works[4], Fandrich[5], Lindenman[6] |
| 16–20 | 103(a) | Lindenman, Fandrich, Works |
| 16, 17, 19 | 102(e) | Withers[7] |

[3] The '585 patent was filed on Dec. 4, 2017, and claims priority back to Oct. 30, 2008. Ex. 1001, codes (22), (60), (63). Petitioner disputes the effective priority date, asserting it "cannot be . . . before October 30, 2009 (the filing date of the earliest non-provisional application in the . . . family)." *See, e.g.*, Pet. 12. Regardless of the outcome of that dispute, it appears that Patent Owner is entitled to a filing date prior to March 16, 2013, and we apply the versions of 35 U.S.C. §§ 102 and 103 that were in force before they were amended by the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112–29, 125 Stat. 284 (2011).
[4] US 6,969,090 B1, iss. Nov. 29, 2005 (Ex. 1009).
[5] US 6,467,791 B1, iss. Oct. 22, 2002 (Ex. 1011).
[6] US 7,121,573 B2, iss. Oct. 17, 2006 (Ex. 1010).
[7] US 7,793,968 B1, filed June 23, 2009, iss. Sept. 14, 2010 (Ex. 1012).

## II. PATENTABILITY ANALYSIS

### *A. Legal Standards Used in the Merits Analysis*

"In an IPR, the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden of persuasion never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (discussing the burden of proof in *inter partes* review).

"A claim is anticipated [under 35 U.S.C. § 102] only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *Verdegaal Bros. Inc., v. Union Oil Co*., 814 F.2d 628, 631 (Fed. Cir. 1987); *see also Finisar Corp. v. DirecTV Group, Inc*., 523 F.3d 1323, 1334 (Fed. Cir. 2008) (to anticipate a patent claim under 35 U.S.C. § 102, "a single prior art reference must expressly or inherently disclose each claim limitation"). Anticipation is a question of fact, as is the question of what a prior art reference teaches. *In re NTP, Inc*., 654 F.3d 1279, 1297 (Fed. Cir. 2011). Moreover, "[b]ecause the hallmark of anticipation is prior invention, the prior art reference—in order to anticipate under 35 U.S.C. § 102—must not only disclose all elements of the claim within the four corners of the document, but must also disclose those elements 'arranged as in the claim.'" *Net MoneyIN, Inc. v. VeriSign, Inc*., 545 F.3d 1359, 1369 (Fed. Cir. 2008) (quoting *Connell v. Sears, Roebuck & Co*., 722 F.2d 1542, 1548 (Fed. Cir. 1983)).

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious . . . to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective evidence of nonobviousness, i.e., secondary considerations. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

### *B. Level of Ordinary Skill in the Art*

Petitioner asserts the following level of ordinary skill in the art:

> a bachelor's degree in mechanical engineering or a related discipline, and at least one to two years of industry experience in the design, development or manufacture of mechanical devices, including, for example, automotive or mounting systems, or equivalent experience, education or both.

Pet. 25 (citing Ex. 1007 ¶¶ 1–19).

Patent Owner "does not challenge this definition," which is the same one we used in our Decision on Institution. PO Resp. 11; Dec. Inst. 19–20. Reviewing the '585 patent and the cited prior art, and in the absence of dispute, we maintain Petitioner's definition in this decision.

### *C. Claim Construction*

Petitioner offers a construction of the term "tubular members each having a cross-sectional shape a substantial portion of which is defined by an enclosed peripheral wall with a generally hollow section," as recited in

independent claim 16. Pet. 25–26. However, reviewing the parties' briefs, we see no utility in construing the term (or any other) because claim construction does not appear to be in dispute. PO Resp. 11–12 (stating that Patent Owner "contends that the issues to be resolved . . . can be done so without any express constructions"); *see Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (holding that "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy").

### *D. Obviousness over Works, Fandrich, and Lindenman (Claims 16–20)*

Claim 16 is directed to a trailer hitch that combines a socket for a ball/coupler-type of hitch with sockets for a kingpin/receiver type of hitch. The socket for the ball/coupler type of hitch is located on a mid rail, which connects two tubular cross members in an "H" configuration. The sockets for the kingpin/receiver type of hitch, called "receiving members," are located on the cross members. The other challenged claims, which are not argued separately, depend therefrom.

#### *1. Petitioner's Ground*

Petitioner asserts that claims 16–20 would have been obvious in view of Works, Fandrich, and Lindenman. Pet. 26–48. As will be explained in more detail below, Petitioner asserts that Works discloses each of the limitations except for the receiving members, which it asserts are disclosed in Lindenman. *See id.* Fandrich is provided merely to show in more detail something already described in Works (tubularly-shaped cross members). *Id.* at 35–36; *see also id.* at 27 (stating that "*Works* only describes its tubular members textually" and "for the avoidance of doubt" also cites Fandrich).

Patent Owner does not dispute that Petitioner's proposed combination is missing any limitations, but does dispute Petitioner's rationale for the proposed combination. *See generally* PO Resp. To provide context for the rationale discussion, we walk through the various limitations and how the prior art shows them.

As to claim 16, Petitioner asserts that Works discloses a hitch mounting system having a pair of tubular members (cross members 18, 19) (Pet. 34–37), and a mid rail (base member 17) attached to the tubular members having a socket 24 capable of accepting a gooseneck hitch ball 10 (*id.* at 37–39). Petitioner offers a colorized version of Figure 2 of Works, reproduced below:




Figure 2 of Works, as annotated by Petitioner, depicts a partially exploded perspective view of a hitch mounting system with cross members 18, 19 (red), base member 17 (green), socket 24 (orange) attached between the cross members, and gooseneck hitch ball 10 (purple) in the base member. Ex. 1009, 4:20–31.

Petitioner acknowledges that Figure 2 of Works depicts cross members 18, 19 as angle bars rather than tubes, but directs our attention to a passage in Works that explains that "cross members 18 and 19 could be . . . I-shaped members, channels, *round or square tubes*, or the like." Pet. 35 (quoting Ex. 1009, 4:60–62) (emphasis added). Notwithstanding the fact that Works explicitly teaches tubular cross members, Petitioner also directs our attention to Fandrich, which shows a hitch mounting system having "generally hollow tube[s]" for the cross members. *Id.* at 35–36 (quoting Ex. 1011, 3:64–66).

Petitioner then states that neither Works nor Fandrich discloses the claimed receiving members, but asserts that receptacles 14 in Lindenman are receiving members. Pet. 39–40. In particular, Petitioner directs our attention to Figure 1 of Lindenman, a version colorized by Petitioner is reproduced below:

FIG. 1




Figure 1 of Lindenman, as annotated by Petitioner, depicts an exploded perspective view of a vehicle accessory mounting system. Ex. 1010, 2:44–45. Two receptacles 14 (purple) are provided in each of two cross members

(red); the receptacles are for attaching "a number of different vehicle accessories" such as a fifth wheel hitch or "article anchor." *Id.* at 1:49–52, 4:23–25, 5:10–11, Fig. 5. Petitioner asserts it would have been obvious to add the receptacles of Lindenman to the support members of Works-Fandrich. Pet. 31–32, 39.

Accordingly, Petitioner has shown how Works, Fandrich, and Lindenman disclose each element as arranged in claim 16, and Patent Owner has not contested that the references teach each element as asserted by Petitioner. For the same reasons set forth in the Petition, we find that Works, Fandrich, and Lindenman disclose each element as arranged in claim 16. The disputed issue is the reason for combining the references.

On that issue, Petitioner asserts that it would have been obvious to take a hitch system using one known connection method (a centrally-located socket, e.g., Works) and add a second known connection method (cross member-mounted sockets, e.g., Lindenman, Fandrich), which would predictably provide the functions of both connection methods. Pet. 29 (asserting that a person of ordinary skill in the art would have reason to "enhance *Works/Fandrich* . . . to provide a hitch mounting system capable of accommodating a variety of accessories, including fifth-wheel or gooseneck-style hitches"). Petitioner notes that the prior art demonstrates a desire for versatility in the art—"mounting systems capable of accepting a variety of accessories." *Id.* (citing Ex. 1007 ¶ 84, quoting Ex. 1010, 1:46–52).

*2. Argument that Works Already Teaches a Kingpin/Receiver Hitch*

Patent Owner's chief argument is that Works can already accommodate both gooseneck and fifth-wheel hitches, such that there is no reason to add structures in order to accommodate both. PO Resp. 37–43; PO

Sur-reply 3–5, 8. *But see* Pet. Reply 17–19 (arguing against). In effect, Patent Owner is arguing that Petitioner's proposed modification adds a redundant feature for no reason beyond hindsight. *See, e.g.*, PO Sur-reply 8 ("because . . . Works . . . already accomplishes that objective without modification, that evidence cannot establish the motivation to modify"). We are not persuaded by Patent Owner's argument for the reasons described below.

Patent Owner is incorrect to assert that Works teaches receiving a kingpin/receiver hitch. As we explained in our Decision on Institution, although Works uses the term "fifth wheel," it does so not to describe a kingpin/receiver hitch, but to describe its towing connector *generically*. Dec. Inst. 26–27. In particular, reading Works in context, it describes the "fifth wheel" as requiring a "hitch ball" where it explains that "*[i]n order to allow* the trailing vehicle to be connected to a fifth wheel type hitch, a *'gooseneck'* type extension is utilized." Ex. 1009, 1:26–41 (italics added). Thus, Works defines its "fifth wheel" as the *gooseneck* type of hitch. When Works says "fifth wheel" it is describing a ball/coupler hitch, not a kingpin/receiver hitch.

Notwithstanding the express disclosure of Works, Patent Owner asserts that both experts "agree" that Works teaches a kingpin/receiver hitch. *See, e.g.*, PO Resp. 37 ("Both experts now agree that a POSITA would readily have understood that the hitch[] of Works . . . had the capability of accommodating fifth wheel hitches."); PO Sur-reply 4 (describing "Petitioner's expert's own concession about what Works teaches"). But Patent Owner's arguments here are at best a mischaracterization of the testimony, based on Patent Owner's tendency to use the word "Works" to refer to things that are not Works. These arguments rely on a catalog

depicting a commercial product allegedly made by the assignee of the Works patent. *See, e.g.*, PO Resp. 38 (asserting that "the underbed hitch system described in Works is still being sold"); Ex. 2012 (B&W company product catalog, allegedly published in 2021, and allegedly showing products covered by the Works patent); Ex. 2014 (same, but colorized).[8] Petitioner's ground is premised on the Works *patent*, not on a commercial product allegedly stemming from that patent. Patent Owner's catalog evidence does change what Works itself says.

Further, Patent Owner's catalog evidence is not persuasive in showing the knowledge of a person of ordinary skill in the art *at the time of invention* because the catalogs were allegedly published in 2021, well past the time of invention. *See, e.g.*, PO Resp. 37 (asserting "the hitch[] of Works . . . had the capability of accommodating fifth wheel hitches" and citing Ex. 2011, 64:18–65, 68:9–12); PO Sur-reply 3–4 (citing Ex. 2011, 64:18–65:19).[9] Patent Owner's characterization of the testimony of Petitioner's expert is unpersuasive because the expert was asked about his present abilities to obtain a product to adapt what is disclosed in Works; the relied-upon testimony is not about what Works teaches or how a person of ordinary skill in the art would have understood the prior art at the time of invention. For example, Petitioner's expert is asked if he could "get" or "connect" an accessory that would adapt Works' hitch into a kingpin/receiver type of hitch. Ex. 2011, 65:10–19 (emphasis added). The question was directed to

---

[8] For simplicity, we will refer only to Exhibit 2012 catalog.
[9] We assume only for the sake of argument that Patent Owner has established sufficient public availability of the catalog as of 2021. *Cf.* Ex. 2004 ¶ 100, n.1 (the expert merely asserting he found the catalog on a B&W website in 2022).

whether a company *sells* (present tense) a product that allows converting a center socket (i.e., for a ball/coupler hitch, as in Works) into a kingpin/receiver hitch. *Id.* at 64:18–65:2. Patent Owner also cites testimony where Petitioner's expert is discussing the "Companion" product from Exhibit 2012, but again, this testimony is not what Works discloses or what the person of ordinary skill in the art knew at the time of invention. *Id.* at 68:9–12. In sum, we find that Petitioner's expert has not conceded that a person of ordinary skill in the art would have understood Works to be describing a kingpin/receiver hitch, or that a person of ordinary skill in the art was aware of a product that converted Works's hitch into a kingpin/receiver hitch.

Similarly, Patent Owner's reliance on the testimony of its own expert is unpersuasive because it is conclusory or based on the product catalog in Exhibit 2012 instead of Works. *See, e.g.*, PO Resp. 37 (citing Ex. 2004 ¶¶ 67, 97–102, 109–111). Patent Owner's expert first testifies that B&W Hitches, assignee of Works, "solve[d] the problem of utilizing a gooseneck hitch platform for 5th wheel attachment" with the "Companion" product. Ex. 2004 ¶ 67. We do not credit this testimony because we are not given competent supporting evidence, nor a timeframe or context, so it is not clear how the testimony is material to the inquiry of how a person of ordinary skill in the art would have understood the prior art at the time of invention. *See* 37 C.F.R. §§ 42.63(a) (evidence must be submitted in the form of an exhibit), 42.65(a) (expert testimony must disclose underlying facts). Patent Owner's expert then testifies that "Works already can . . . accommodate both a fifth wheel and goose style hitch." Ex. 2004 ¶ 97. This testimony cites to the language in Works we have addressed above, but fails to provide any explanation in support of the expert's assertion, or that offers a persuasive

alternative to the plain reading—that Works does not disclose a kingpin/receiver hitch. *Id.* ¶ 99 (citing Ex. 1009, 1:26–41, 2:33–43). The testimony also relies on the Exhibit 2012 catalog, which is not Works and is too far removed from the date of invention to tend to show the level of ordinary skill in the art *at the time of invention*.[10] *Id.* ¶¶ 97–102. Lastly, the testimony in paragraphs 109–111 are premised on the same faulty reading of Works, and are without supporting evidence.[11] *See* 37 C.F.R. § 42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight.").

In summary of the above, Patent Owner's arguments and evidence that a person of ordinary skill in the art would have been aware of the products allegedly currently made by the assignee of the Works patent is immaterial as to what Works teaches. Patent Owner's arguments that Works already discloses a kingpin/receiver hitch or that a person of ordinary skill would have understood that a commercial adapter for Works was on the market at the time of invention is not supported by credible evidence. And even if it were, Works still teaches what it teaches (i.e., no kingpin/receiver hitch). Accordingly, we find that Works does not teach a kingpin/receiver hitch.

---

[10] For this reason, Patent Owner's and its expert's related arguments that a person of ordinary skill in the art would have been aware of Works's ability to be converted to receive a kingpin/receiver type of hitch (*e.g.*, PO Resp. 38–40; PO Sur-reply 3–5) is unpersuasive because it is not supported by evidence. 37 C.F.R. § 42.65(a).

[11] The testimony has placeholders for where supporting evidence could have been placed, but were not filled in. Ex. 2004 ¶ 111 ("In addition to this there were already solutions in the aftermarket to accommodate a 5th wheel in a gooseneck hitch (EXAMPLES) and a gooseneck in a 5th wheel hitch (EXAMPLES).").

### *3. Argument About the Rationale for Incorporating Features from Lindenman*

Patent Owner's chief argument about rationale is premised on its unpersuasive allegation that Works already teaches a kingpin/receiver hitch, which we found unpersuasive above. To the degree Patent Owner is arguing a lack of rationale for the combination separate from that, we address Petitioner's rationale for incorporating the receiving members of Lindenman to the hitch of Works. *See, e.g.*, PO Sur-reply 2–3, 5–8.

Initially, we find that combining the ability to attach a ball/coupler hitch provided by Works (via its central-mounted socket 24) with the ability to attach a kingpin/receiver hitch provided by Lindenman (via its cross member-mounted receptacles 14) "'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement." *KSR*, 550 U.S. at 417, *citing Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 282 (1976). Having both types of attachment types in one device "unites old elements with no change in their respective functions." *Id.* at 415–416 (*quoting Great Atlantic & Pacific Tea Co. v. Supermarket Equip. Corp.*, 340 U.S. 147, 152–153 (1950)). We find the combination of the features is not adding redundancy because each type of attachment mechanism provides a native connection for a different type of hitch. That adapters are available does not subtract from this. We credit Petitioner's expert testimony that a person of ordinary skill in the art would have had a reason to have both attachment mechanisms in order to "accommodat[e] a variety of accessories." Pet. 29 (citing Ex. 1007 ¶ 84). This testimony is supported by Lindenman, who advocates for its socket design to provide "unparalleled versatility since one may mount a number of different vehicle accessories to the vehicle through the

mounting system," not limited to hitches but also "an article anchor or carrier such as a bike rack, a motorcycle stand or other useful device." Ex. 1010, 1:46–52. Indeed, even if we set aside the addition for native ability to mount a kingpin/receiver hitch, the four attachment points of Lindenman would add to Works by providing an ability to removably mount these other accessories.[12] *See also* Ex. 1022, 3:26–31 (stating that the sockets mounted on cross-members can be used to connect chains when the central socket is used to tow a gooseneck trailer).[13]

Further, as explained in the next few pages, we find that a person of ordinary skill in the art would have understood it would have been a benefit to natively mount both types of hitches (as opposed to using an adapter, as Patent Owner argues). The record supports Petitioner's combination because the record espouses a desire for flexibility and versatility—which is why having both types of hitches is better than one alone.

First, it is plain that not having to purchase an adapter is a readily apparent advantage to the proposed combination. *Perfect Web Tech., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2009) (holding that "while an analysis of obviousness always depends on evidence . . . it also may include recourse to logic, judgment, and common sense available to the person of ordinary skill that do not necessarily require explication in any reference"). *But cf., e.g.*, PO Resp. 40 (arguing that "Works could accommodate a variety of accessories [using aftermarket adapters]."); PO Sur-reply 2 ("Works['s] . .

---

[12] Patent Owner characterizes Petitioner's "variety of accessories" argument as new (PO Sur-reply 5) but we find that it was argued in the Petition. Pet. 29 (citing Ex. 1007 ¶ 84 and Ex. 1010, 1:46–52).
[13] Withers et al., U.S. Pat. No. 7,828, 317 B2, iss. Nov. 9, 2010, prov app. filed May 30, 2018 (Ex. 1022, "Withers '317").

. commercial systems are still available to this day"), 4 ("Works already teaches that very solution in its existing system [(if one considers the aftermarket adapters)]."). From a logical standpoint, the elimination of adapters critically undermines Patent Owner's theme, throughout its arguments, that the combination is of redundant features or otherwise superfluous. *See, e.g.*, PO Resp. 37 (arguing that "Works . . . had the capability of accommodating [both types of] hitches"), 38 (similar); PO Sur-reply 3 (arguing no motivation where the prior art "already solves the issue"); *see also* Ex. 1022, 1:31–38 (expressing a dislike in the art for adapters).

Second, we find that Lindenman suggests the benefits of versatility. Ex. 1010, 1:46–52. Although Lindenman itself does not suggest using both types of sockets, it does support our finding of a general desire in the art for versatility in accommodating many different types of attachments.

Third, we find patents filed at or near the time of invention directly suggest a hitch that has both types of sockets to eliminate the need for adapters. Withers describes the disadvantage of having to use adapters (it raises the attachment point), and then describes a hitch system that includes both types of sockets. Ex. 1012, 1:28–31 ("A gooseneck adapter on a fifth wheel mount raises the height of the gooseneck ball, and usually obstructs more of the pick-up bed."), 1:32–35 ("There is a need for an integrated support structure . . . to which either [hitch type] can be easily assembled."). Withers '317 espouses the same concern and solution. Ex. 1022, 1:31–38.[14]

---

[14] Facially, Withers is prior art because it was filed on June 23, 2009, whereas the '585 patent was filed on December 4, 2017. We acknowledge that Patent Owner challenges whether Withers is prior art to the '585 patent. *See, e.g.*, PO Resp. 13–32. We do not reach the Withers anticipation ground

Fourth, Patent Owner's experts and declarants explain that the notion of combining the two types of sockets into one hitch comes from market forces at the time of invention. For example, Patent Owner's expert witness testified that "Ford and its customers" "desired" a hitch with both types of sockets, and sought out Patent Owner to supply a product meeting that design criteria. Ex. 2004 ¶ 50; *see also id.* ¶ 47 ("an OEM like Ford would want any factory installed system to accommodate as many different hitches as possible"); Ex. 1026, 77:17–80:25, 82:17–83:3 (further explaining the background of why Ford would want the ability to have one hitch system accommodate both hitch types—to sell a single product without having to build a vehicle dedicated to a particular end market, e.g., RV towing (fifth wheel) vs. agricultural towing (gooseneck)). That expert also implies that it was Ford's willingness to put to market a hitch system that led a product *being sold* that has both socket types (rather than any lack of awareness of the notion of combining the sockets or technical know-how). *Id.* ¶ 111. Similarly, an inventor of the '585 patent admits that it was Ford's idea to have a hitch that combined both types of sockets:

> Q: And do you know what the specific request from Ford to [Patent Owner] was?
>
> A: For us to develop an underbed mounting kit . . . for both fifth wheel and gooseneck.
>
> Q: Was Ford looking for . . . a hitch that would accommodate both a fifth wheel hitch and a gooseneck hitch?
>
> A: Yes, they were.

---

and therefore do not decide whether Withers is prior art. Patent Owner is not prejudiced here by us not reaching the issue because Withers '317 has the same relevant disclosure as Withers, and there is no issue raised about the prior art status of Withers '317.

Ex. 1024, 25:7–20; *see also id.* at 30, 2–3 ("Ford asked us to develop this product"); 51:21–23 ("[Ford] wanted to have a combination fifth-wheel and gooseneck system."); Ex. 1026, 93:16–94:18 (Patent Owner's expert testifying that Ford "asked for a solution" for "accommodating both types of hitches"), 166:13–14 ("Ford Motor Company came to us and said, we want to combine these [hitch types]"), 167:2–11.[15] Thus, we find that market forces at the time of the invention demonstrate a desire to have an integrated device for natively receiving both ball/coupler and kingpin/receiver hitches.

Patent Owner also argues that Works and Lindenman are compatible with aftermarket adapters that allow them to be converted to accept the other hitch of type, and the fact that they still sell these single-hitch-type products along with adapters is evidence that it would not be obvious to introduce a hitch that natively accepts both hitch types. *See, e.g.*, PO Resp. 38–39; PO Sur-reply 2. We do not find this (even assuming it is true) to be evidence of non-obviousness. For one, Patent Owner asserts that other companies have

---

[15] We cite this testimony for the purposes of demonstrating that the evidence of record supports a finding that there was a desire in the art to provide a hitch that had native connections for both ball/socket and kingpin/receiver hitches. A "motivation to combine may be found explicitly or implicitly in market forces; design incentives; the 'interrelated teachings of multiple patents'; 'any need or problem known in the field of endeavor at the time of invention and addressed by the patent'; and the background knowledge, creativity, and common sense of the person of ordinary skill." *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1354 (Fed. Cir. 2013) (citing *Perfect Web*, 587 F.3d at 1328 (quoting *KSR,* 550 U.S. at 418–21)). We do not reach the issue of whether the Withers patent (assigned to Ford) is prior art. We do not imply any notion of derivation nor are we discussing inventorship. Our discussion in these passages is limited to the *notion of combining the two socket types in one hitch*, not to any particular configuration of hitch that had such a combination.

copied its design. PO Resp. 50–51 (citing Ex. 2004 ¶ 127). Thus, Patent Owner cannot also assert that no one else has thought to combine socket types into one hitch. In addition, we have already discussed how the testimony (regarding Ford) and relevant art from the time of invention (Lindenman, Withers, Withers '317) offer evidence on market forces and knowledge in the art regarding the desirability of the combination. Lastly, even assuming that the company owning the Works patent has not offered a hitch with both socket types, any such product would have to contend with the '585 patent as well as both Withers patents (as well as any other patents claiming a hitch with both types of sockets), such that it may be a business decision not to offer those features and risk a lawsuit or pay licensing fees. These types of business decisions do not change our view of the facts tending to show that both types of sockets were known and that there was reason in the art to combine them into one unit. In sum, we do not find that no one else wanted to offer a hitch that natively accommodated both socket types at the time of invention, that no one else thought of doing it, or that no one else could figure out a way to do so. *See KSR*, 550 U.S. at 418 (instructing factfinders to consider "demands known to the design community or present in the marketplace").

Based on the foregoing, we find a general desire in the art for versatility, and in particular a desire to have a hitch that provides for both types of sockets (i.e., for ball/socket and kingpin/receiver connection types). Accordingly, we find that Petitioner's reasons for combination are based on rational underpinnings and that Petitioner has established a reason for combining the hitch connectors of Works and Lindenman in the manner proposed.

*4. Argument About Fandrich and Cross-Members*

Petitioner takes a backup position that Fandrich (in addition to Works) teaches tubular cross-members. Pet. 27. For reference, we have reproduced Petitioner's annotated copy of Figure 2 of Fandrich below.




Fig. 2

Pet. 36 (annotated version of Ex. 1011, Fig. 2). Figure 2 of Fandrich depicts an under-bed mounting system for connecting a hitch. Ex. 1011, 1:12–14. Hollow tubes 110 are "designed to withstand substantial tensile and compressive loading." *Id.* at 3:67–4:2.

Patent Owner argues that Petitioner has not provided sufficient rationale for taking the tube-shaped cross member of Fandrich and applying that shape to the cross members of Works. PO Resp. 43–44; PO Sur-reply 9–10; *see also* Pet. Reply 24–25. We have considered these arguments and the evidence cited therein, and find Patent Owner's argument unpersuasive for the reasons described below.

Initially, Works already teaches tubular cross members, so Petitioner has no need to include those of Fandrich. Pet. 35 (citing Ex. 1009, 4:60–62); Ex. 1009, 4:60–62 ("Alternatively, the cross members 18 and 19 could be

other types of members, such as I-shaped members, channels, round or square tubes, or the like."). This alone can dispose of this aspect of the case.

But even if Fandrich were needed, Patent Owner's argument is unpersuasive because it reads too much into the word "motivation." *See* PO Sur-reply 9 (arguing that "Petitioner['s] argu[ment] that there was nothing inventive about using tubular members . . . is not the issue," but rather "[t]he issue is whether a [person of ordinary skill in the art] would be *motivated* to pick and choose all the various features in the prior art . . ."). As the Supreme Court said in *KSR*: "[t]he obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation." *KSR*, 550 U.S. at 419. Here, we have evidence from both Works and Fandrich that tubular members were known in underbed hitch systems. Ex. 1009, 4:60–62; Ex. 1011, 4:6–8. To the extent it is not already disclosed sufficiently in Works, Fandrich teaches tubular members to provide a "rigid support structure." Ex. 1011, 4:6–8. Using tubular members to provide a similar rigid support structure in Works is therefore merely the use of established elements working according to their established function. *See KSR*, 550 U.S. at 415–16 (A "patent for a combination which only unites old elements with no change in their respective functions ... obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful [persons]." (*quoting Great Atlantic & Pacific Tea*, 340 U.S. at 152–153)). The casual manner in which Works lists the various potential cross-member construction options further indicates that Works is speaking to a person of ordinary skill in the art that would be aware that these are known options to choose from, none of which are characterized as particularly noteworthy or troublesome to implement. Ex. 1009, 4:60–62 ("Alternatively . . . could be

other types of members, such as [list of types], or the like."); *see also KSR*, 550 U.S. 421 ("[A] person of ordinary skill has good reason to pursue the known options within his or her technical grasp."). Patent Owner's implication that a petitioner must show that their combination is more obvious or a better combination is not supported by case law. *See, e.g.*, *PAR Pharm., Inc., v. TWI Pharm., Inc.*, 773 F.3d 1186, 1197–98 (Fed. Circ. 2014) (summarizing the state of the law on this topic, which "does not require that the motivation be the best option, only that it be a suitable option from which the prior art did not teach away"); *In re Mouttet*, 686 F.3d 1322, 1334 (Fed. Cir. 2012) (explaining that *even if* "better alternatives exist in the prior art does not mean that an inferior combination is inapt for obviousness purposes"). We find that Patent Owner's arguments and evidence about the pros and cons of different cross-member constructions do not teach away from the proposed combination or otherwise take away from the fundamental fact that tubes were known to be a suitable choice for cross members in a device like Works.

Accordingly, we find the tubular member limitation taught in Works, and to address Petitioner's fallback position, we also find Petitioner has established that a person of ordinary skill the art would have had known that tubular members are a suitable option to provide structural support, as taught in Works and Fandrich.

*5. Arguments About "Other Considerations"*

Patent Owner next argues that there are several "other considerations" that a person of ordinary skill in the art would have considered but that Petitioner has failed to analyze. PO Resp. 44–47; *see also* PO Sur-reply 7 (similar arguments). These considerations include additional holes,

additional weight, cost/benefits, other alternatives, performance, and cost/complexity. PO Resp. 44–47. We have considered the arguments and evidence regarding these types of "other considerations," and find Patent Owner's arguments unpersuasive for the reasons described below.

We acknowledge that any proposed physical modification of something involves changes in configuration, and potentially weight, cost, performance, etc. What is unpersuasive about Patent Owner's analysis is that it fails to show that any of these particular potential practical effects of the modification would prevent or lead a person away from considering the proposed modification (or show any other tendency to non-obviousness). Patent Owner admits that a petitioner does not have an affirmative burden *ab initio* to address weight, cost, performance, etc. Tr. 47:16–48:7. Instead, Patent Owner's argument is that it has raised a concern over the obviousness of the proposed combination in view of these considerations, and Petitioner has not sufficiently addressed them. *Id.*; *see also id.* at 48:20–51:12 (further questioning seeking to clarify Patent Owner's argument). But we find insufficient evidence or reason to conclude that any of the alleged concerns tend to show non-obviousness in the first place.

As to the argument that the modification would require additional holes, Patent Owner merely cites its expert, who states that cutting holes in the bed of the truck "is an obvious disadvantage." Ex. 2004 ¶ 117. It is not clear how additional holes is an "obvious disadvantage," especially given that Petitioner's proposed modification provides the benefit of allowing different types of hitches to be attached through those holes. In other words, we find the holes provide the noted benefit of allowing removable

attachment points, and we do not find sufficient evidence that adding holes would detract from this desire.[16]

As to the argument that the modification adds weight, Patent Owner seems to rest on the fact that Petitioner has not discussed weight. *See* PO Resp. 45; Ex. 2004 ¶ 118. But Patent Owner has not offered evidence that any weight change implied by the proposed modification was a concern (to the extent it is even relevant), or would otherwise tend to show non-obviousness. To be clear, for all of these "other considerations," we are not espousing a requirement for Patent Owner to prove non-obviousness. Instead, to the extent Patent Owner (or its expert) argues that a person of ordinary skill in the art would not have considered the proposed combination obvious on account of weight (or cost, adding holes, etc.), we have insufficient evidence in support of that argument. It is merely attorney argument that does not stand on its own. We find insufficient evidence that these other considerations teach away from the combination.

Our analysis is the same with respect to Patent Owner's arguments about cost and performance. Patent Owner's arguments and evidence do not meaningfully tend to show that a person of ordinary skill in the art would not have considered the proposed combination. Cost is a practical concern for bringing any product to market, but merely stating that Petitioner has not done a cost or performance analysis for selling a product embodying the proposed combination fails to apprise us of a teaching away from the combination, or of any reason that cost or performance was a concern that

[16] We also note that the arguments regarding a consumer not wanting to cut holes in a truck bed are largely irrelevant. *See, e.g.*, Ex. 2004 ¶ 119. The claims are not limited to an aftermarket hitch.

would lead a person of ordinary skill in the art not to consider the proposed combination.[17]

In sum, we find no requirement here for Petitioner to have done a cost, weight, performance, etc. analysis because we do not find evidence or technical reasoning that tends to explain why such considerations teach away from whether a person of ordinary skill in the art would have considered the particular combination of known features that Petitioner has proposed.

### *6. Evidence Offered as Objective Indicia of Non-Obviousness*

Patent Owner asserts objective indicia of non-obviousness in the forms of commercial success, recognition/praise, and copying. PO Resp. 48–51; PO Sur-reply 10–11. *But see* Pet. Reply 25–27 (arguing against). Patent Owner appears to address nexus when it states that "the claimed features . . . were featured prominently in the design that made its way into Ford pickup trucks beginning in Model Year 2011." PO Resp. 49. To show praise, Patent Owner points to an image in its brief purported to be a Ford

---

[17] Even if Patent Owner had established that these other factors were material, they do not appear to be important to the technological aspects of the invention, and we find no evidence that they teach away from it. *See Orthopedic Equip. Co. v. United States*, 702 F.2d 1005, 1013 (Fed. Cir. 1983) ("[T]he fact that the two disclosed apparatus would not be combined by businessmen for economic reasons is not the same as saying that it could not be done because skilled persons in the art felt that there was some technological incompatibility that prevented their combination. Only the latter fact is telling on the issue of nonobviousness."); *Joy Tech., Inc. v. Manbeck*, 751 F.Supp. 225, 232 (D.D.C. 1990), *aff'd*, 959 F.2d 226 (Fed. Cir. 1992) (finding the expert's expressed skepticism was entitled to little weight as evidence of nonobviousness because it "was directed to economic and commercial factors, not the technical merit of [the claimed invention]").

advertisement mentioning Patent Owner's product. *Id.* at 48–49 (citing Ex. 2004 ¶ 125). To show commercial success, Patent Owner asserts it "has sold hundreds of thousands [of] units . . . (millions in revenue) . . . to Ford from launch to present" and "has also sold thousands of additional units after-market." *Id.* at 49–50 (citing Ex. 2009 ¶ 25; Ex. 2062-10). As to copying, Patent Owner asserts that Petitioner manufactures a similar hitch for General Motors. *Id.* at 50–51 (citing Ex. 2004 ¶ 127).

We address nexus, then the individual assertions made by Patent Owner.

*a) Nexus*

For objective indicia of nonobviousness to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention. *ClassCo, Inc., v. Apple, Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016). "[T]here is no nexus unless the evidence presented is 'reasonably commensurate with the scope of the claims.'" *Id.* (quoting *Rambus Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed. Cir. 2013)). A patentee is entitled to a presumption of nexus "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)). "[T]he purpose of the coextensiveness requirement is to ensure that nexus is only presumed when the product tied to the evidence of secondary considerations 'is the invention disclosed and claimed.'" *Id.* at 1374 (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)). "[T]he degree of correspondence between a product

and the patent claim falls along a spectrum. At one end of the spectrum lies perfect or near perfect correspondence. At the other end lies no or very little correspondence." *Id.* "A patent claim is not coextensive with a product that includes a 'critical' unclaimed feature that is claimed by a different patent and that materially impacts the product's functionality." *Id.* at 1375.

We find that Patent Owner has not established nexus and has not made a meaningful attempt to do so. *See* Pet. Reply 25–27. Patent Owner directs our attention to its evidence on conception and diligence to establish the correlation between the claimed features and what is allegedly depicted in a Ford advertisement on page 49 of its Response. Initially, we note that the advertisement has not been entered as evidence, which immediately disposes of this issue in this case because Patent Owner offers no credible evidence of the advertisement. 37 C.F.R. § 42.63(a) (evidence must be in the form of an exhibit); *see also* Inst. Dec. 27 (warning Patent Owner to submit evidence under our Rules).[18] To the extent Patent Owner believes the evidence offered for diligence and conception show what is in the Ford products, we are not persuaded. All that those documents would tend to show is what plans Patent Owner was offering to Ford. There is no evidence showing what was sold to customers in Ford products. It is possible that Ford never included the products (or included a modified version, or

---

[18] The requirement to file evidence as an exhibit is not a formality. Properly-filed evidence facilitates the process of vetting that evidence through the Federal Rules of Evidence and our procedures for questioning and confirming the evidence. 37 C.F.R. §§ 42.62(a) (stating the "Federal Rules of Evidence shall apply to a proceeding"); 42.64 (setting out the procedure for objecting to evidence).

included its own Withers-based solution); we do not have credible evidence to know.

Accordingly, we find that Patent Owner has not established a nexus between the claimed invention and what Ford sold. This rests on the fact that Patent Owner has not directed us to credible evidence or analysis comparing the two. Notwithstanding, we proceed to address the objective evidence offered by Patent Owner, with the fact in mind that the nexus to the claimed invention is at or near zero.

*b) Praise*

To show praise, Patent Owner offers the image on page 49 of its Response, which states:

> A[.] FACTORY-INSTALLED 5TH-WHEEL/GOOSENECK TRAILER TOW PREP PACKAGE offers you the strength of an under-the-bed frame crossmember and maintains a flat cargo bed floor. This patent-pending system is fully covered by a Ford Warranty,[] and is compatible with the Ford Custom Accessory 5th-Wheel and Gooseneck Hitch Kits by Reese®.

PO Resp. 49; *see also id.* at 48 (asserting that Patent Owner uses the brand name "Reese").

This passage states that the "patent-pending system . . . is *compatible with* . . . Kits by Reese." (emphasis added). Notably, the patent-pending system is also compatible with Ford's "Custom Accessory" kits. Thus, we find that the advertisement states that one can have the advertised features by purchasing Ford's kit, without purchasing anything from Reese.

In addition, the "patent-pending system" is not described as Reese's—it is merely described as "patent-pending." *Cf.* Ex. 1012, code (73) (noting the Withers patent, which depicts a fifth-wheel/gooseneck hitch system, is

assigned to Ford); Ex. 1022 (same). We find that this passage is not calling Reese's products patent-pending.

We also agree with Petitioner, who argues that we do not know how the claimed invention maps to what is being described in this passage (Pet. Reply 27), which is especially persuasive given that the very language of the passage indicates that one can obtain the features of the prep package without purchasing anything from Reese. In sum, the evidence offered for praise is not proper evidence, and even if we considered it, it has no nexus and does not tend to show praise of Patent Owner's claimed invention.

*c) Commercial Success*

Patent Owner's claim of commercial success merely notes that units allegedly covered by the claims of the '585 patent were sold. PO Resp. 49–50. Even assuming this were true, mere sale of products does not persuade us of non-obviousness. Beyond attorney argument, Patent Owner offers the testimony of one of its employees, but that testimony is offered with insufficient supporting evidence. Ex. 2009 ¶¶ 25 (declarant's allegation of success without citation of supporting evidence), 26 (declarant citing Ex. 2062 without explanation). The 2021 Annual Report cited by Patent Owner and its declarant provides information at a very high level and nothing specific to the product claimed in the '585 patent. Ex. 2062-10. In sum, we do not find evidence of commercial success.

*d) Copying*

In Patent Owner's copying argument, Patent Owner again improperly offers an image not entered as evidence, which depicts a schematic drawing purportedly of a 2016 Chevrolet Silverado with a hitch system having both types of sockets. PO Resp. 50. Again, we do not consider improperly filed

evidence. Even if we did, we have no evidence before us of copying, as opposed to merely offering a competing product. *See Cable Elec. Prods., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1028 (Fed. Cir. 1985) ("[M]ore than the mere fact of copying . . . is needed to make that action significant to a determination of the obviousness issue,"), overruled on other grounds by *Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1358-61 (Fed. Cir. 1999) (en banc)); *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004) ("Not every competing product that arguably falls within the scope of a patent is evidence of copying. Otherwise every infringement suit would automatically confirm the nonobviousness of the patent."). Indeed, as we explained above, we have found that market forces desired a combined hitch system, independent of Patent Owner's efforts on the device claimed in the '585 patent. Accordingly, we do not find evidence of copying.

*7. Alleged Obviousness Over Works-Fandrich-Lindenman*

Having reviewed and analyzed the evidence offered to show obviousness and non-obviousness, we now turn to our determination as to the obviousness of the claims of the '585 patent. *Apple Inc. v. Samsung Electronics Co., Ltd.*, 839 F.3d 1034, 1048 (Fed. Cir. 2017) ("A determination of whether a patent claim is invalid as obvious under § 103 requires consideration of all four *Graham* factors, and it is error to reach a conclusion of obviousness until all those factors are considered."). In review of the facts, it is undisputed that Works, Fandrich, and Lindenman show each feature of claim 16. Works shows a hitch with a center socket for ball/socket hitches; Lindenman shows a hitch with cross member-mounted sockets for kingpin/receiver hitches; Fandrich shows a hitch using tubular

supports. We find that Petitioner has rational underpinnings in support of its combination—to provide versatility and additional attachment points for other accessories. The rational underpinnings are based on the facts that Works does not describe receiving kingpin/receiver hitches (despite its awkward wording), that versatility was a known motivation in the art, that the combination eliminates the need to purchase adapters, and that market forces were demanding a combined hitch (as evidenced by the two Withers patents and the testimony about Ford). We find that the record shows that Patent Owner did not come up with the notion of combining the hitch types, and instead it was known market forces that led to Ford asking them to design a product with that feature. We did not find evidence of praise, copying, or commercial success, or of any other objective indicia of non-obviousness.

Having reviewed all of the evidence, we now turn to our determination on obviousness. The only difference between the prior art and claims is that the two different types of prior art sockets are combined into one hitch device in the claims. However, this is not a case where all of the known elements were available but no one had thought to combine them except for the inventors. The notion of combining the two types of sockets did not originate from Patent Owner and instead comes from market forces and desires existing in the art. Thus, even the "missing" feature (the combination) is something taught in the art, and nothing in the art teaches away from the combination. We conclude that Petitioner has shown by a preponderance of the evidence that the subject matter of claim 16 would have been obvious in view of Works, Fandrich, and Lindenman.

Patent Owner does not separately argue dependent claims 17–20, and for the same reasons set forth in the Petition, we determine those claims also would have been obvious. *See* Pet. 42–48.

### *E. Obviousness over Lindenman, Fandrich, and Works (Claims 16–20)*

Our analysis for the Works-Fandrich-Lindenman combination applies to the Lindenman-Fandrich-Works combination, with the caveat that because Lindenman teaches sockets on the cross members for a kingpin/receiver hitch, the issue of whether Works teaches a kingpin/receiver hitch is not pertinent. The discussion about the remaining aspects of the obviousness inquiry remains the same, especially the desire in the art for a combined hitch, as does the ultimate conclusion of obviousness.

### *F. Anticipation by Withers (Claims 16, 17, 19)*

Because we have found each claim unpatentable, we do not reach the issue of anticipation by Withers, which involves fewer than all claims and which involves the issues of conception and diligence in Patent Owner's arguments of prior conception to Withers. *See Boston Scientific Scimed, Inc. v. Cook Gp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) ("We agree that the Board need not address issues that are not necessary to the resolution of the proceeding.").

### *G. Conclusion as to Petitioner's Unpatentability Grounds*

Petitioner has shown, by a preponderance of the evidence, that claims 16–20 of the '585 patent are unpatentable over the Works, Fandrich, and Lindenman references. This represents a final determination as to each challenged claim. We do not reach the Withers anticipation ground.

## III. PETITIONER'S MOTION TO EXCLUDE

Petitioner moves to exclude Exhibit 2004 ¶¶ 92–94, 123–128 (Walstrom Declaration); Exhibits 2007 (Stanifer Declaration) and 2008 (Morrison Declaration); Exhibits 2011 (Becker Deposition) and 2013 (Cequent Towing Products CAD Drawing); Exhibits 2012 and 2014 (B&W Trailer Hitches Catalog); and Exhibit 2064 (Table of Files).

As an initial matter, we dismiss as moot Petitioner's motion as to Exhibit 2004 ¶¶ 92–94 as well as to Exhibits 2007, 2008, 2011, 2013, and 2064. These are related to the Withers ground, which we did not reach. The remaining exhibits relate to Mr. Walstrom's declaration as to objective indicia (Ex. 2004 ¶¶ 123–128) and the B&W Trailer Hitches Catalog (Exs. 2012, 2014).

### *A. Walstrom Declaration*

Petitioner argues that Mr. Walstrom offers non-expert fact testimony and that his testimony is influenced by impermissible bias and unreliable. Mot. Excl. 3–8. Petitioner asserts that Mr. Walstrom's testimony regarding various aspects of his objective evidence discussion (Ex. 2004 ¶¶ 123–128) are without evidentiary support. Mot. Excl. 4.

Patent Owner argues that, if anything, we should address Petitioner's concerns by our weighing of the evidence. Opp. Mot. Excl. 10–11.

As we mentioned in our analysis above, Mr. Walstrom's testimony regarding praise and copying rely on drawings that have not been submitted as evidence and which we do not consider as evidence. Ex. 2004 ¶¶ 125–127; 37 C.F.R. §§ 42.63(a) ("All evidence must be filed in the form of an exhibit."), 42.6(c) ("Each exhibit must be filed with the first document in which it is cited."), 42.6(a)(3) ("combined documents are not permitted").

Mr. Walstrom's testimony regarding commercial success lacks sufficient supporting evidence. Ex. 2004 ¶ 128. We agree with Petitioner that Mr. Walstrom's testimony is without evidentiary support, yet we agree with Patent Owner with how to handle the testimony—we afford it no weight. We see little added value in Petitioner's requested remedy of expunging the paragraphs, when the document will remain in the record anyway, and our Rules provide a sufficient remedy by discounting the testimony. 37 C.F.R. § 42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight.").

### *B. B&W Product Catalogs*

Petitioner moves to exclude Exhibits 2012 and 2014, which Patent Owner asserts to be copies of a B&W Product Catalog from 2021. Mot. Excl. 13–14; *see also* PO Resp. vi, 36. Petitioner asserts that these exhibits are from 2021 and are not prior art to the '585 patent (filed in 2009), that Patent Owner has failed to establish the exhibits reflect commercial embodiments of the Works patents, and even if it did, that the prior art asserted is Works, not the catalogs. Mot. Excl. 13–14. Petitioner asserts that the catalogs are therefore irrelevant and prejudicial by confusing Works with the products in the catalog. *Id.* at 14 (asserting Fed. R. Evid. 401, 403).

Patent Owner argues that we should consider Mr. Walstrom's testimony relating to the catalogs, but does not address the evidentiary issues Petitioner raised in its Motion. *See* Opp. Mot. Excl. 9–13.

We agree with Petitioner that Patent Owner's "references to Exhibits 2012 and 2014 instead of *Works* are irrelevant." Even if we assume the

exhibits are what Patent Owner says they are,[19] they do not tend to show what is taught in the Works reference, nor do they tend to show the level of ordinary skill in the art in the relevant timeframe. We also agree with Petitioner that Patent Owner's repeated references to the catalogs as if they were Works is confusing.

Given the context of *inter partes* review, we see little value in excluding the catalogs at this phase of the proceeding. We are the factfinders, and as we discussed in our merits analysis above, we gave Exhibits 2012 and 2014, and the testimony relying thereon, little to no weight or persuasive value. In effect, Petitioner has the remedy it seeks through the typical mechanisms in the obviousness analysis requiring art to be prior art.

In sum, we dismiss Petitioner's Motion to Exclude as moot.

## IV. MOTION TO AMEND

Patent Owner's contingent Motion to Amend proposes substitute claim 21 for original independent claim 16. Mot. Amend 2–3. At a high level, the added limitations are directed to (1) the mid rail being "permanently attached" to the tubular members "as a one piece assembly" and (2) each rail end having a flange with an aperture configured to attach directly to the vehicle frame. *Id.* at 5–6. Patent Owner's motion also proposes to substitute claim 22 for original claim 17 (which just updates dependency). *Id.* at 2–3.[20]

---

[19] We do not reach the issues of authentication or public availability of the catalogs, nor whether they have any connection to the Works patent.
[20] Patent Owner also states that we should "[c]ancel claims 18–20 if they are found unpatentable." Mot. Amend 3. However, our precedent does not

Petitioner asserts that proposed substitute claim 21 is not responsive to a ground of unpatentability involved in the trial. Opp. Mot. Amend 1–2. Petitioner asserts that proposed substitute claim 21 is unpatentable over Withers '317 and Fandrich. *Id.* at 8–19. Petitioner also asserts that the claim lacks written description and is indefinite. *Id.* at 19–25.

We analyze the Motion to Amend using the guidance and burdens set forth in *Lectrosonics, Inc. v. Zaxcom, Inc.*, IPR2018-01129, Paper 15 (PTAB 2019) (precedential). Because the issue is dispositive, we only discuss in detail Petitioner's arguments that the subject matter of proposed substitute claim 21 would have been obvious. *Bos. Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) (non-precedential) (recognizing that the "Board need not address issues that are not necessary to the resolution of the proceeding").

---

permit a contingent motion to cancel claims. *Lectrosonics, Inc. v. Zaxcom, Inc.*, IPR2018-01129, Paper 15 at 3 (PTAB 2019) (precedential) ("A request to cancel claims will not be regarded as contingent."). Given the "if" language in the Motion to Amend, as well as statements in its briefing such as "the Board should find that claim 16–20 are patentable" (PO Resp. 52), we do not understand Patent Owner to be requesting a non-contingent motion to cancel the claims. Because Patent Owner may not make a contingent motion to cancel a claim under *Lectrosonics*, and because it is clear Patent Owner does not intend a non-contingent motion, we do not further consider Patent Owner's motion to cancel claims 18–20. In addition, granting cancelation here appears to be moot because the Director will cancel any unpatentable claims. *See* 35 U.S.C. 318(b) ("[T]he Director shall issue and publish a certificate canceling any claim of the patent finally determined to be unpatentable. . . .").

Petitioner asserts that the proposed substitute claim is obvious in view of Withers '317 and Fandrich. Figure 1 of Withers '317 is reproduced below.




Ex. 1022, Fig. 1. Figure 1 of Withers '317 depicts a hitch mounting system having an H-shaped body including a pair of transverse members 28, 30 each having a pair of receiving members 18 for connecting a fifth wheel hitch. *Id.*; *see id.* at 3:3–5 (referencing "fifth wheel pucks 18"). Transverse members 28, 30 are fabricated as one piece with central bridging portion 32, to which is assembled a gooseneck ball receiver 16. *Id.* at 2:64–3:2. The ends of transverse members 28, 30 are flattened and shown to be connected to the vehicle. *Id.* at Figs. 1, 3, 5, 7–9, 3:50–52 ("support structure assembly . . . is attached to the frame").

Petitioner has shown, and Patent Owner does not dispute, how Withers '317 describes each limitation as arranged in the claim (including

the newly-added "one piece" and "flange" limitations), with the exception of the transverse members being tubes. Opp. Mot. Amend 10–19. Accordingly, for the reasons set forth in the Opposition to the Motion to Amend, we find that Withers '317 teaches all of the undisputed limitations of the proposed substitute claim. This leaves us with the tubes, and Petitioner's reasons for modifying the cross members of Withers '317 to include that shape.

Petitioner asserts that it would have been obvious to modify the transverse members of Withers '317 to be tubular, as taught in Fandrich. *Id.* at 10–13. As we discussed before, Fandrich teaches a hitch that uses tubular support members "as a rigid support structure providing a secure foundation for vehicle hitch components." *Id.* at 11 (quoting Ex. 1011, 4:6–8). Petitioner asserts it would have been obvious to substitute the tubular members of Fandrich for the stamped members in Withers '317, because it was a known option in the art to use tubular cross members, such that their incorporation would have been a simple substitution and obvious to try. *Id.* at 10–11 (citing, *inter alia*, Ex. 1028 ¶¶ 22–28); *see also* Ex. 1028 ¶ 14 (citing Ex. 1012, 2:63–65) (explaining that Withers '317 may have stamped cross members).

Patent Owner argues that Petitioner's theory is not supported by evidence, and that Petitioner never stated why a person of ordinary skill in the art would be motivated to use the tubes (rather than the mere fact that they *could* use them). Reply Mot. Amend 4–7 (citing *Adidas AG v. Nike, Inc.*, 963 F.3d 1355, 1359 (Fed. Cir. 2020) ("The obviousness inquiry does not merely ask whether a skilled artisan could combine the references, but instead asks whether 'they would have been motivated to do so.'")).

As with their arguments for the Works-Fandrich-Lindenman grounds of unpatentability, we consider Patent Owner's arguments here to be impermissibly "confined by a formalistic conception of the words teaching, suggestion, and motivation." *KSR*, 550 U.S. at 419. We acknowledge that we are not looking merely for whether the combination was possible, but Patent Owner reads too much into isolated statements made in the case law. The *Adidas* case cited by Patent Owner does not stand for the premise that "motivation" requires a showing that combination is *specifically desired*. *See Adidas*, 963 F.3d at 1359 ("The obviousness inquiry does not *merely* ask whether a skilled artisan could combine the references." (emphasis added) (citing *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014)[21])). Instead, the quoted portion of *Adidas* stands for the premise that the obviousness inquiry cannot rest *merely* at the possibility of the combination. *KSR*, 550 U.S. at 418 ("[The obviousness] analysis should be made explicit.").

Here, Petitioner has gone further than merely suggesting the possibility of the combination. Petitioner has provided evidence that tubes were a known shape in the specific context at issue, truck-bed-mounted trailer hitches, and that such a shape is described as providing "a rigid support structure," which is the same purpose as in the proposed

---

[21] *InTouch*, which is the origin of the quote that includes the word "motivation" that Patent Owner repeats, discusses in great detail the obviousness analysis in light of *KSR* and does not stand for Patent Owner's reading-into of the word "motivation." *See, e.g.*, *InTouch* at 1347 (citing *KSR* and stating that "[w]hile an analysis of . . . motivation . . . is useful . . . the overall inquiry must be expansive and flexible"), 1351 (finding "insufficient evidence on this record of a *reason or motivation* . . . to combine [the references].") (emphasis added).

combination. Ex. 1011, 4:6–8; *see also* Ex. 1022, 2:64–65 (describing a "support structure assembly 10 [that] includes a H-shaped body portion 12"). *But see* Reply Mot. Amend 6 (arguing that Petitioner "presents no evidence to support [the assertion to use Fandrich's tubes for their strength]"). As such, this is not the case where a person of ordinary skill in the art merely knew about tubular-shaped structures, but rather one where Petitioner has shown that a person of ordinary skill in the art had a reason to select tubular-shaped structures—they were a known, suitable structure for hitch devices like Withers '317. *KSR*, 550 U.S. 421 (holding that "a person of ordinary skill *has good reason* to pursue the known options within his or her technical grasp" (emphasis added)).

Further, Patent Owner has not shown that, despite tubular-shaped members being known, a person of ordinary skill in the art would not select tube shapes for Withers '317 due to the specific nature of the alteration. *See* Reply Mot. Amend 4–7. To the extent Patent Owner argues that Petitioner has not shown tubes to be better than what is already shown in Withers '317, we again note that Petitioner must show a reason to combine supported by rational underpinnings; Petitioner need not rule out other potential combinations. *PAR Pharm.*, 773 F.3d at 1197–98. As to the argument regarding fabrication and engineering considerations in changing from the stamped-layer construction of Withers '317 to accommodate tubes, we find that these are at best business or manufacturing considerations that bear little, if any, on whether a person of ordinary skill in the art would consider it obvious to use tube shapes on Withers '317. In particular, we find no reason to require the obviousness analysis to ask a person of ordinary skill in the art to consider a scenario in which they were already producing a given product and then deciding whether it was worth the cost to modify it in the

manner proposed. *Cf.* Ex. 2065, 30:15–31:4 (Petitioner's expert being cross-examined as to how to modify the production process making the product shown in Withers '317), 27:6–8 (cross examination as to strength), 29:10–17 (as to cost).[22] It is certainly possible that a proposed modification would be sufficiently difficult to achieve that a person of ordinary skill in the art would be taught away from considering that combination. *See, e.g.*, *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994) (stating, "a reference will teach away if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result"). But we find no persuasive evidence of that here. Accordingly, we find that Petitioner's assertions that the proposed combination is an option known in the art, a simple substitution, and obvious to try is supported by sufficient evidence.

Given that a person of ordinary skill in the art already knew it was an option to use tubular-shaped support members for an underbed trailer hitch system, we see no room for granting Patent Owner a claim whose sole argument to innovation over the prior art is the use of that known structure already used in the art for the same purpose. *KSR*, 550 U.S. at 415–16 (A

---

[22] Patent Owner's assertion that Petitioner's expert "contradicts Petitioner's argument, testifying that this change would be superfluous and 'wouldn't make sense'" is a mischaracterization. Reply Mot. Amend 5 (citing and quoting Ex. 2065, 31:5–32:2). At the cited portion of his testimony, Mr. Becker was asked "[i]f Withers 317 already had tubular members, would adding those by Fandrich give it two additional tubular members?" To which Mr. Becker answered, "Yeah, that wouldn't make sense." Contrary to Patent Owner's strawman argument, Petitioner's combination results in "a *pair* of tubular members (i.e., the front and rear transverse bar portions 28, 30 of *Withers '317* as modified by *Fandrich* to be tubular)." Opp. Mot. Amend 12–13 (emphasis added); *see also id.* at 11 ("simple *substitution of one* known element . . . *for another*." (emphasis added)).

"patent for a combination which only unites old elements with no change in their respective functions . . . obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful [persons]." (*quoting Great Atlantic & Pacific Tea*, 340 U.S. at 152–153)). Accordingly, reviewing all of the evidence of obviousness and non-obviousness,[23] we determine that Petitioner has shown proposed substitute claim 21 to be unpatentable and do not enter it. Additionally, for similar reasons discussed above for claim 17, we determine that Petitioner has shown proposed substitute claim 22 to be unpatentable and do not enter it.

## V. CONCLUSION

As explained above, we find that Petitioner has established, by a preponderance of the evidence, that claims 16–20 are unpatentable over the references of Works, Fandrich, and Lindenman. Petitioner has also established, by a preponderance of the evidence, that proposed substitute claim 21 would have been obvious over the references of Withers '317 and Fandrich. Thus, we deny Patent Owner's Motion to Amend to enter proposed substitute claims 21 and 22. We have considered Petitioner's Motion to Exclude but deny as moot because we have sufficiently addressed the valid concerns Petitioner has raised by discounting the evidence using other mechanisms.

[23] Although the parties do not address it in their motion to amend briefing, we have considered again the evidence of non-obviousness offered by Patent Owner in the case-in-chief and again note the paucity and lack of persuasive value of such evidence.

In summary:

| **Claims** | **35 U.S.C. §** | **Reference(s)/Basis** | **Claims Shown Unpatentable** | **Claims Not Shown Patentable** |
|---|---|---|---|---|
| 16–20 | 103(a) | Works, Fandrich, Lindenman | 16–20 | |
| 16–20 | 103(a) | Lindenman, Fandrich, Works | 16–20 | |
| 16, 17, 19 | 102(e) | Withers[24] | | |
| **Overall Outcome** | | | 16–20 | |

For the Motion to Amend:

| Motion to Amend Outcome | Claim(s) |
|---|---|
| Original Claims Cancelled by Amendment | |
| Substitute Claims Proposed in the Amendment | 21, 22 |
| Substitute Claims: Motion to Amend Granted | |
| Substitute Claims: Motion to Amend Denied | 21, 22 |
| Substitute Claims: Not Reached | |

## VI. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Petitioner has shown by a preponderance of the evidence that claims 16–20 of the ’585 patent are unpatentable; and

FURTHER ORDERED that Petitioner’s Motion to Exclude is dismissed as moot;

FURTHER ORDERED that Patent Owner’s Motion to Amend is denied as to proposed substitute claims 21 and 22; and

[24] As noted above, we do not reach this ground because we have determined each challenged claim unpatentable in the other grounds.

FURTHER ORDERED that, because this is a Final Written Decision, any party to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

For PETITIONER:

Scott Barnett
Dennis Abdelnour
David Thomas
HONIGMAN LLP
sbarnett@honigman.com
dabdelnour@honigman.com
dthomas@honigman.com

For PATENT OWNER:

David Cupar
Matthew Cavanagh
MCDONALD HOPKINS LLC
dcupar@mcdonaldhopkins.com
mcavanagh@mcdonaldhopkins.com

US010589585B2

(12) **United States Patent**
**Stanifer et al.**

(10) **Patent No.: US 10,589,585 B2**
(45) **Date of Patent: *Mar. 17, 2020**

(54) **UNDERBED HITCH MOUNTING SYSTEM**

(71) Applicant: **HORIZON GLOBAL AMERICAS INC.**, Plymouth, MI (US)

(72) Inventors: **Eric J. Stanifer**, Mishawaka, IN (US); **Richard W. McCoy**, Granger, IN (US)

(73) Assignee: **HORIZON GLOBAL AMERICAS INC.**, Plymouth, MI (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 66 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/830,139**

(22) Filed: **Dec. 4, 2017**

(65) **Prior Publication Data**

US 2018/0093540 A1 Apr. 5, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 14/739,076, filed on Jun. 15, 2015, now Pat. No. 9,834,050, which is a

(Continued)

(51) **Int. Cl.**

***B60D 1/48*** (2006.01)
***B60D 1/02*** (2006.01)

(Continued)

(52) **U.S. Cl.**

CPC ............... ***B60D 1/488*** (2013.01); ***B60D 1/02*** (2013.01); ***B60D 1/06*** (2013.01); ***B60D 1/52*** (2013.01); ***B62D 53/0828*** (2013.01)

(58) **Field of Classification Search**

CPC . B60D 1/488; B60D 1/02; B60D 1/06; B60D 1/52; B62D 53/0828

(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

1,958,723 A 5/1934 Spencer
1,996,162 A 4/1935 Lubbers

(Continued)

FOREIGN PATENT DOCUMENTS

DE 2121876 4/1971
EP 0038928 B1 4/1981

(Continued)

OTHER PUBLICATIONS

International Search Report for International App. No. PCT/US2011/063922 dated May 8, 2012.

(Continued)

*Primary Examiner* — Jacob D Knutson

(74) *Attorney, Agent, or Firm* — McDonald Hopkins LLC

(57) **ABSTRACT**

An underbed hitch mounting system is described. The mounting system may be utilized for towing vehicles wherein the mounting system may selectively accommodate either a fifth wheel hitch or a gooseneck hitch. The mounting system may include at least one rail capable of being connected to a vehicle frame, wherein the rail includes at least one socket. The socket may be engaged with a receiving member, wherein the receiving member may be engaged with a leg of a fifth wheel hitch. A mid rail may be connected to the rails and may include a hitch ball socket that is capable of engagement with a hitch.

**20 Claims, 7 Drawing Sheets**



### Related U.S. Application Data

continuation of application No. 13/790,134, filed on Mar. 8, 2013, now Pat. No. 9,067,468, which is a continuation of application No. 12/609,062, filed on Oct. 30, 2009, now Pat. No. 8,414,009.

(60) Provisional application No. 61/197,732, filed on Oct. 30, 2008.

(51) **Int. Cl.**
***B60D 1/06*** (2006.01)
***B60D 1/52*** (2006.01)
***B62D 53/08*** (2006.01)

(58) **Field of Classification Search**
USPC .......................................................... 280/495
See application file for complete search history.

(56) **References Cited**


U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,027,990 A | 1/1936 | Lubbers | |
| 2,041,124 A | 5/1936 | Francis | |
| 2,289,079 A | 7/1942 | Seyferth | |
| 2,507,616 A | 5/1950 | Stephen | |
| 2,513,117 A | 6/1950 | Stephen | |
| 2,543,749 A | 3/1951 | Walther | |
| 2,610,069 A | 9/1952 | Ketel | |
| 2,621,056 A | 12/1952 | Kayler | |
| 2,680,627 A | 6/1954 | Johnson et al. | |
| 2,749,144 A | 6/1956 | Kayler | |
| 2,778,657 A | 1/1957 | Chaplin | |
| 2,779,605 A | 1/1957 | Braunberger | |
| 2,799,516 A | 7/1957 | Greenway | |
| 2,809,851 A | 10/1957 | Beck | |
| 2,819,096 A | 1/1958 | Sencenich | |
| 2,856,203 A | 10/1958 | Kayler | |
| 2,860,891 A | 11/1958 | Ramun | |
| 2,900,194 A | 8/1959 | De Lay | |
| 2,925,286 A | 2/1960 | Hodges, Jr. et al. | |
| 2,977,137 A | 3/1961 | Durham | |
| 2,985,463 A | 5/1961 | Geerds | |
| 3,073,624 A | 1/1963 | Thomas | |
| 3,112,936 A | 12/1963 | Cole et al. | |
| 3,170,716 A | 2/1965 | Walther et al. | |
| 3,171,672 A | 3/1965 | Dalton | |
| 3,198,549 A | 8/1965 | Martin | |
| 3,220,750 A | 11/1965 | Mead | |
| 3,318,616 A | 5/1967 | Fontaine et al. | |
| 3,402,944 A | 9/1968 | Day | |
| 3,584,899 A | 6/1971 | Gottler et al. | |
| 3,595,125 A | 7/1971 | Jacobs | |
| 3,606,384 A | 9/1971 | Fontaine et al. | |
| 3,630,545 A | 12/1971 | Fontaine et al. | |
| 3,640,549 A | 2/1972 | Neff et al. | |
| 3,746,369 A | 7/1973 | Neff et al. | |
| 3,844,584 A | 10/1974 | Fontaine | |
| 3,847,414 A | 11/1974 | Madura | |
| 3,861,709 A | 1/1975 | Mulcahy et al. | |
| 3,888,514 A | 6/1975 | Klein | |
| 3,893,710 A | 7/1975 | Madura | |
| 3,941,407 A | 3/1976 | Breford | |
| 4,017,095 A | 4/1977 | Best | |
| 4,029,335 A | 6/1977 | Cady et al. | |
| 4,039,087 A | 8/1977 | Sandvick, Sr. | |
| 4,134,601 A | 1/1979 | Propst | |
| 4,429,892 A | 2/1984 | Frampton et al. | |
| 4,477,100 A | 10/1984 | Elyakim | |
| 4,505,344 A | 3/1985 | Hobbs et al. | |
| 4,531,774 A | 7/1985 | Whatley | |
| 4,614,355 A | 9/1986 | Koch | |
| 4,721,323 A | 1/1988 | Czuk et al. | |
| 4,856,804 A | 8/1989 | Nash | |
| 4,892,324 A | 1/1990 | Spencer et al. | |
| 4,921,266 A | 5/1990 | Beals | |
| 4,928,987 A | 5/1990 | Hunger | |
| 4,946,183 A | 8/1990 | Benson et al. | |
| 4,960,288 A | 10/1990 | Chambers | |
| 4,962,945 A | 10/1990 | Vannoy et al. | |
| 5,044,651 A | 9/1991 | Weikel | |
| 5,120,080 A | 6/1992 | Ritter | |
| 5,141,277 A | 8/1992 | Alexander | |
| 5,246,244 A | 9/1993 | Colibert | |
| 5,306,037 A | 4/1994 | Robertson | |
| D362,224 S | 9/1995 | McCoy et al. | |
| 5,449,191 A | 9/1995 | Cattau | |
| 5,509,682 A | 4/1996 | Lindenman et al. | |
| 5,516,137 A | 5/1996 | Kass et al. | |
| 5,529,329 A | 6/1996 | McCoy | |
| D376,751 S | 12/1996 | Hanson et al. | |
| 5,580,073 A | 12/1996 | Irwin et al. | |
| D378,077 S | 2/1997 | Lindenman et al. | |
| 5,707,070 A | 1/1998 | Lindenman et al. | |
| 5,738,471 A | 4/1998 | Zentner et al. | |
| 5,772,229 A | 6/1998 | Cattau | |
| 5,839,745 A | 11/1998 | Cattau et al. | |
| 5,971,418 A * | 10/1999 | Lindenman | B60D 1/06 280/417.1 |
| 6,065,766 A | 5/2000 | Pulliam | |
| 6,170,850 B1 | 1/2001 | Works | |
| 6,179,316 B1 | 1/2001 | Sibley, Jr. | |
| 6,199,889 B1 | 3/2001 | Golembiewski et al. | |
| 6,467,791 B1 | 10/2002 | Fandrich et al. | |
| 6,502,846 B2 | 1/2003 | Fandrich et al. | |
| 6,520,528 B2 | 2/2003 | Fandrich et al. | |
| 6,523,841 B2 | 2/2003 | Glaser | |
| 6,533,308 B1 | 3/2003 | Tambormino | |
| 6,758,921 B1 | 7/2004 | Struebel | |
| 6,824,157 B1 * | 11/2004 | Putnam | B60D 1/06 280/490.1 |
| 6,851,695 B2 | 2/2005 | Lindenman et al. | |
| 6,969,090 B1 * | 11/2005 | Works | B60D 1/06 280/407 |
| 7,121,573 B2 | 10/2006 | Lindenman et al. | |
| 7,264,259 B2 | 9/2007 | Lindenman et al. | |
| 7,413,390 B1 | 8/2008 | Allison et al. | |
| 7,775,541 B2 | 8/2010 | Linger et al. | |
| 7,793,968 B1 * | 9/2010 | Withers | B60D 1/015 280/415.1 |
| 7,828,317 B2 | 11/2010 | Withers et al. | |
| 8,414,009 B2 * | 4/2013 | Stanifer | B60D 1/02 280/433 |
| 9,067,468 B2 * | 6/2015 | Stanifer | B60D 1/02 |
| 9,834,050 B2 * | 12/2017 | Stanifer | B60D 1/02 |
| 2003/0015855 A1 | 1/2003 | McCoy et al. | |
| 2003/0038452 A1 | 2/2003 | Lindenman et al. | |
| 2003/0209878 A1 | 11/2003 | Lindenman et al. | |
| 2003/0209879 A1 | 11/2003 | Lindenman et al. | |
| 2009/0295122 A1 * | 12/2009 | Withers | B62D 53/08 280/476.1 |
| 2010/0109285 A1 | 5/2010 | Stanifer et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1078785 A2 | 2/2001 |
| EP | 1036679 B1 | 8/2004 |
| WO | WO2009030026 A1 | 3/2009 |

OTHER PUBLICATIONS

Cequent Towing Products, Inc., Installation Instructions Mounting Kit Ford F250/F350/F450 LD/HD/SD 6' & 8' Beds, Dec. 13, 2006, pp. 1-11, Litho in USA.

Cequent Performance Products, Installation Instructions Gooseneck Mounting Kit Chevrolet/GMC 2500/3500 Heavy Duty Short & Long Bed, (Part No. 4456), Apr. 11, 2011, pp. 1-8.

Instruction Sheet No. 63102N, Make/Model(s) Hide-A-Goose, Mar. 26, 2007, 4 pages.

Instruction Sheet No. 50117N, Make/Model(s) Dodge Pick-Ups, 2003-Up 2500, 3500 All Models, Mar. 22, 2007, 3 pages.

(56) **References Cited**

OTHER PUBLICATIONS

Cequent Towing Products, Inc., Operating Instructions Signature Series 5th Wheel Slider Hitch, pp. 1-12, Jan. 23, 2004, Litho in USA.
Cequent Towing Products, Inc., Installation Instructions Mounting Kit GM '99-'07 "Classic" 1500 (LD/HD) and 2500 5'8" & 6'6" Beds Only, Aug. 29, 2008, 10 pages, Litho in USA.
Cequent Towing Products, Inc., Installation Instructions Mounting Kit Ford 2004-Current F150 5.5', 6' and 8' Beds, 11 pages, Aug. 21, 2008, Litho in USA.
Cequent Towing Products, Inc., Assembly Instructions Signature Series 24K 5th Wheel Hitch, pp. 1-11, Jan. 28, 2004, Litho in USA.
Draw-Tite Catalog 2004, 7 pages.
Draw-Tite Catalog 2005, 7 pages.
Draw-Tite Catalog 2006, 5 pages.
Draw-Tite Catalog, 2007, 6 pages.
Draw-Tite Catalog, 2008, 3 pages.
Reese Catalog, 2004, 8 pages.
Reese Catalog, 2005, 9 pages.
Reese Catalog, 2006, 6 pages.
Reese Catalog, 2007, 7 pages.
Reese Catalog, 2008, 5 pages.
Cequent Towing Products, Inc., Operating Instructions Signature Series 5th Wheel Slider Hitch, pp. 1-12, Dec. 13, 2004, Litho in USA.
Cequent Towing Products, Inc., Assembly Instructions Signature Series 5th Wheel Slider Hitch, pp. 1-16, Jan. 23, 2004, Litho in USA.
Cequent Towing Products, Inc., Assembly Instructions Signature Series 5th Wheel Slider Hitch, pp. 1-16, Jan. 5, 2004, Litho in USA.
Cequent Towing Products, Inc., Assembly Instructions Signature Series 16K 5th Wheel Hitch, pp. 1-11, Mar. 15, 2005, Litho in USA.
Cequent Towing Products, Inc., Assembly Instructions Signature Series 24K 5th Wheel Hitch, pp. 1-11, Dec. 13, 2004, Litho in USA.
Cequent Towing Products, Inc., Operating Instructions Signature Series 16K 5th Wheel Hitch, pp. 1-9, Dec. 14, 2004, Litho in USA.
Cequent Towing Products, Inc., Assembly Instructions Signature Series Gooseneck, pp. 1-14, Oct. 13, 2006, Litho in USA.
Cequent Towing Products, Inc., Assembly Instructions Signature Series 24K 5th Wheel Hitch, pp. 1-11, Jun. 15, 2006, Litho in USA.
Cequent Towing Products, Inc., Assembly Instructions Signature Series 24K 5th Wheel Hitch, pp. 1-11, May 21, 2008, Litho in USA.
Cequent Towing Products, Inc., Assembly Instructions Signature Series 5th Wheel Slider Hitch, pp. 1-17, Jun. 2, 2004, Litho in USA.
Cequent Towing Products, Inc., Operating Instructions Signature Series 24K 5th Wheel Hitch, pp. 1-9, Mar. 15, 2005, Litho in USA.
Cequent Towing Products, Inc., Operating Instructions Signature Series 24K 5th Wheel Hitch, pp. 1-9, May 21, 2008, Litho in USA.
Cequent Towing Products, Inc., Operating Instructions Signature Series 24K 5th Wheel Hitch, pp. 1-9, Dec. 14, 2004, Litho in USA.
Cequent Towing Products, Inc., Operating Instructions Signature Series 24K 5th Wheel Hitch, pp. 1-9, Aug. 20, 2007, Litho in USA.
Cequent Towing Products, Inc., Assembly Instructions Signature Series 24K 5th Wheel Hitch, pp. 1-11, Jan. 6, 2006, Litho in USA.
Cequent Towing Products, Inc., Operating Instructions Signature Series 24K 5th Wheel Hitch, pp. 1-9, Jan. 28, 2004, Litho in USA.
Cequent Towing Products, Inc., Assembly Instructions Signature Series 5th Wheel Slider Hitch, pp. 1-17, Jan. 24, 2007, Litho in USA.
Cequent Towing Products, Inc., Operating Instructions Signature Series 5th Wheel Slider Hitch, pp. 1-12, Aug. 20, 2007, Litho in USA.
Cequent Towing Products, Inc., Operating Instructions Signature Series 5th Wheel Slider Hitch, pp. 1-12, Jan. 25, 2007, Litho in USA.

* cited by examiner




FIG. 1




FIG. 2




FIG. 3


26
28
44
56
26
10
26
26
28
28
56
46
42
36
20
44
56
44
40
32
28
28
26
26
28
20
56
26
28
44
26

FIG. 4




FIG. 5




FIG. 6



57
44
55
44
57
44
57
44
57
10
26
28
28
26
30
20
18
46
30
28
40
26
30
20
28
30
26


FIG. 7

# UNDERBED HITCH MOUNTING SYSTEM

## CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. patent application Ser. No. 14/739,076, entitled "Underbed Hitch Mounting System," filed Jun. 15, 2015, which is a continuation of U.S. patent application Ser. No. 13/790,134, entitled "Underbed Hitch Mounting System," filed Mar. 8, 2013, now U.S. Pat. No. 9,067,468, which is a continuation of U.S. patent application Ser. No. 12/609,062, entitled "Underbed Hitch Mounting System," filed Oct. 30, 2009, now. U.S. Pat. No. 8,414,009 which claims benefit from U.S. Provisional Patent Application No. 61/197,732, entitled "Underbed Hitch Mounting System," filed on Oct. 30, 2008, which are all hereby incorporated in their entirety by reference.

## FIELD OF INVENTION

The present invention is generally related to a towing apparatus and, more particularly, to an underbed hitch mounting system.

## BACKGROUND

Many vehicles are designed to transport freight, goods, merchandise, personal property, and other such cargo. Often, a hitch assembly is utilized to connect a towed vehicle or trailer to a towing vehicle, such as a truck for example, to increase the capacity to transport goods. Many types of coupling devices have been developed for providing this connection between a towing vehicle and a towed vehicle.

It is well known to utilize a trailer hitch to connect a trailer to a towing vehicle. There are many different types of trailer hitches that may be attached to the towing vehicle in a variety of ways, depending on the type of hitch to be used. Some of the most common types of hitches include gooseneck, fifth wheel, front mount, and the like. Often, the type of hitch used to connect a trailer and a vehicle is determined by the size, shape and other features of the trailer. For example, large trailers such as semi trailers and campers often require a fifth wheel hitch, whereas, small and mid-sized trailers, such as boat trailers, are better suited for gooseneck trailer hitches. Typically, trailers are connected to a towing vehicle by way of a ball hitch secured to the vehicle and a ball socket coupling mechanism on the trailer that mounts over the ball and thereby allows for the trailer to pivot behind the towing vehicle.

Due to the size and weight of many trailers, towing a trailer may cause unsafe conditions for the towing vehicle, such as fishtailing or other unsafe effects. To avoid these unwanted effects, it is preferable to evenly balance and distribute the weight of the trailer over the wheels of the towing vehicle. This is best accomplished by connecting the hitch to the frame or base of the towing vehicle, near the vehicle's center of gravity. Accordingly, fifth wheel and gooseneck hitches mounted to pickup trucks are often connected to the truck frame underneath the bed of the truck.

Traditional fifth wheel hitches include a head assembly for receiving a king pin on a trailer, a base having a plurality of legs, and one or more mounting rails. The mounting rails may be permanently fixed to the frame of a vehicle, such as a pickup truck. For example, the mounting rails may be connected between two portions of a pickup truck frame



underneath the truck bed. The mounting rails may include a plurality of holes for receiving the legs of the fifth wheel hitch.

Corresponding openings may be cut in the truck bed and aligned with the holes in the mounting rails. The legs of the fifth wheel hitch may be connected to holes in the mounting rails through the openings in the truck bed, thereby securing the fifth wheel hitch to the frame of the truck. When the fifth wheel hitch is not in use, the legs may be disconnected from the holes in the rails and the hitch may be removed from the bed of the truck. Caps may be placed over the holes to allow the truck bed to be used for other purposes.

Traditional gooseneck hitches also mount to a pickup truck frame, beneath the bed of a truck. A gooseneck hitch is designed for use in a pickup truck similar to a fifth wheel. The difference is that the gooseneck uses a ball and coupler verses a kingpin and pin receiver. Gooseneck hitches include a mounting plate configured to connect to the frame of a truck, a receptacle in the mounting plate configured to receive a ball hitch, and a hitch ball removably connected to the receptacle and configured to engage a coupling member of the trailer. An opening in the bed of the truck is aligned with the receptacle in the mounting plate, allowing the hitch ball to connect to the receptacle through the opening in the truck bed. The hitch balls themselves are typically removable or retractable so that when the hitch is not in use, the hitch ball may be removed or retracted when not in use, so as not to obstruct the bed of the pick-up truck in any significant manner.

Towing vehicles are generally arranged to accommodate either a fifth wheel hitch or a gooseneck hitch, but not both. To convert a towing vehicle from accommodating a fifth wheel hitch to a gooseneck hitch or vice versa is time and labor intensive and inefficient. Furthermore, both fifth wheel hitches and gooseneck hitches are preferably mounted to the vehicle frame near the vehicle's center of gravity. However, since fifth wheel hitches and gooseneck hitches use different mounting configurations, traditionally only one hitch can occupy this location. Therefore, there is a need in the art for an improved apparatus for towing vehicles that allow for selectively accommodating either a fifth wheel hitch or a gooseneck hitch.

## SUMMARY

An underbed hitch mounting system is described. The mounting system may be utilized for towing vehicles wherein the mounting system may selectively accommodate either a fifth wheel hitch or a gooseneck hitch. The mounting system may include at least one rail capable of being connected to a vehicle frame, wherein the rail includes at least one socket. The socket may be engaged with a receiving member, wherein the receiving member may be engaged with a leg of a fifth wheel hitch. A mid rail may be connected to the rails and may include a hitch ball socket that is capable of engagement with a hitch.

## DESCRIPTION OF THE DRAWINGS

Objects and advantages together with the operation of the invention may be better understood by reference to the following detailed description taken in connection with the following illustrations, wherein:

FIG. **1** illustrates a perspective and partially exploded view of an underbed hitch mounting system in an embodiment of the invention.

FIG. **2** illustrates a perspective view of a rail assembly.

FIG. **3** illustrates a perspective view of an adapter plate.

FIG. **4** illustrates a perspective view of an underbed hitch mounting system in an embodiment of the invention.

FIG. **5** illustrates a top view of the underbed hitch mounting system of FIG. **4**.

FIG. **6** illustrates a perspective view of an embodiment of the underbed hitch mounting system.

FIG. **7** illustrates a perspective view of embodiments of an underbed hitch mounting system with a fifth wheel hitch in phantom immediately over the underbed hitch mounting system.

## DETAILED DESCRIPTION

Reference will now be made in detail to exemplary embodiments of the present invention, examples of which are illustrated in the accompanying drawings. It is to be understood that other embodiments may be utilized and structural and functional changes may be made without departing from the respective scope of the invention. As such, the following description is presented by way of illustration only and should not limit in any way the various alternatives and modifications that may be made to the illustrated embodiments and still be within the spirit and scope of the invention.

FIGS. **1-7** illustrate an underbed hitch mounting system **10**. The underbed hitch mounting system **10** may be used with towing vehicles that allow for selectively accommodating either a fifth wheel hitch **55** or a gooseneck hitch. Trailer hitches, such as a gooseneck or fifth wheel hitch **55** may be mounted to a truck bed. These types of hitches are often mounted beneath the truck bed in conjunction with the truck's own frame rails **52**, such as with cross members or rails **20**, for example.

The underbed hitch mounting system **10** may include at least one rail mount or cross member **20** and at least one mid rail or adapter plate **40**. For example, the mounting system **10** may include two rails **20** and one mid rail or adapter plate **40**. The rails **20** may be configured to support a gooseneck hitch (not shown) or a fifth wheel hitch **55**. Typical fifth wheel hitches **55** may include a plurality of legs **57** to connect the hitch to a vehicle. While the underbed hitch mounting system **10** may be shown and described as having two rails **20** and one mid rail or adapter plate **40**, it is to be understood that there may be any appropriate number of rails or adapter plates and it should not be limited to that shown and described herein.

The rails **20** may be of any appropriate shape or size, such as a generally tubular, square or rectangular shape. Each rail **20** may include one or more sockets **30** (FIGS. **1**, **2** and **4-6**). The sockets **30** may be of any appropriate shaper or size, such as a generally ovular, circular or rectangular shape. The sockets **30** may be configured to receive and support the legs **57** of a fifth wheel hitch **55**. The legs **57** may be secured to the rails **20** through the sockets **30** by any appropriate means, such as by fasteners, being welded, or the like.

The rails **20** may include connecting holes or mounting apertures **28** (FIGS. **1**, **2** and **4-6**). The mounting apertures **28** may be of any appropriate shape or size, such as a generally circular, ovular or rectangular shape. There may be any number of appropriate mounting apertures **28** and should not be limited to that shown and described herein.

The mounting apertures **28** may be utilized for connecting another member to the rails **20**, such as the adapter plate **40** or attachment brackets **54** (see FIGS. **1**, **2** and **4**). The mounting apertures **28** may also be used to connect the rails **20** of the hitch mounting system **10** to the underbed of the towing vehicle frame **52**. For example, the rails **20** may be connected to the towing vehicle frame **52**, such as underneath the truck bed (not shown).

The rails **20** may include one or more attachment brackets **54** (FIG. **2**). For example, the mounting system **10** may have two attachment brackets **54**. The attachment brackets **54** may be utilized for connecting the rails **20** to the frame **52**. The rails **20** may be connected to the attachment brackets **54** by any appropriate means, such as with fasteners, welding or the like. The attachment brackets **54** may be of any appropriate shape or size, such as a general L-shape, rectangular plate or the like. The attachment brackets **54** may be sized and shaped to engage a vehicle frame.

Typical vehicle frames **52** may include two parallel steel members. An end of each rail **20** may connect to a first member of the frame **52** and an opposite end of the rail **20** may connect to a second member of the vehicle frame **52** (FIG. **2**). The cross members or rails **20** may extend between the mounting brackets **54**. The rails **20** may be of a length sufficient to span the distance between the mounting brackets **54** when those brackets engage the vehicle framework **52**. The attachment brackets **54** may form a generally L-shaped bracket to engage the frame **52**. The attachment brackets **54** may be attached to the frame **52** by any appropriate means, such as with fasteners, welding or the like.

The mid rail or adapter plate **40** may be of any appropriate shape or size, such as a generally rectangular or tubular shape that may span the length between the rails **20** (FIGS. **1** and **4**). The mid rail or adapter plate **40** may be configured to connect to the rails **20**. The mid rail or adapter plate **40** may be attached to the rails by any appropriate means, such as with fasteners, welding or the like.

The adapter plate **40** may be of a one piece construction or may include several sections that may be secured together. The adapter plate **40** may include a center section **32** and one or more mounting sections **34** extending therefrom. For example, there may be two mounting sections **34** (FIG. **3**). As an alternative, there may be no mounting sections **34**, such that the center section may be attached directly to the rails **20** (FIGS. **4-6**).

The center section **32** may be located between the mounting sections **32**. The mounting sections **34** may extend at a downward angle and away from the center section **32**, such that the center section **32** may be positioned above the mounting sections **34**. The mounting sections **34** may extend in opposite directions away from the center section **32**.

The mounting sections **34** may engage the rails **20** at any appropriate location, such as the underside of the rails **20**. The mounting sections **34** may be configured to connect to the rails **20** by any appropriate means, such as with fasteners, welding or the like. When the mid rail **40** is connected to the rails **20**, the center section **32** may be approximately flush with and parallel to the rails **20** (FIGS. **3** and **4**). When the mounting section **34** engages the rails **20**, the mounting sections **34** may be approximately parallel to the rails **20**. Each mounting section **34** may include one or more openings or rail mounting apertures **38**. The mounting apertures **38** may be configured to align with the mounting apertures **28** in the rails **20**. The mounting apertures **38** may be of any appropriate shape or size, such as a generally circular, ovular or rectangular shape.

The adapter plate or mid rail **40** may also include a base member **36** (FIGS. **3** and **6**). The base member **36** may be of any appropriate shape or size, such as a generally square, rectangular or tubular shape. The base member **36** may be attached to the bottom of the adapter plate or mid rail **40**.

The base member **36** may be attached to the mid rail **40** by any appropriate means, such as by welding, fasteners or the like. The base member **36** may also be secured to the rails **20**, such as on the underside of the rails **20** (FIGS. **4** and **6**).

The adapter plate or mid rail **40** may be configured to receive a hitch ball **18** (see FIGS. **3** and **4-6**). For example, the center section **32** may include a hitch ball socket **42** that may be configured to receive the hitch ball **18**. The hitch ball socket **42** may be of any appropriate shape or size, such as a generally cylindrical shape. The hitch ball socket **42** may be located at any appropriate position on the adapter plate **40**, such as the approximate center of the adapter plate **40**. For example, the hitch ball socket **42** may be configured to receive a removable hitch ball **18** with spring-loaded ball bearings. It should be appreciated, however, that the receptacle may be configured to receive any appropriate type of hitch ball **18** and should not be limited to that shown or described herein.

The hitch ball socket **42** may include a raised collar **46** and a cap **48** (FIG. **3**). The raised collar **46** may be of any appropriate shape or size, such as one that may extend above and approximately perpendicularly to the surface of the center section **32**. The cap **48** may be of any appropriate shape or size, such as one that may engage the collar **46** and cover the hitch ball socket **42** when a hitch ball **18** is not connected to the hitch ball socket **42**.

FIGS. **4-6** illustrate another embodiment of the underbed hitch mounting system **10**. The underbed hitch mounting system **10** may utilize a puck mounting system whereby the trailer hitch may be installed in the pickup truck bed with only four small holes (not shown). Utilizing a puck mounting system may provide uninhibited use of the truck bed when the hitch is dismounted. The puck mounting system may also provide for a wider platform and mounting surface, which increases the stability. The puck mounting system may be used with any appropriate trailer hitch mounting kit, such as those that utilize rail mounts or cross members **20** for example, such as with the "Signature Series" produced and sold by Cequent.

The underbed hitch mounting system **10** may include at least two rails or cross members **20**. The cross members **20** may include sockets **30** for attachment with a puck or receiving member **44**. The cross members **20** may be attached to the vehicle framework **52** by any appropriate means, such as with fasteners, by welding or the like.

Holes may be drilled in the truck bed corresponding to the locations of the sockets **30** in the rails **20** and the hitch ball socket **42**. A fifth wheel hitch may be removably connected to the sockets **30** in the rails **20** through the holes located in the truck bed. A hitch ball **18** may be removably connected to the hitch ball socket **42** through the hole in the truck bed, whereby a gooseneck hitch may be utilized.

The cross members **20** may be mounted to the truck bed with the use of the receiving members **44**. Each receiving member **44** may be mounted in a socket **30** provided in either of the cross members **20**. The receiving member **40** may be secured in the socket **30** by any appropriate means, such as with fasteners, welding or the like. For example, a fastener, such as a bolt, could pass through an aperture in the bottom wall of the cross member **20** and be secured in place by a cooperating nut and lock washer (not shown) if desired.

The puck or receiving member **44** may be of any appropriate shape or size, such as a cylindrical, oval, or a square shape, for example, and should not be limited to that shown and described herein. The receiving member **44** may be a one-piece integrally formed member. Each receiving member **44** may also include an aperture **56** that may receive an accessory member **60**. The aperture **56** may also be correspondingly shaped and sized to receive the accessory member **60**. Any number or variety of accessories **60** may be utilized with the receiving members **44**. The accessory member **60** may be any appropriate or desired type of object, such as a cap or a safety chain tie down member. For example, caps (not shown) may be placed over the receiving members **44** or holes in the truck bed when the hitch is not in use.

FIGS. **4** and **5** illustrate an integrally formed mounting system **10**, whereby the receiving members **44** may be formed within the cross members **20**. FIG. **6** illustrates a mounting system **10** where the receiving members **44** may be placed and secured into sockets **30** located within the cross members **20**. The cross members **20** may be attached to one another by the mid rail **40**. The hitch ball socket **42** and corresponding hitch ball **18** may be located on the mid rail **40** (FIGS. **4-6**).

The underbed hitch mounting system **10** may include any number or variety of mounting flanges **26** and mounting apertures **28** (FIGS. **4-6**). The mounting flanges **26** may be of any appropriate shape or size, such as generally rectangular or circular. The mounting flanges **26** may be located at any appropriate position on the rails **20**, such as adjacent or at the ends of the rails **20**. The mounting apertures **28** may be located in or around the mounting flanges **26**. The mounting apertures **28** and mounting flanges **26** may aid in attached the mounting system **10** to the underbed of the towing vehicle or the vehicle framework **52**.

The invention has been described with reference to the embodiments. Obviously, modifications and alternations will occur to others upon a reading and understanding of this specification. The claims as follows are intended to include all modifications and alterations insofar as they come within the scope of the claim or an equivalent thereof.

Having thus described the invention, we claim:

**1**. A hitch mounting system comprising:

a pair of tubular members having cross-sectional shapes a substantial portion of which is defined by an enclosed peripheral wall with a generally hollow section;

a central member attached to at least one of said pair of tubular members, said central member having a socket; and

a pair of solid members fixedly attached to at least one of said pair of tubular members, said solid members configured to attach to a frame of a vehicle.

**2**. The hitch mounting system of claim **1**, wherein said central member is permanently attached to said tubular members as a one piece assembly.

**3**. The hitch mounting system of claim **1**, wherein a first of said pair of tubular member has a first transverse length and a second of said pair of tubular members has a second transverse length, said first transverse length different than said second transverse length.

**4**. The hitch mounting system of claim **1**, further comprising a second pair of solid members fixedly attached to a second of said pair of tubular members, said second pair of solid members configured to attach to said frame of said vehicle.

**5**. The hitch mounting system of claim **4**, wherein said second pair of solid members are asymmetrical with said pair of solid members.

**6**. The hitch mounting system of claim **4**, wherein said second pair of solid members are of a different configuration than said pair of solid members.

**7**. A hitch mounting system comprising:

a rail configured to attach to a frame of a vehicle, wherein said rail includes a tubular member and first and second solid members fixedly attached to each side of said tubular member whereby said first solid member has a first length in a first direction and said second solid member has a second length in said first direction whereby said first length is greater than said second length;

a mid rail connected to said rail, wherein said mid rail includes a socket; and

a pair of receiving members included with said rail, wherein each of said receiving members are configured to engage a respective leg of a fifth wheel hitch.

**8**. The hitch mounting system of claim **7**, wherein said tubular member has a cross-sectional shape a substantial portion of which is defined by an enclosed peripheral wall with a generally hollow section.

**9**. The hitch mounting system of claim **7**, wherein said receiving members are formed with said rail.

**10**. The hitch mounting system of claim **7**, wherein said receiving members are attached with said rail.

**11**. The hitch mounting system of claim **7**, wherein said receiving members are configured to engage a safety chain tie down member.

**12**. The hitch mounting system of claim **7**, wherein said socket is configured to accept a hitch ball.

**13**. The hitch mounting system of claim **7**, further comprising a second rail spaced from said rail wherein said mid rail is positioned between and attached to said second rail and said rail.

**14**. The hitch mounting system of claim **13**, wherein said second rail is configured to attach to the frame of the vehicle, whereby said second rail includes a second tubular member and third and fourth solid members fixedly attached to each side of said second tubular member.

**15**. The hitch mounting system of claim **14**, wherein said third solid member has a third length in said first direction and said fourth solid member has a fourth length in said first direction whereby said third length is greater than said fourth length.

**16**. A hitch mounting system comprising:

a pair of tubular members each having a cross-sectional shape a substantial portion of which is defined by an enclosed peripheral wall with a generally hollow section;

a mid rail attached to each of and between said pair of tubular members spacing said pair of tubular members apart, said mid rail having a socket capable of accepting a gooseneck hitch ball; and

a pair of receiving members attached with each of said pair of tubular members, said receiving members configured to engage a leg of a fifth wheel hitch.

**17**. The hitch mounting system of claim **16**, wherein at least a pair of the receiving members are configured to accept a safety chain tie down.

**18**. The hitch mounting system of claim **16** further comprising a plurality of fasteners attaching said mid rail between said pair of tubular members.

**19**. The hitch mounting system of claim **16**, wherein the pair of tubular members are configured to attached with a frame of a vehicle.

**20**. The hitch mounting system of claim **19**, further comprising an attachment bracket attached with the pair of tubular members, the attachment bracket capable of attaching the pair of tubular members to the frame of the vehicle.

* * * * *

APPENDIX A – LIST OF PROPOSED SUBSTITUTE CLAIMS

Pursuant to 37 CFR § 1.121(c)(2), the use of brackets indicates deleted text and underlining indicates inserted text.

1. A hitch mounting system comprising:

a pair of tubular members having cross-sectional shapes a substantial portion of which is defined by an enclosed peripheral wall with a generally hollow section;

a central member attached to at least one of said pair of tubular members, said central member having a socket; and

a pair of mounting flanges fixedly attached to at least one of said pair of tubular members, said mounting flanges configured to attach to a frame of a vehicle.

2. The hitch mounting system of claim 1, wherein said central member is permanently attached to said tubular members as a one piece assembly.

3. The hitch mounting system of claim 1, wherein a first of said pair of tubular member has a first transverse length and a second of said pair of tubular members has a second transverse length, said first transverse length different than said second transverse length.

4. The hitch mounting system of claim 1, further comprising a second pair of mounting flanges fixedly attached to a second of said pair of tubular members, said second pair of mounting flanges configured to attach to said frame of said vehicle.

5. The hitch mounting system of claim 4, wherein said second pair of mounting flanges are asymmetrical with said pair of mounting flanges.

6. The hitch mounting system of claim 4, wherein said second pair of mounting flanges are of a different configuration than said pair of mounting flanges.

7. A hitch mounting system comprising:

a rail configured to attach to a frame of a vehicle, wherein said rail includes a tubular member and first and second mounting flanges fixedly attached to each side of said tubular member whereby said first mounting flange has a first length in a first direction and said second mounting flange has a second length in said first direction whereby said first length is greater than said second length;

a mid rail connected to said rail, wherein said mid rail includes a socket; and

a pair of receiving members included with said rail, wherein each of said receiving members are configured to engage a respective leg of a fifth wheel hitch.

8. The hitch mounting system of claim 7, wherein said tubular member has a cross-sectional shape a substantial portion of which is defined by an enclosed peripheral wall with a generally hollow section.

9. The hitch mounting system of claim 7, wherein said receiving members are formed with said rail.

10. The hitch mounting system of claim 7, wherein said receiving members are attached with said rail.

11. The hitch mounting system of claim 7, wherein said receiving members are configured to engage a safety chain tie down member.

12. The hitch mounting system of claim 7, wherein said socket is configured to accept a hitch ball.

13. The hitch mounting system of claim 7, further comprising a second rail spaced from said rail wherein said mid rail is positioned between and attached to said second rail and said rail.

14. The hitch mounting system of claim 13, wherein said second rail is configured to attach to the frame of the vehicle, whereby said second rail includes a second tubular member and third and fourth mounting flanges fixedly attached to each side of said second tubular member.

15. The hitch mounting system of claim 14, wherein said third mounting flange has a third length in said first direction and said fourth mounting flange has a fourth length in said first direction whereby said third length is greater than said fourth length.

16. A hitch mounting system comprising:

a pair of tubular members each having a cross-sectional shape a substantial portion of which is defined by an enclosed peripheral wall with a generally hollow section;

a mid rail attached to each of and between said pair of tubular members spacing said pair of tubular members apart, said mid rail having a socket capable of accepting a gooseneck hitch ball; and

a pair of receiving members attached with each of said pair of tubular members, said receiving members configured to engage a leg of a fifth wheel hitch.

17. The hitch mounting system of claim 16, wherein at least a pair of the receiving members are configured to accept a safety chain tie down.

18. (Cancel).

19. (Cancel).

20. (Cancel).

21. (Proposed Substitute for Claim 16) A hitch mounting system comprising:

a pair of tubular members each having a cross-sectional shape a substantial portion of which is defined by an enclosed peripheral wall with a generally hollow section, said pair of tubular members having a first, second, third and fourth end;

a mid rail attached to each of and between said pair of tubular members spacing said pair of tubular members apart, said mid rail is permanently attached to said pair of tubular members as a one piece assembly, and said mid rail having a socket capable of accepting a gooseneck hitch ball; ~~and~~

a pair of receiving members attached with each of said pair of tubular members, said receiving members configured to engage a leg of a fifth wheel hitch;

a first mounting flange attached to said first end, a second mounting flange attached to said second end, a third mounting flange attached to said third end, and a fourth mounting flange attached to said fourth end;

each of said mounting flanges extend along a same axis as said tubular member to which said mounting flange is attached; and

a mounting aperture on each of said mounting flanges, said mounting flanges and mounting apertures configured to attach directly to a frame of a vehicle.

21. (Proposed Substitute for Claim 17) The hitch mounting system of claim [[16]] 21, wherein at least a pair of the receiving members are configured to accept a safety chain tie down.