**Appeal No. 23-1767**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

---

HORIZON GLOBAL AMERICAS INC.,
*Appellant*,

v.

NORTHERN STAMPING CO.,
*Appellee*.

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in IPR2021-01411 before Administrative Patent Judges William V. Saindon, Scott B. Howard, and Matthew S. Meyers

---

# APPELLEE NORTHERN STAMPING CO.'S RESPONSE BRIEF

---

Dennis J. Abdelnour
HONIGMAN LLP
155 North Wacker Drive, Ste. 3100
Chicago, IL 60606
(312) 701-9300

*Counsel for Appellee Northern Stamping*

December 19, 2023

**U.S. Patent No. 10,589,585**

16. A hitch mounting system comprising:

a pair of tubular members each having a cross-sectional shape a substantial portion of which is defined by an enclosed peripheral wall with a generally hollow section;

a mid rail attached to each of and between said pair of tubular members spacing said pair of tubular members apart, said mid rail having a socket capable of accepting a gooseneck hitch ball; and

a pair of receiving members attached with each of said pair of tubular members, said receiving members configured to engage a leg of a fifth wheel hitch.

---

21. (Proposed Substitute for Claim 16) A hitch mounting system comprising:

a pair of tubular members each having a cross-sectional shape a substantial portion of which is defined by an enclosed peripheral wall with a generally hollow section, said pair of tubular members having a first, second, third and fourth end;

a mid rail attached to each of and between said pair of tubular members spacing said pair of tubular members apart, said mid rail is permanently attached to said pair of tubular members as a one piece assembly, and said mid rail having a socket capable of accepting a gooseneck hitch ball; ~~and~~

a pair of receiving members attached with each of said pair of tubular members, said receiving members configured to engage a leg of a fifth wheel hitch;

a first mounting flange attached to said first end, a second mounting flange attached to said second end, a third mounting flange attached to said third end, and a fourth mounting flange attached to said fourth end;

each of said mounting flanges extend along a same axis as said tubular member to which said mounting flange is attached; and

a mounting aperture on each of said mounting flanges, said mounting flanges and mounting apertures configured to attach directly to a frame of a vehicle.

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rules 26.1 and 47.4, counsel for Appellee Northern Stamping Co., certifies the following:

1. The full name of every party represented by me is: **Northern Stamping Co.**

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: **N/A**

3. All parent corporations and any publically-held companies that own 10% or more of the stock of any party represented by me are: **Bear Diversified Inc.**

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are: **Ron N. Sklar, Scott D. Barnett, and David J. Thomas of Honigman LLP.**

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal: ***Northern Stamping Co. v. Horizon Global Americas, Inc.*** **IPR No. 2021-01411 (Patent Trial and Appeal Board);** ***Horizon Global Americas Inc. v Northern Stamping, Inc.*****, Case No. 1-20-cv-00310 (N.D. OH).**

6. Organizational Victims and Bankruptcy Cases. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6). **N/A**

December 19, 2023

/s/ Dennis J. Abdelnour
HONIGMAN LLP

*Counsel for Appellee*
*Northern Stamping, Co.*

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST .......... i

TABLE OF AUTHORITIES .......... v

STATEMENT OF RELATED CASES .......... viii

INTRODUCTION .......... 1

COUNTER-STATEMENT OF THE ISSUES .......... 3

STATEMENT OF THE CASE .......... 3

I. Background Of The ’585 Patent And Prior Art .......... 3

A. Traditional Gooseneck and Fifth-Wheel Hitches And Systems For Mounting Them To The Underbed Of A Pick-Up Truck .......... 3

B. The ’585 Patent .......... 8

C. The Invalidating Prior Art .......... 10

1. Works: U.S. Patent No. 6,969,090 .......... 10

2. Lindenman: U.S. Patent No. 7,121,573 .......... 11

3. Fandrich: U.S. Patent No. 6,467,791 .......... 12

D. Ford Came Up With The Idea For Combining Native Hitch Mounts, Not Horizon .......... 13

II. The IPR Proceedings .......... 14

A. Horizon’s Opposition and Motion to Amend .......... 15

1. Horizon’s Response To The Obviousness Grounds .......... 15

2. Horizon Filed A Contingent Motion To Amend With Proposed Substitute Claims 21 And 22 .......... 20

B. The Board’s Final Written Decision .......... 20

1. The Board Found That Works Only Disclosed A Mount For A Gooseneck-Style Hitch, Rejecting The Argument That Modifying Works Would Add Redundant Functionality ....................21

2. The Board Found Several Motivations To Modify Works In View Of Lindenman ....................23

3. The Board Considered And Rejected Horizon's Evidence Of Secondary Considerations ....................25

4. The Board Denied Horizon's Motion To Amend....................27

SUMMARY OF THE ARGUMENT ....................28

STANDARD OF REVIEW....................29

ARGUMENT....................30

I. Substantial Evidence Supports The Board's Finding That Claims 16-20 Are Obvious....................30

A. Substantial Evidence Supports The Board's Finding Of A Motivation To Combine *Works* And *Lindenman*....................30

1. Combining *Works* and *Lindenman* Allows For Attachment Of Hitches And Other Equipment Only Compatible With One Or The Other....................31

2. The Market Was Driving The Need For Versatility....................37

3. Combining *Works* And *Lindenman* Does Not Add Redundancy....................41

4. Horizon's Other Arguments Are Without Merit ....................48

B. Substantial Evidence Supports The Board's Weighing Of Horizon's Weak Secondary Considerations Evidence....................55

1. Substantial Evidence Supports The Board's Finding Of Little To No Commercial Success....................56

2. Substantial Evidence Supports The Board's Finding Of Little To No Industry Praise ....................61

3. Substantial Evidence Supports The Board's Finding Of No Copying ....63

4. On The Facts Of This Case, Secondary Considerations Do Not Outweigh A Strong Case Of Obviousness ....65

II. Substantial Evidence Supports the Board's Finding That The Substitute Claims Are Obvious ....66

CONCLUSION ....69

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ActiveVideo Networks Inc. v. Verizon Communications Inc.*,
694 F.3d 1312 (Fed. Cir. 2012)........................................................ 54, 55

*Ancor Pharm., Inc. v. Iancu*
889 F.3d 1372 (Fed. Cir. 2018)........................................................ 53

*B/E Aerospace, Inc. v. C & D Zodiac, Inc.*,
709 Fed.Appx. 687 (Fed. Cir. 2017)........................................................ 60

*Bayer Healthcare Pharm., Inc. v. Watson Pharm., Inc.*,
713 F.3d 1369 (Fed. Cir. 2013)........................................................ 63

*Bosch Automotive Servs. Solns., LLC v. Matal*,
878 F.3d 1027 (Fed. Cir. 2017)........................................................ 33

*Boston Sci. SciMed, Inc. v. Iancu*,
811 Fed. Appx. 618 (Fed. Cir. 2020)........................................................ 52

*cxLoyalty, Inc. v. Maritz Holdings Inc.*,
986 F. 3d 1367 (Fed. Cir. 2021)........................................................ 60

*Elekta Ltd. v. ZAP Surgical Sys., Inc.*,
81 F.4th 1368 (Fed. Cir. 2023)........................................................ 29

*Essity Prof. Hygiene North Am. LLC v. Cascades Canada ULC*,
811 Fed.Appx. 643 (Fed. Cir. 2020)........................................................ 52

*Genentech, Inc. v. Sandoz Inc.*,
55 F.4th 1368 (Fed. Cir. 2022)........................................................ 65

*Impax Laboratories Inc. v. Lannett Holdings Inc.*,
893 F.3d 1372 (Fed. Cir. 2018)........................................................ 30

*In re Cree, Inc.*,
818 F.3d 694 (Fed. Cir. 2016)........................................................ 63

*In re Taylor Made Golf Co., Inc.*,
589 Fed. App'x 967 (Fed. Cir. 2014)........................................................... 50

*Intellectual Ventures I LLC v. EMC Corp.*,
786 Fed.Appx. 1021 (Fed. Cir. 2019)........................................................... 52

*Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*,
392 F.3d 1317 (Fed. Cir. 2004)........................................................... 64, 65

*J.T. Eaton & Co., Inc. v Atlantic Paste & Glue Co.*,
106 F.3d 1563 (Fed. Cir. 1997)........................................................... 60

*KSR Int'l Co. v. Teleflex Inc*,
550 U.S. 398 (2007)........................................................... 23, 40, 41, 53, 54, 68

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*,
719 F.3d 1346 (Fed. Cir. 2013)........................................................... 52

*Perfect Web Tech., Inc. v. InfoUSA, Inc.*,
587 F.3d 1324 (Fed. Cir. 2009)........................................................... 42

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007)........................................................... 65

*Plantronics, Inc. v. Aliph, Inc.*,
724 F.3d 1343 (Fed. Cir. 2013)........................................................... 41

*Polaris Industries, Inc. v. Arctic Cat, Inc.*
882 F.3d 1056 (Fed. Cir. 2018)........................................................... 57

*Provisur Techs., Inc. v. Weber, Inc.*,
50 F.4th 117 (Fed. Cir. 2022)........................................................... 29

*Regents of Univ. of Cal. v. Broad Inst., Inc.*,
903 F.3d 1286 (Fed. Cir. 2018)........................................................... 51, 52

*Roku, Inc. v. Universal Electronics, Inc.*,
63 F.4th 1319 (Fed. Cir. 2023)........................................................... 29, 51, 69

*Ruiz v. A.B. Chance Co.*,
357 F.3d 1270 (Fed. Cir. 2004)........................................................... 49, 50

*Schwendimann v. Nennah, Inc.*,
82 F.4th 1371 (Fed. Cir. 2023)........................................................................ 29

*Stratoflex, Inc. v. Aeroquip Corp.*,
713 F.2d 1530 (Fed. Cir. 1983)........................................................................ 56

*Teva Pharm. Int'l GmbH v. Eli Lilly and Co.*,
8 F.4th 1349 (Fed. Cir. 2021).......................................................................... 56

*Volvo Penta of the Am., LLC v. Brunswick Corp.*,
81 F.4th 1202 (Fed. Cir. 2023)................................................................... 54, 56

*Wyers v. Master Lock Co.*,
616 F.3d 1231 (Fed. Cir. 2010)................................................................... 64, 65

*Yita LLC v. MacNeil IP LLC*,
69 F.4th 1356 (Fed. Cir. 2023)........................................................................ 56

**Regulations**

37 C.F.R. § 42.121 ............................................................................................ 20

37 C.F.R. § 42.63(a)..................................................................................... 61, 64

## STATEMENT OF RELATED CASES

This appeal relates to *Horizon Global Americas Inc. v. Northern Stamping, Inc.*, Case No. 1:20-cv-00310 (N.D. Ohio), which involves the same parties and patent-at-issue in this appeal, U.S. Patent No. 10,589,585 ('585 patent).

## INTRODUCTION

Repeating the same rejected theories and relying on the same rejected testimony proffered below, Horizon's appeal asks this Court to reweigh the evidence anew and substitute its judgment for that of the fact-finder. But every issue presented in Horizon's brief is factual, reviewed for substantial evidence. On this proper standard of review, the record in this case easily mandates affirmance.

*First*, substantial evidence supports the Board's finding of motivation to combine Works and Lindenman. There was never a dispute that Works and Lindenman include all of the elements of the claims. The only question is whether there would be a motivation to combine them. On appeal, Horizon merely repeats its "chief argument" below that both Works and Lindenman already accommodated both gooseneck and fifth-wheel hitches and thus there would be no reason to combine redundant features. But the Board rightly rejected this theory on a full review of the record.

The Board found that Works does not disclose both hitch types and that Horizon's argument to the contrary was "at best a mischaracterization of the testimony." Appx14. It also found that the native—*or unmodified*—attachments of Works and Lindenman were not redundant (even if Works and Lindenman could accommodate both types of hitches through the use of mechanical adapters). The combination of two different native connections allows both a gooseneck and fifth-

wheel hitch attachment *without the need for an adapter*—something neither reference alone could provide. The evidence also showed that, when one type of hitch is attached to its native connection, the remaining native connection can accommodate other accessories and provide other uses. The Board's reliance on this increased "versatility"—attaching additional accessories and eliminating a need for mechanical adapters—as a motivation to combine is thus fully supported by substantial evidence.

*Second*, Horizon asks for a re-do on secondary considerations, but the Board was right to find "near zero" nexus based on Horizon's lack of "credible evidence or analysis." Appx32. Even assuming some minimal nexus, each of Horizon's secondary considerations theories failed badly on the merits. Indeed, for two of the three theories (praise and copying), the Board found that Horizon failed to properly offer *any* supporting evidence under the Board's evidentiary rules, a finding that Horizon did not appeal.

*Finally*, substantial evidence supports the Board's finding that the substitute claims are obvious and that there was a motivation to combine the prior art. The only perceptible difference was the tubular shape of a cross-member in the primary reference (Withers '317). But the record showed that a tubular shape was well known in the specific context of the patent and would provide a desirable level of rigid structural support. That alone is enough to affirm.

This Court should affirm the Board's decision in its entirety.

## COUNTER-STATEMENT OF THE ISSUES

1. Whether substantial evidence supports the Board's finding that the '585 patent is obvious over Works, Fandrich, and Lindenman where the Board identified multiple motivations to combine, including eliminating adapters, offering versatility, and market forces, each of which is supported by the references themselves and expert testimony, and where Horizon did not present adequate evidence of secondary considerations.

2. Whether substantial evidence supports the Board's denial of Horizon's motion to amend where it was obvious to combine the tubular members of Fandrich with the dual-hitch structure of Withers '317.

## STATEMENT OF THE CASE

### I. Background Of The '585 Patent And Prior Art

The '585 patent relates to hitches that connect a trailer (or other towed vehicle) to a towing vehicle like a pick-up truck. Appx141(Abstract). More specifically, the '585 patent relates to a mechanical system for mounting a hitch to the towing vehicle. *Id.*

#### A. Traditional Gooseneck and Fifth-Wheel Hitches And Systems For Mounting Them To The Underbed Of A Pick-Up Truck

As the '585 patent points out, there are a number of different types of hitches that are used to connect a towed vehicle to a towing vehicle. Appx.151(1:36-38).

Two of the most common hitches are called gooseneck and fifth-wheel hitches. *Id*.(1:39-40).

A gooseneck hitch utilizes a ball (mounted on the towing vehicle) and a coupler (mounted or built-in to a towed vehicle). Appx3120. When mounting the ball to the bed of a truck using an underbed mounting system, the ball attachment is the only element that protrudes above the truck bed. *See* Appx2881(Fig. 1). Examples of the ball of a gooseneck hitch mounted using an underbed mount onto the bed of a pick-up truck are shown below:




**Appx2881**



**Appx2727**

A fifth-wheel hitch utilizes a receiver plate (sometimes referred to as a retainer plate or kingpin receiver) mounted to the towing vehicle which connects to a kingpin on the towed vehicle. Appx3121. Unlike the gooseneck hitch, typically a fifth-wheel receiver plate has a four-point attachment to the towing vehicle.

Known underbed mounting systems for a fifth wheel hitch thus provide for four attachment points through the bed of the truck. An example of a fifth-wheel receiver plate mounted to the bed of a truck using an underbed mount is shown below at left. At right is an example of a similar fifth-wheel hitch receiver plate where the mounting system is above-bed (cross-bars bolted onto the top of the pick-up truck bed).




**Appx2861(Fig. 6)**




**Appx2727**

Different types of mounts for fifth-wheel and gooseneck-type hitches—both above-bed and underbed—have been well-known for almost ninety years. *See* Appx2725-34(¶¶ 27–36). For example, U.S. Patent No. 2,041,124 ("Francis"), which issued in 1936, is entitled "Fifth Wheel Construction for Detachable Trailers." Francis discloses a mounting structure for a fifth-wheel type trailer hitch. *See generally* Appx2867-71. The mount (including elements 4 and 5) is above-bed and attaches to the frame (3, beige) of the towing vehicle:







Appx2867-69(1:53–2:6, Figs. 1 and 3 (annotated)).

As another example, U.S. Patent 3,390,896 ("Philapy") discloses an above-bed mounting structure for a gooseneck-style hitch. *See generally* Appx2876-2879. In Philapy, the ball of the hitch (38) is secured in a mid-rail (33, referred to as a "rod") that is connected to curved members (31 and 32), which in turn are connected to parallel cross-bars (27 and 28):




**Fig. 2.**




**Fig. 6.**

Appx2878-79(2:58–3:11, Figs. 2 and 6).

Later mounting systems were deployed below the bed of the truck in order to provide use of the full truck bed when the hitch was not in use. For example, U.S. Patent No. 5,472,222 ("Marcy") discloses a mounting structure for "a goose neck trailer…which includes a cross member positionable beneath the cargo bed and between the frame members of the truck." Appx2880(Abstract). Marcy's cross-member (16) attaches to the frame of the vehicle at each end (via bracket 24), and it includes a socket for receiving a hitch ball (14), as shown by Figures 1 and 2 below. Appx2881, 2886(3:31–32, 4:17–23, Figs. 1–2).







Likewise, as shown in the figure below, U.S. Patent 7,264,259 ("Lindenman '259") discloses an under bed mounting structure for a fifth-wheel trailer hitch. *See generally* Appx2889-2902. The mounting assembly 12 is secured by brackets 18 to the vehicle frame. It includes cross bars 20 (red) with apertures 28 for receiving socket elements 26 (green):




Appx2891, 2899(3:62–64, Fig. 1 (annotated, and excerpted)).

### B. The ’585 Patent

The ’585 patent discusses the state of the art, including the known use of “traditional fifth wheel hitches” and “traditional gooseneck hitches,” and systems for mounting them underneath the bed of a towing vehicle. Appx151(1:62-2:29).

The problem, according to the ’585 patent, is that “[t]owing vehicles are generally arranged to accommodate either a fifth wheel hitch or a gooseneck hitch, but not both.” *Id.*(2:30-31). To “convert a towing vehicle from accommodating a fifth wheel hitch to a gooseneck hitch or vice versa is time and labor intensive and inefficient.” *Id.*(2:32-34). Also, because “both fifth wheel hitches and gooseneck hitches” are typically mounted in the same location using “different mounting configurations,” “traditionally only one hitch can occupy this location.” *Id.*(2:36-39). Thus, according to the ’585 patent, “there is a need in the art for an improved

apparatus for towing vehicles that allow for selectively accommodating either a fifth wheel hitch or a gooseneck hitch." *Id.*(2:39-42).

To meet this need in the art, the '585 patent discloses a "mounting system" for a towing vehicle that "may selectively accommodate either a fifth wheel hitch or a gooseneck hitch." *Id.*(2:46-49).

The mounting system of the '585 patent is shown below. It includes two cross-members 20 (red). Appx152(3:48-56). The cross members have mounting apertures 28 and mounting flanges 26 for attaching the mounting system to the underbed frame of a towing vehicle. Appx153(6:20-30). The mounting system also includes mid-rail 40 (blue), arranged perpendicular to, and connecting, the two cross-members 20. Appx152(3:35-47).




Appx147(Fig. 4) (annotated).

The cross-members 20 each include sockets 30, which are "configured to receive and support the legs…of a fifth wheel hitch." Appx152(3:53-54). A

receiving member, or puck, 44 (green) attaches to the cross-members 20 at the socket 30. Appx153(5:54-57). The mid-rail 40 includes a hitch ball socket 42 (yellow) configured to receive the hitch ball of a gooseneck hitch. *Id.*(5:5-10). The assembly is mounted below the bed of a truck, and holes corresponding to the attachment points for the fifth wheel hitch and the gooseneck hitch are drilled through the truck bed, leaving only the attachment points (green 44 and yellow 42) extending through the bed of the truck. Appx153(5:40-52).

### C. The Invalidating Prior Art

In its IPR petition, Northern Stamping's challenge to the '585 patent focused on the following references, which were indisputable prior art.[1]

#### 1. Works: U.S. Patent No. 6,969,090

Works discloses an underbed mounting system for a gooseneck hitch. Appx2810(2:36-37, Fig. 2); Appx2758-62(¶¶ 92-101). It includes two cross members (18 and 19, red) and a mid-rail (17, blue). Appx2811(4:66-5:2). The mid-rail 17 includes a socket 24 (yellow) for receiving the hitch ball of a gooseneck hitch. *Id.*(4:29-31). Works does not, however, contain sockets for receiving the legs of a fifth-wheel hitch retainer plate. Appx2763-66(¶¶ 102-07).

---

[1] Northern Stamping also challenged the '585 patent on a reference, Withers, U.S. Patent No. 7,793,968, which anticipates the claims. Horizon argued that Withers did not qualify as prior art due to prior invention, which Northern Stamping disputed. The Board in its final written decision did not reach the issue. Appx36.




Appx2808(Fig. 2).

### 2. Lindenman: U.S. Patent No. 7,121,573

Lindenman[2] discloses a mounting assembly having a pair of cross members 22 (red) each having a pair of openings 52 for receiving sockets 14 (green), which are used to attach the four connection points for a fifth-wheel hitch retainer plate. Appx2837(4:24-28); Appx2780-82, 2784-85(¶¶ 134-39, 143-44). Lindenman does not, however, disclose a mid-rail having a socket to accept a gooseneck hitch ball. Appx2783-84(¶¶ 140-42).

---

[2] Lindenman is continuation-in-part of *Lindeman '259* (discussed above).




Appx2818(Fig. 1). Lindenman touts its system as offering "versatility since one may mount a number of different vehicle accessories." Appx2836(1:47-48). For example, in Lindenman, the receiving elements 14 extend through the truck bed for receiving the four attachment points of a fifth-wheel hitch retainer plate. Appx2837(4:30-37). These receiving elements also provide for other types of attachment when the fifth-wheel hitch is not attached—for example, to attach a bike rack. Appx2836(1:49-52).

### 3. Fandrich: U.S. Patent No. 6,467,791

Fandrich likewise discloses an underbed mounting system for a fifth-wheel hitch. Appx2842(Abstract). It includes two cross members 110 (red), each of which contains two receptacles (green) for receiving the legs of a fifth wheel hitch retainer plate. Appx2853(3:64-67).




Appx2844(Fig. 2). The cross-members are tubular in shape and referred to in the patent as "tubes." *E.g.*, Appx2853(4:4-8).

### D. Ford Came Up With The Idea For Combining Native Hitch Mounts, Not Horizon

Horizon's inventor Stanifer admitted under cross-examination that it was Ford that made the suggestion to Horizon to combine native hitches into a single mount. Appx21 (quoting Appx3922(25:7-20), citing Appx3927(30:2-3), Appx3948(51:21-23)).

Indeed, Ford and its engineer Sean Withers obtained patents on a design that appears to be the same as that contained in Horizon's '585 patent. U.S. Patent No. 7,793,968 (Appx2858-2866) to Withers, for example, contains the same structure as Horizon's '585 patent:




Appx2859 (Fig. 1). Although Horizon contested whether Withers qualified as prior art, a related Withers patent, U.S. Patent 7,828,317 (Appx3863-3871), was used against the substitute claims, and Horizon conceded that it qualified as prior art.[3]

## II. The IPR Proceedings

Northern Stamping's IPR petition sought review of the patentability of claims 16-20 of the '585 patent on three grounds: (i) as obvious over Works in view of Fandrich and Lindenman; (ii) as obvious over Lindenman in view of Fandrich and Works, and (iii) as anticipated by Withers, U.S. Patent No. 7,793,968. Appx77.

On February 22, 2022, the Board instituted Northern Stamping's IPR on all grounds. *See generally* Appx3118-49.

---

[3] The Board does not have the ability to hear and decide issues concerning derivation and inventorship; however, those issues are being litigated in the co-pending district court litigation.

### A. Horizon's Opposition and Motion to Amend

#### 1. Horizon's Response To The Obviousness Grounds

Horizon did not dispute that the prior art disclosed every element of the challenged claims. *See* Appx13 ("Patent Owner has not contested that the references teach each element as asserted by Petitioner."). Instead, Horizon's opposition argued that there was a lack of motivation to combine the references, and that there was objective evidence of non-obviousness. *See e.g.*, Appx3215, 3221.

##### a. Motivation To Combine Arguments

For both grounds concerning the combination of Works and Lindenman, Horizon argued that one of skill would not be motivated to combine the two references because both allegedly already disclose a mounting device that could accommodate both a fifth-wheel and gooseneck hitch. Appx3211-3213 (arguing that Works discloses a combination mounting system); Appx3214-3215 (arguing that Lindenman discloses a combination mounting system).

**Works argument.** Regarding Works, Horizon argued that Works could accommodate both a gooseneck hitch and a fifth-wheel hitch. Appx3211. Horizon did not rely on any disclosure in the Works patent, however. Rather, Horizon relied on *an advertisement* for a commercial product that Horizon argued was an embodiment of the Works patent. Appx3211-12. The advertisement did not, however, suggest that the device had a native four-point attachment to

accommodate a traditional retainer plate for a fifth wheel hitch. Rather, it explained that the single attachment point (the ball) could be used to attach a special fifth-wheel hitch retainer plate designed specifically to be secured to a ball hitch. Appx3213.

**Lindenman argument.** Regarding Lindenman, Horizon similarly argued that it could accommodate both a gooseneck hitch and a fifth-wheel hitch. Appx3214. Horizon cited a single passage from Lindenman stating that its mounting system "offers the consumer unparalleled versatility to mount a number of different vehicle accessories" including "a fifth wheel hitch assembly" and "a gooseneck hitch assembly." *Id.* (quoting Appx2836(1:46-52)).

Horizon then cited various commercial descriptions of *commercial products* (not the Lindenman patent). Appx3214-15. The descriptions of a commercial embodiment, however, show that the mounting system only provides for a four-point attachment; it does not provide for a native center-point attachment for a gooseneck hitch ball. *Id.*

**Other arguments.** Horizon also argued that Northern Stamping had failed to articulate a sufficient motivation to combine the various prior art references. Appx3217-3220.

**b. Horizon's Evidence Of Secondary Considerations**

Horizon pointed to three categories of alleged secondary consideration evidence of non-obviousness: commercial success, industry praise, and copying. Appx3221-3224 (Patent Owner Response); *see also* Appx29-34 (Final Written Decision addressing secondary considerations).

**Nexus.** For commercial success and industry praise, Horizon focused on a hitch-mounting system that it makes and sells to Ford. Appx3221-3224. Horizon did not submit any testimony connecting the alleged commercial embodiment to the challenged claims of the '585 patent. Instead, Horizon stated, that "evidence offered above for conception/diligence establishes that the claimed features of the Challenged Claims were featured prominently in the design that made its way into Ford pickup trucks…." Appx3222; Appx3300-3301(¶ 126).

Although Horizon's expert declaration contains discussion of secondary considerations of non-obviousness, Appx3300-3302, it contains no analysis or discussion comparing the elements of the challenged claims to any purported commercial embodiment (sold to Ford or otherwise).

**Commercial Success.** Horizon's entire evidence of commercial success is the declaration of Henry Guthard, who states:

> Patent Owner has sold hundreds of thousands of its products (received millions of dollars in revenues) of its underbed hitch mounting system to Ford from launch to

> the present. Patent Owner has also sold thousands of after-market units during that same period.

Appx3379 (¶ 25). Horizon did not provide specific unit or revenue information, market share information, or information that would show when these sales were made and how they may have changed over time. When asked during cross-examination about this testimony, Guthard was unable to provide any additional information or details. Appx4056-4057. And elsewhere, Horizon stated that "exact units and revenue figures for [Horizon's] relationship with Ford is confidential." Appx3223(n.11).

Horizon's expert Walstrom relies on commercial success, but only further states: "It is my understanding that the product is a big success for the Company and is well known in the industry as being a high quality and demanded product." Appx3300(¶ 124). When asked the basis for this opinion, Walstrom admitted that "I don't have facts with me regarding sales dollars or market share or anything else, general[ly] speaking market share….but I just know that it was a very commercially successful product…." Appx4346-47(200:22-201:9).

**Industry Praise.** Horizon's evidence of industry praise is a single paragraph from Walstrom's declaration, which contains an alleged annotated version of what Walstrom claims is a Ford advertisement. Appx3300(¶ 125). Horizon did not offer into evidence the advertisement itself or the publication from where the advertisement apparently came. *See* Appx31. When asked where he got

the advertisement, Walstrom could not say. Appx4347(201:10-23). He also had no information dating the advertisement. *Id.*

Walstrom was asked during cross-examination whether he compared the device in the Ford advertisement to the challenged claims and admitted he had not, stating "[t]here's no need to. There's no need to." Appx4349-50 (203:23-204:3).

**Copying.** Finally, Horizon argued that General Motors copied the claimed invention. Appx3223-3224. In support, Horizon relied solely on paragraph 127 from expert Walstrom's declaration, which contains various images. Appx3301-3302(¶ 127). Like the advertisement mentioned above, there is no identifying information about these images or where they came from, and Horizon did not offer them or the document containing them into evidence. Appx33-34. Walstrom testified he was provided the images by Horizon's attorney, but does not know where they came from or what they are. Appx4353-4354(207:13-208:2).

Walstrom admits he never compared the device shown in the image to the claims of the '585 patent; rather, his opinion is based off the fact that "this representation certainly looks like it's a copy of one of the embodiments of our '585." Appx4351-52(205:15-206:5). He also admitted that, other than his comparison of the images, he had no further evidence of any alleged copying by GM or others. Appx4352(206:6-12).

#### 2. Horizon Filed A Contingent Motion To Amend With Proposed Substitute Claims 21 And 22

Horizon filed a contingent motion to amend under 37 C.F.R. § 42.121, seeking to substitute claims 16 and 17 with claims 21 and 22 (if the Board found claims 16 and 17 unpatentable). *See generally* Appx3228-53.

These substitute claims added limitations "directed to (1) the mid rail being permanently attached to the tubular members as a one piece assembly" and (2) "each rail end having a flange with an aperture configured to attach directly to a vehicle frame." Appx39.

Northern Stamping opposed Horizon's motion to amend, arguing that the substitute claims were obvious over a combination of prior art references addressed in the Petition: U.S. Patent No. 7,828,317 ("Withers '317") and Fandrich. *See generally* Appx3828-62.

### B. The Board's Final Written Decision

The Board found that Northern Stamping "established, by a preponderance of the evidence that claims 16-20 are unpatentable over the references of Works, Fandrich, and Lindenman." Appx46. To that end, the Board held claims 16-20 unpatentable on two of the three grounds: (i) Works, Fandrich, and Lindenman, and (ii) Lindenman, Fandrich, and Works. Appx46-47. Because of these findings, the Board declined to reach the third ground in the Petition, i.e., anticipation by Withers. Appx36.

The Board also denied Horizon's contingent motion to amend, finding that Northern Stamping "established, by a preponderance of the evidence, that proposed substitute claim 21 would have been obvious over the references of Withers '317 and Fandrich" and therefore denied Horizon's motion to amend. Appx46.

As pertinent to this appeal, the Board made the following specific factual findings.

#### 1. The Board Found That Works Only Disclosed A Mount For A Gooseneck-Style Hitch, Rejecting The Argument That Modifying Works Would Add Redundant Functionality

The Board first considered and rejected Horizon's "chief argument" that Works disclosed both a gooseneck and fifth-wheel hitch. Appx13-14. Horizon had argued that if "Works can already accommodate both gooseneck and fifth-wheel hitches," "there is no reason to add structures to accommodate both." Appx13.

But the Board found as a factual matter that Works does not teach "receiving a kingpin/receiver [fifth-wheel] hitch." Appx17. The Board explained that "although Works uses the term 'fifth wheel,' it does so not to describe a kingpin/receiver hitch, but to describe its towing connector *generically*." Appx14 (original emphasis). The Board further found that, when read "in context," Works actually "describes a 'fifth wheel' as requiring a 'hitch ball'" and uses a '*gooseneck*' type extension." Appx14 (citing Appx2810(1:26-41)). That is,

"[w]hen Works says 'fifth wheel' it is describing a ball/coupler [gooseneck] hitch, not a kingpin/receiver [fifth wheel] hitch." Appx14.

Next, the Board rejected Horizon's "evidence," a catalog, as immaterial and misleading. Appx14-17. The Board held that evidence from a catalog describing a commercial product is not evidence of what the patent says and "does not change what Works itself says." Appx15-16. The Board also found that the catalog, published in 2021, long after the alleged invention, is legally irrelevant because it is not evidence of what a person of skill in the art "at the time of the invention" would have understood. Appx15.

The Board also rejected Horizon's argument that its expert testimony, and its characterization of Northern Stamping's expert's testimony, supported Horizon's theory. The Board found Horizon's citation to this testimony was "at best a mischaracterization" because Horizon conflated the Works patent with the 2021 catalog. Appx14. The Board further criticized Horizon's reliance on expert statements as legally irrelevant because the experts were asked about "present abilities" and not "about what Works teaches or how a person of ordinary skill in the art would have understood the prior art at the time of the invention." Appx15. The Board also found Horizon's expert testimony to be "conclusory." Appx16. The Board walked through various statements and pointed out why it did not "credit this testimony," including because various statements are not "material" to

the proper legal inquiry, are not supported by "any explanation," and are not a "persuasive alternative to the plain reading" of the Works patent. Appx16-17.

The Board summarized its opinion, finding that a 2021 catalog is "immaterial as to what Works teaches," Horizon's argument that a person of skill would have had an understanding of an undisclosed "commercial adapter for Works" "is not supported by credible evidence," and that even if it were, "Works still teaches what it teaches"—"i.e. no kingpin/receiver hitch." Appx17.

### 2. The Board Found Several Motivations To Modify Works In View Of Lindenman

Having first rejected Horizon's "chief argument" against combining Works and Lindenman, the Board then analyzed the evidence supporting such a combination. Appx18.

The Board found that "combining the ability to attach a ball/coupler hitch provided by Works (via its central-mounted socket 24) with the ability to attach a kingpin/receiver hitch provided by Lindenman (via its cross member-mounted receptacles 14) 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement.'" Appx18 (quoting *KSR Int'l Co. v. Teleflex Inc*, 550 U.S. 398, 417 (2007)).

In doing so, the Board found that "the combination of features is not adding redundancy because each type of attachment mechanism provides a native

connection for a different type of hitch." Appx18. In other words, whether a single-point mount could be compatible with a fifth-wheel hitch through an adapter, or whether a four-point mount could be compatible with a gooseneck hitch through an adapter, did not make the combination any less obvious. "That adapters are available does not subtract from" this motivation to combine. *Id.*

The Board noted its determination is "supported by Lindenman, who advocates for its socket design to provide 'unparalleled versatility since one may mount a number of different vehicle accessories to the vehicle through the mounting system,' not limited to hitches but also 'an article anchor or carrier such as a bike rack, a motorcycle stand or other useful device." Appx18-19 (quoting Appx2836(1:46-52)). The Board noted that, regardless of what you are attaching, "the four attachment points of Lindenman would add to Works by providing an ability to removably mount these other accessories." Appx19 (citing Appx3870(3:26-31)).

Ultimately, on the entirety of the record, the Board found that "a person of ordinary skill in the art would have understood it would have been a benefit to natively mount both types of hitches (as opposed to using an adapter…)." Appx19. And that further, the "record supports [Northern Stamping's] combination because the record espouses a desire for flexibility and versatility—which is why having both types of hitches is better than one alone." *Id.* The Board then reviewed that

record, including Works and Lindenman, and the testimony of both sides' experts, and credited Northern Stamping's evidence, while rejecting Horizon's assertions. *See* Appx19-23. The Board found that market forces would have motivated a skilled artisan to combine Works and Lindenman. Appx21. Horizon's expert admitted that auto-makers desired a dual-hitch system. Appx21 (citing Appx3272(¶ 47) ("an OEM like Ford would want any factory installed system to accommodate as many different hitches as possible")); *see also* Appx4239-40(93:16-94:18); Appx4312(166:9-24); Appx4313(167:2-11). And indeed, Horizon's own inventor admitted that the idea for a mount able to accommodate both types of hitches was Ford's idea, not Horizon's. Appx21 (quoting Appx3922(25:7-20), citing Appx3927(30:2-3), Appx3948(51:21-23)). It was Ford that came to Horizon with the idea to create a dual-mount system. *Id.*

#### 3. The Board Considered And Rejected Horizon's Evidence Of Secondary Considerations

The Board found that Horizon did not present any *credible* evidence of secondary considerations of non-obviousness. *See* Appx29-34.

First, regarding the commercial success and praise of the product Horizon allegedly sold to Ford, the Board found that Horizon "has not established nexus and has not made a meaningful attempt to do so." Appx31. The only depiction of a Ford product in the record is from a single advertisement, which itself was never "entered as evidence." *Id.* The Board found that alone "immediately disposes of

this issue in this case because [Horizon] offers no credible evidence of the advertisement." *Id.*

Even if that advertisement was properly in evidence, the Board found that Horizon never tied that product to the claims at issue. Rather, Horizon relied on its analysis of certain "conception and diligence" evidence, but that did not suffice. *Id.* "All that those documents would tend to show is what plans Patent Owner was offering to Ford." *Id.* "There is no evidence showing what was sold…." *Id.*

Second, even assuming a nexus, the Board found that the single Ford advertisement "does not tend to show praise of Patent Owner's claimed invention." Appx33. The Board found the advertisement unclear as to what "patent-pending" referred to, and unclear "how the claimed invention maps to what is being described." Appx32-33.

Third, the Board found that Horizon failed to offer legally sufficient evidence of commercial success—conclusory testimony of an undisclosed number of "units" sold that were allegedly covered by the '585 patent was "insufficient" and was not "persua[sive]." Appx33. Accordingly, the Board did "not find evidence of commercial success." *Id.*

Finally, the Board found no evidence of copying. Appx33-34. The single image on which Horizon relied was "not entered as evidence," and the Board had no obligation to "consider improperly filed evidence." *Id.* In any event, the Board

found this image at best showing the "offering [of] a competing product," not copying. *Id.*

### 4. The Board Denied Horizon's Motion To Amend

The Board denied Horizon's contingent motion to amend, holding that Northern Stamping has "shown proposed substitute claim 22 to be unpatentable." Appx46.

Northern Stamping argued that Withers '317 disclosed all of the elements of the proposed substitute claims, except that the cross-members in Withers '317 were not tubular. Appx41-42. Northern Stamping relied on Fandrich as disclosure of the tubular shape. Appx42.

First, the Board noted that Horizon "does not dispute" that "Withers '317 describes each limitation as arranged in the [proposed substitute] claim…with the exception of the transverse members being tubes." Appx41-42.

The Board then analyzed the evidence "that it would have been obvious to modify the transverse members of Withers '317 to be tubular, as taught in Fandrich." Appx42. The Board agreed that "it would have been obvious to substitute the tubular members of Fandrich for the stamped members of Withers '317, because it was a known option in the art to use tubular cross members, such that their incorporation would have been a simple substitution and obvious to try." Appx42. The Board considered but rejected Horizon's arguments that one of skill

in the art would not make such a combination. Appx42-46. Indeed, the Board agreed that the tubular shape was known to provide "a rigid support structure" and that such rigidity was desired in the specific context of hitch-mounting systems. Appx43-44. Tubular cross members were thus "a known, suitable structure for hitch devices like Withers '317." Appx44. "Accordingly, we find that Petitioner's assertions that the proposed combination is an option known in the art, a simple substitution, and obvious to try is supported by sufficient evidence." Appx45.

## SUMMARY OF THE ARGUMENT

1. Substantial evidence supports the Board's finding that claims 16-20 of the '585 patent are obvious over (i) Works in view of Fandrich and Lindenman and (ii) Lindenman in view of Fandrich and Works. That includes the Board's subsidiary factual findings that there is a motivation to combine the references, and that the claims are obvious even despite Horizon's weak secondary consideration evidence. In addition, Horizon has not and cannot show that the Board's evidentiary findings, including that Horizon failed to properly introduce evidence of industry praise and copying, are an abuse of discretion.

2. Substantial evidence supports the Board's finding that Horizon's proposed substitute claims are obvious over Withers '317 in view of Fandrich, and that there exists a motivation to combine the tubular cross-member of Fandrich with the hitch-mounting system of Withers '317.

## STANDARD OF REVIEW

This Court "review[s] the Board's legal conclusions de novo and its factual findings for substantial evidence." *Elekta Ltd. v. ZAP Surgical Sys., Inc.*, 81 F.4th 1368, 1373 (Fed. Cir. 2023). "Obviousness is a question of law based on underlying facts, including the scope and content of the prior art, differences between the prior art and the claims at issue, the level of ordinary skill, and relevant evidence of secondary considerations." *Id.* at 1373-74.

"[T]he subsidiary obviousness questions of whether a skilled artisan would be motivated to combine prior art references…are factual, and" this Court "review[s] them for substantial evidence." *Schwendimann v. Nennah, Inc.*, 82 F.4th 1371, 1380 (Fed. Cir. 2023).

"Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Roku, Inc. v. Universal Electronics, Inc.*, 63 F.4th 1319, 1324 (Fed. Cir. 2023).

This Court reviews the Board's evidentiary determinations for abuse of discretion. *Provisur Techs., Inc. v. Weber, Inc.*, 50 F.4th 117, 122 (Fed. Cir. 2022).

## ARGUMENT

### I. Substantial Evidence Supports The Board's Finding That Claims 16-20 Are Obvious

It is undisputed that the prior art at issue discloses each and every limitation of the challenged claims. Appx13. On appeal, Horizon raises two issues concerning the finding of unpatentability of claims 16-20. First, Horizon contends the Board's motivation to combine finding is not supported by substantial evidence. Second, Horizon contends the Board should have weighed the secondary considerations evidence differently. But this Court does "not reweigh evidence or make factual findings anew on appeal." *Impax Laboratories Inc. v. Lannett Holdings Inc.*, 893 F.3d 1372, 1382 (Fed. Cir. 2018). On both issues, substantial evidence exists, and the Board's judgment should be affirmed.

#### A. Substantial Evidence Supports The Board's Finding Of A Motivation To Combine *Works* And *Lindenman*

Horizon's appeal brief largely ignores the primary motivation for combining Works and Lindenman—increased versatility of combining a mount for a single-point, center attachment, and a mount for a four-point perimeter attachment, into a single versatile mount that includes both. As Northern Stamping and its expert established, providing a mount with both types of attachments would have been desirable to one of skill in the art at the time of the invention because it increased the versatility of the product, allowing for attachment of hitches and other types of

devices that were only compatible with one or the other, and providing additional native attachment points for other accessories. This was the central basis for the Board's finding of a motivation to combine.

Horizon sought to rebut this motivation by asserting that Works and Lindenman already teach that they work with both gooseneck and fifth-wheel hitches. Hor.Br. at 30-34. But the Board correctly rejected that contention because even if true it does not impact the motivation to combine based on the added versatility provided by the additional native connections. Appx18-19. Further the Board rejected Horizon's interpretation of the prior art. Appx13-17.

### 1. Combining *Works* and *Lindenman* Allows For Attachment Of Hitches And Other Equipment Only Compatible With One Or The Other

To start, it was (and remains) undisputed that Works only discloses a mount for a single-point attachment (24, yellow), located at the center of the mounting device, as shown in Figure 2:



Appx2808(Fig. 2) (annotated).

By contrast, Lindenman shows a mount that only provides for a four-point attachment at the corners of the mounting device (receiving members 14, green):



Appx2818(Fig. 1) (annotated).

It was this fundamental difference that served as the premise for the testimony of Northern Stamping's expert, Becker, who explained:

> [I]t is my opinion that it would have been obvious to enhance the hitch mount system of *Works/Fandrich* by incorporating a pair of receiving members, such as the receiving members taught by *Lindenman*, for receiving accessories, such as legs of a fifth wheel hitch. I believe a POSA would have been motivated to enhance *Works/Fandrich* in this manner to provide a hitch mounting system capable of accommodating a variety of accessories, including fifth-wheel or gooseneck-style hitches. Indeed, *Lindenman* expressly recognizes versatile mounting systems capable of mounting a variety of different accessories—including fifth-wheel and gooseneck hitches—as a known objective within the art. [Appx2836(1:46–52)] ("The mounting system…offers the consumer unparalleled versatility since one may

> mount a number of different vehicle accessories…[such as] a fifth wheel hitch assembly, a gooseneck hitch assembly…or other useful device.”).

Appx2753(¶ 84).

This testimony is supported by Lindenman, as Becker notes above, which provides: “The mounting system also offers the consumer unparalleled versatility since one may mount a number of different vehicle accessories to the vehicle through the mounting system. Such accessories include but are not limited to a fifth wheel hitch assembly, a gooseneck hitch assembly and an article anchor or carrier such as a bike rack, a motorcycle stand or other useful device.” Appx2836(1:46-52); *see also Bosch Automotive Servs. Solns., LLC v. Matal*, 878 F.3d 1027, 1035-36 (Fed. Cir. 2017) (finding that where references called for “a single, handy tool having the versatility” to communicate with different sensors, a skilled artisan would be motived to combine the different sensor tools into one).

Other prior art references support this testimony. For example, Withers ’317 notes that the four-point attachment receiving members can be used even when a gooseneck ball is secured at the center attachment point. Appx3870(3:28-31) (“The fifth wheel pucks **18** may be used to secure the safety chains of the trailer to the bed of the truck when the trailer is assembled to the gooseneck”). The Board explicitly agreed with this evidence. Appx20 (“we find that Lindenman suggests

the benefits of versatility”) (citing Appx2836(1:46–52)); Appx19 (citing Appx3870(3:26-31)).

Northern Stamping’s expert Becker further testified why one of skill in the art would be motivated to modify Works in view of Lindenman (and vice versa) due to this increased versatility to secure additional equipment and other structures to the towing vehicle. For example, Becker stated:

> Q: And what would be one of the reasons why you would want four additional holes in the bed of your truck?
>
> [A]: The reason you would want four additional holes with the receiving members would be ***so that you could mount other things***.
>
> Q: What other things would you want to mount?
>
> A: ***Anything that you would want to mount in a bed of a truck***. You could use it for ***securing a load***. You could ***mount accessories***. You could mount other products that you currently own. Truck owners are always customizing their vehicles.

Appx3396(60:1-17); Appx3397(64:2-9) (“Q: … [W]hat would the reasons be that somebody would want to modify figure 2 [of Works] to contain the four receiving members for a fifth-wheel hitch? [A]: It would be for adaptability and additional accessory capability.”).[4]

---

[4] All objections omitted in quoted testimony, and all emphasis added, unless otherwise noted.

Likewise, and for the same reasons, Northern Stamping's expert Becker opined that adding a mid-rail, as taught by Works, to Lindenman would also increase versatility:

> It is my opinion that a POSA would have been motivated to enhance Lindenman/Fandrich in this manner to provide a hitch mounting system capable of accommodating a variety of accessories, including fifth-wheel or gooseneck-style hitches, a known objective in the art. *See* [Appx2836(1:46–52)].

Appx2776(¶ 126); *see also id.* (¶ 125).

Additionally Northern Stamping's expert stated that adaptability would be the reason to modify Lindenman to accept a gooseneck ball.

> Q: If you were going to modify Lindenman to accept a gooseneck ball, how would you go about doing that?
>
> A: I would add a center rail with a receiver.
>
> Q: And ***what would your motivation*** for doing that be?
>
> A: ***Adaptability. That way you wouldn't have to, again, have a larger structure for mounting your gooseneck***.

Appx3399-3400(73:15-74:2).

Horizon's expert, Walstrom, recognized in his declaration that Works and Lindenman, by themselves, do not offer the versatility of the combination. Walstrom admitted that a ball-hitch mount like Works could only attach to a fifth-wheel receiver plate through "a single point attachment," making it incompatible with receiver plates designed for a four-point perimeter attachment.

Appx3291(¶ 102). Walstrom also admitted that adding a gooseneck to Lindenman would require an over-bed adapter designed to connect to the four-point perimeter receiving members. Appx3293(¶ 106). But this use of an adapter structure to secure a gooseneck ball hitch to a four-point attachment designed for a native fifth-wheel hitch was criticized in the prior art. *See* Appx3869(1:31-34) ("A gooseneck adapter on a fifth wheel mount raises the height of the gooseneck ball, and usually obstructs more of the pick-up bed").

The Board agreed. It "credit[ed] Petitioner's expert testimony that a person of ordinary skill in the art would have had a reason to have both attachment mechanisms in order to 'accommodat[e] a variety of accessories.'" Appx18-19 (citing Appx90 (Petition) and Appx2753(¶ 84)). The Board observed that Becker's "testimony is supported by Lindenman, who advocates for its socket design to provide 'unparalleled versatility since one may mount a number of different vehicle accessories to the vehicle through the mounting system,' not limited to hitches but also 'an article anchor or carrier such as a bike rack, a motorcycle stand or other useful device.'" *Id.* (quoting Appx2836(1:46–52)).

The Board was also clear that this motivation supported the obviousness combination regardless of whether Works and/or Lindenman disclosed the ability to accommodate both gooseneck and fifth wheel hitches. The Board explained: "even if we set aside the addition for native ability to mount a kingpin/receiver

hitch, the four attachment points of Lindenman would add to Works by providing an ability to removably mount these other accessories." Appx19. Thus, the Board's motivation-to-combine finding is supported by substantial evidence regardless of whether Works and Lindenman disclose the ability to accommodate both gooseneck and fifth wheel hitches.

### 2. The Market Was Driving The Need For Versatility

The Board found that the marketplace at the time of the invention further motivated one of skill in the art to combine the different attachment types of Works and Lindenman to provide for additional versatility. *See* Appx21-22. This finding is also supported by abundant evidence.

First, Horizon's own expert testified that an auto-maker "like Ford would want any factory installed system to accommodate as many different hitches as possible." Appx3271(¶ 47). He explained that, unlike a consumer who may purchase a specific mounting system to accommodate a specific type of hitch, an auto-maker like Ford would want to offer its customers the versatility to allow them to choose what hitch they want to use. *Id.* A customer buying a new truck may not know what hitch she may use in the future, whereas a customer buying a hitch mount to install herself into a vehicle will already know. *Id.*; *see also* Appx4224(78:2-11).

As Horizon's expert explained, the versatility that Ford specifically desired was provided by a mount that combined a single, center-point attachment, with a four-point perimeter attachment. Appx3272-73(¶ 50) ("This system created by Horizon's engineers accomplished all of the solutions desired by Ford and its customers: …it could use the same receiving members to accommodate either a fifth wheel or gooseneck hitch, regardless whether they mount to a hitch ball (or hitch ball location) or by four legs").

The evidence further establishes that it was Ford who demanded a mounting system providing for both types of attachments (single, center-point and four-point perimeter). As Horizon's expert acknowledged, "Ford was looking for a solution to accommodate as many hitches as possible. They came to Horizon Global…[a]nd we developed it for them." Appx4226(80:4-8); *see also* Appx4228-29(82:25-83:3) ("Ford, as I state, wanted a system that would accommodate both of those markets in an OEM environment."); Appx4240(94:12-18) ("My understanding is that Ford wanted a solution, as I've already testified to, that accommodated both a fifth wheel and a gooseneck hitch from the factory at Ford through the dealership lots to a consumer. So the general concept of accommodating both types of hitches and maybe other types of applications as well."); Appx4312(166:13-14) ("Ford Motor Company came to [Horizon] and said, we want to combine these [hitch types].").

To that end, as Horizon's expert admits, Ford's desire for a dual hitch was the "driving force" behind the development of the '585 patent:

> A: …prior to 2009, these—this underbed or above-bed gooseneck and fifth wheel attachment systems were sold nearly exclusively in the aftermarket…. When Ford comes along, Ford says, I sell trucks to dealerships. No idea what consumer is going to walk in to buy that truck, and we want—we want a hitch system that would accommodate either one of those end markets. So that's where the—where I'm saying ***the driving force*** came from to accommodate as many hitches as possible, in this case primarily the fifth wheel and the gooseneck, in the Ford vehicle itself, not in the aftermarket.

Appx4223-24(77:17-78:16).

> Q: The key driving force is Ford coming to Horizon. Is that what you're saying?
>
> A: For the '585 patent, the—Ford came to Horizon with a need for an OEM application for their trucks which could be sold to…to RV customers [fifth-wheel hitch] or gooseneck customers. ***That became the driving force to -- for that patent and that product.***

Appx4313(167:2-11).

Even the inventor of the '585 patent testified that Ford motivated Horizon to develop the '585 patent.

> Q: And do you know what the specific request from Ford to Cequent was?
>
> A: For us to develop an underbed mounting kit that would meet all of Ford's requirements and the SAE requirement -- testing requirements, that could be installed at the factory level, for both fifth wheel and gooseneck.
>
> Q: Was Ford looking for a combo unit, "a combo unit" meaning a hitch that would accommodate both a fifth wheel hitch and a gooseneck hitch?

A: Yes, they were.

Appx3922(25:7-20); *see also* Appx3927(30:2-3) ("Ford asked us to develop this product"); Appx3948(51:21-23) ("[Ford] wanted to have a combination fifth-wheel and gooseneck system").

Horizon argues that these market forces cannot support a motivation to combine, arguing that this was "the inventor's actual path to invention." Hor.Br. at 38, 41. Not so. What the evidence quoted above shows is that the "path" to combining known features (in a known way to achieve a predictable result) came from Ford, not Horizon or its inventors. This "path" is thus the knowledge and motivation of one of skill in the art at the time of the invention as guided by then-prevailing market demands. *KSR Int'l Co.*, 550 U.S. at 419-20 ("[N]either the particular motivation nor the avowed purpose of the patentee controls. What matters is the objective reach of the claim. … [A]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed."). If the "invention" was truly the concept of combining a fifth-wheel and gooseneck hitch mount, Ford and its engineers would be the inventors, not Horizon.

Moreover, the law is clear that market forces should be considered in an obviousness analysis and can—and typically do—serve as a motivation to combine. *KSR* spelled that out exactly: "When a work is available in one field of

endeavor, design incentives ***and other market forces*** can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability." *KSR Int'l Co.*, 550 U.S. at 417 (emphasis added); *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1354 (Fed. Cir. 2013) ("motivation to combine may be found ***explicitly or implicitly in market forces***") (emphasis added).

Thus, substantial evidence supports the Board's finding that "market forces at the time of the invention demonstrate a desire to have an integrated device" for multiple types of hitches. Appx22.

### 3. Combining *Works* And *Lindenman* Does Not Add Redundancy

#### a. Even If *Works* and *Lindenman* Both Accommodated Two Types Of Hitches, The Combination Is Still A Desirable Enhancement

Horizon argued below, and argues again on appeal, that Works and Lindenman are each "able to accommodate both gooseneck and fifth wheel hitches." Hor.Br. at 31 (discussing Lindenman); *id.* at 32 (discussing Works). As discussed below, this was not correct and the Board rejected the argument. But even if it was true, one of ordinary skill would still have been motivated to combine Works and Lindenman, as the Board found. Appx19.

While Horizon argued that Works could accommodate a fifth-wheel hitch, the only fifth-wheel hitch Horizon claimed it could accommodate was one that was

specifically adapted to connect to a gooseneck ball, either because it was modified to do so or it included an adapter. That has to be the case because Works only has a single center-point attachment. *See* Appx2808(Fig. 2). Likewise, the only gooseneck hitch that Horizon claimed Lindenman could accommodate was one having an adapter. *See* Appx2836(1:46-52).

The Board recognized this and held that, even if Works and Lindenman could accommodate both types of hitches, one of skill in the art would still be motivated to combine them to eliminate the need for an adapter. Appx20. "[I]t is plain that not having to purchase an adapter is a readily apparent advantage of the proposed combination." Appx19. "From a logical standpoint, the elimination of adapters critically undermines Patent Owner's theme, throughout its arguments, that the combination is of redundant features or otherwise superfluous." Appx20. This "recourse to logic, judgment, and common sense" is more than enough to sustain the Board's determination. *Perfect Web Tech., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2009).

Other prior art references espouse the advantage of eliminating an adapter and providing native connections for both types of hitches. Withers '317, for example, criticizes a gooseneck adapter, and describes a need for an "integrated" device: "A gooseneck adapter on a fifth wheel mount raises the height of the

gooseneck ball, and usually obstructs more of the pick-up bed." Appx3869(1:26-38).

Northern Stamping's expert Becker also testified to the difference between native mounting and mounting through an adapter:

> Q: So you can use a fifth-wheel hitch with the current structure without cutting four holes in the truck?
>
> A: It would depend on what you're attempting to do. So if you cut the four holes in, you would be using a fifth-wheel hitch that had four mounting points. If you used an adapter, you would be adapting to a singular ball. So ***you'd have a different loading structure***.

Appx3396(61:11-20).

Thus, even if Works could accommodate a gooseneck hitch and a fifth-wheel hitch (through an adapter), and even if Lindenman could accommodate a fifth-wheel hitch and a gooseneck hitch (through an adapter), the evidence supporting a motivation to combine discussed above still applies with full force.

#### b. *Works* Does Not Disclose A Native Attachment For a Fifth-Wheel Hitch

Regardless, the Board found that Works does not disclose a mounting system for a fifth-wheel hitch, Appx17, and that finding is supported by substantial evidence.

First, a plain reading of Works itself is evidence enough. As the Board found, Works uses the term "fifth-wheel" only to describe "its towing connector *generically*." Appx14 (original emphasis). The Board pointed to a passage from

Works that “describes the ‘fifth wheel’ as requiring a ‘hitch ball’” and further explained that “*[i]n order to allow* the trailing vehicle to be connected to a fifth wheel type hitch, a ‘*gooseneck’* type extension is utilized.” Appx14 (quoting Appx2810(1:26–41) (emphasis in Board decision)). The Board thus correctly concluded that Works “defines its ‘fifth wheel’ as the gooseneck type of hitch,” such that “[w]hen Works says ‘fifth wheel’ it is describing a ball/coupler hitch, not a kingpin/receiver hitch.” Appx14.

Were there any confusion, the Works figures plainly show only a single point of attachment to a gooseneck ball coupler; it plainly is missing the four-point attachment used to natively secure a fifth-wheel receiver to a truck bed.




On top of this, Northern Stamping’s expert testified that Works does not disclose a fifth-wheel attachment: “*Works* does not explicitly teach Claim 16’s limitations of receiving members attached with a pair of tubular members and

configure to engage a leg of a fifth wheel hitch." Appx2751(¶ 80). He also testified that Works only discloses a gooseneck system. *See* Appx3395-96(56:15-19, 58:8-10, 14-16) (describing Works as an "under-bed hitch product" with a "gooseneck ball" and no "receiving members attached with each of said pair of tubular members").

Second, Horizon itself implicitly conceded that Works did not disclose attachment to both a gooseneck hitch and a fifth-wheel hitch by relying entirely on evidence outside of the Works patent. Horizon sought to expand on the Works patent by introducing a catalog description of a commercial embodiment that Horizon argued was representative of Works. *See generally* Appx 3426-57. But the Board was correct in concluding that this "catalog evidence does not change what Works itself says." Appx15.

In any event, the catalog description was legally irrelevant, as the Board found. It was dated 2021—twelve years after Horizon's alleged conception date, four years after the filing date, and eighteen years after the filing of the Works patent. Appx3189; Appx2807. It thus was not evidence of what Works disclosed years prior, or the knowledge of a person of skill in the art at the time of the '585 patent. Appx15.

Thus, the Board was correct to afford no weight to the contents of the catalog and to Horizon's expert testimony explicitly relying on that catalog. *See*,

*e.g.*, Appx4213(67:18-21) (Horizon's expert referring to the catalog when discussing Works); Appx3276-77(¶ 67) (referring to B&W catalog); Appx3291(¶ 102) (same); Appx16-17. The Board was likewise correct to give little weight to the supposed admissions of Northern Stamping's expert because, as the Board found, his testimony concerned the contents of the catalog and not the disclosure of the Works patent. Appx14-16.

#### c. *Lindenman* Does Not Disclose A Native Attachment For A Gooseneck Hitch

Horizon also contends that Lindenman discloses accommodating both hitch types, but in doing so it readily acknowledges that the only way Lindenman could accommodate a gooseneck hitch is through an adapter, i.e., "a structure that went into the four receivers and then suspended a goose ball." Hor.Br. at 31-32 (quoting Appx3399). Horizon's expert included an image of an adapter that connected a gooseneck ball hitch to a four-point perimeter attachment:



Appx3293(¶ 106). But the elimination of the need for an adapter, discussed above, itself is motivation enough to combine Lindenman with Works, as the Board found. Appx18-19. Horizon does not (and cannot) argue that Lindenman discloses the ability to natively attach a gooseneck hitch without the need for an adapter.

In any event, Lindenman's lack of a native connection to a gooseneck hitch is supported by Lindenman itself, and by the testimony of Becker, who stated: "*Lindenman* does not explicitly teach Claim 16's limitations of a mid rail…having a socket capable of accepting a gooseneck hitch ball." Appx2775(¶ 122). Again, those skilled in the art were aware of the drawbacks of a "gooseneck adapter on a fifth wheel mount" because it "raises the height of the gooseneck ball, and usually obstructs more of the pick-up bed." Appx3869(1:26-38). Likewise, a skilled artisan would want receiving members for a fifth-wheel and a socket for a gooseneck so that when the gooseneck in is use, the receiving members can serve as connection points for other uses. *See* Appx3870(3:26-31) ("The fifth wheel pucks **18** may be used to secure the safety chains of the trailer to the bed of the truck when the trailer is assembled to the gooseneck").

Therefore, substantial evidence supports the Board's finding that Lindenman did not have a native receiver for both types of hitches, and thus that there was a

motivation to combine Lindenman with Works for added versatility. *See* Appx18-19.

### 4. Horizon's Other Arguments Are Without Merit

#### a. The Board Applied The Law Of Obviousness Correctly

Horizon contends that the Board made various legal "errors." First, Horizon contends the Board "failed to consider the references' teachings from the perspective of a skilled artisan at the time of the invention." Hor.Br. at 28. Second, Horizon contends that the Board only considered "the general underlying idea—a hitch that could accommodate both a gooseneck and fifth wheel" and not the "entirety of the invention." *Id.* at 39. Third, Horizon argues that the Board "shifted the burden to Horizon to prove no motivation to combine." *Id.* at 44. None of these arguments have merit.

Critically, Horizon's assertions of legal error all rely on Horizon's misreading of the Board decision, and none are grounded in any explicit statement by the Board of the wrong standard. To the contrary, the Board properly recited the standard for obviousness, including that the Board looks to "the subject matter as a whole" and from the perspective of "a person having ordinary skill in the art to which said subject matter pertains." Appx9. The Board also correctly recited the burden of proof, stating: "the petitioner has the burden from the onset to show

with particularity why the patent it challenges is unpatentable," and "[t]his burden of persuasion never shifts to the Patent Owner." Appx.8.

Not only did the Board correctly recite the legal standard and burden of proof, it correctly applied the law over many pages of its final written decision. Appx8-36. Indeed, the Board's conclusions expressly reflect the proper standards. Appx35 ("We conclude that ***Petitioner has shown by a preponderance of the evidence*** that the subject matter of claim 16 would have been obvious in view of Works, Fandrich, and Lindenman.").

Similarly, Horizon's argument that the Board focused on the "gist" of the invention is unsupported. Northern Stamping's expert walked through every challenged claim, element by element, and explained why it was obvious in view of the prior art. *See* Appx2758-73; Appx2780-89.

Horizon relies on *Ruiz v. A.B. Chance Co.*, 357 F.3d 1270, 1276 (Fed. Cir. 2004), to support its "gist" argument, but in *Ruiz* this Court *affirmed* a finding of motivation to combine. The Court explained that there was a proper "motivation to combine" because the two prior art references "address precisely the same problem." *Id.* That is likewise the case here. Works and Lindenman address the same problem—providing an underbed mounting system for a hitch connection. And, just like the '585 patent, Lindenman observes that there is a need in the art for such systems to provide additional versatility. Appx2836(1:46-52) Therefore,

"a person seeking to solve that exact same problem would consult the references and apply their teachings together." *See Ruiz*, at 1277.

Horizon also argues that the Board "failed to 'take account of all the evidence of record" because it did not adopt Horizon's faulty interpretation of Works. Hor.Br. at 29. But considering and rejecting evidence is the opposite of ignoring it. As discussed above, the Board considered and rejected Horizon's misinterpretation of Works.

Horizon relies on *In re Taylor Made Golf Co., Inc.*, 589 Fed. App'x 967, 971 (Fed. Cir. 2014), but that case actually vacated a finding of ***non***-obviousness. *Taylor Made* thus offers no support to Horizon's position.

Horizon also argues that Northern Stamping provided no evidence outside what it submitted with its petition, while seizing on snippets from the Institution Decision to suggest that Northern Stamping's evidence was insufficient. *See* Hor.Br. at 16, 47-48. But the Institution Decision's discussion of motivation evidence is not binding and is not on appeal, and in any event, it would make sense for the Institution Decision to identify motivation-to-combine as the focus of the IPR proceeding where, as here, Horizon conceded that the combination disclosed all of the claimed elements.

In any event, significant evidence was introduced after the Institution Decision further bolstering the initial evidence of a motivation to combine. Most

importantly, Northern Stamping submitted the cross-examination transcripts of Horizon's expert and one of the named inventors, both of whom gave critical admissions. Appx4312(166:13-14) (Walstrom) ("Ford Motor Company came to [Horizon] and said, we want to combine these [hitch types]."); Appx3927(30:2-3) (Stanifer) ("Ford asked us to develop this product"). Likewise, Northern Stamping's expert further testified to this motivation under cross-examination and redirect, and this transcript is also a part of the voluminous record. Appx3396(60:1-17) (Becker) ("Q: And what would be one of the reasons why you would want four additional holes in the bed of your truck? [A]: The reason you would want four additional holes with the receiving members would be so that you could mount other things").

Horizon further argues that the Board is not permitted to "read[] the references" and interpret them, and that the Board is not permitted to "criticize Horizon's evidence." Hor.Br. at 29-30. That makes no sense—in an IPR, the Board is the factfinder, and it reviews the evidence to make factual determinations. And a factfinder must necessarily resolve disputed issues of fact by siding with certain evidence over other evidence. That is exactly what happened here. *See Roku, Inc.*, 63 F.4th at 1325 ("The Board, in its role as factfinder in the first instance, was entitled to weigh the evidence in the record"); *Regents of Univ. of Cal. v. Broad Inst., Inc.*, 903 F.3d 1286, 1294 (Fed. Cir. 2018) ("It is not our role to

ask whether substantial evidence supports fact-findings not made by the Board, but instead whether such evidence supports the findings that were in fact made").

Likewise, contrary to Horizon's contention, the Board did not "fill[] in the expertise gaps;" rather it properly cited to and credited Northern Stamping's expert and evidence over Horizon's evidence. *See e.g.* Appx16 (crediting Northern Stamping's expert and discrediting Horizon's expert testimony as "conclusory"); *see also Intellectual Ventures I LLC v. EMC Corp.*, 786 Fed.Appx. 1021, 1033-34 (Fed. Cir. 2019) (finding no improper gap filling where the Board relied on the express teachings of a reference and credible expert testimony).

Nor is there anything wrong with identifying the failures in Horizon's positions. *Essity Prof. Hygiene North Am. LLC v. Cascades Canada ULC*, 811 Fed.Appx. 643, 646 (Fed. Cir. 2020) ("It was proper for the Board to identify the failures in Essity's arguments"); *see also Boston Sci. SciMed, Inc. v. Iancu*, 811 Fed. Appx. 618, 626 (Fed. Cir. 2020) ("The PTAB did not shift the burden of proof to Boston Scientific by considering Boston Scientific's counterarguments").

Notably, the law recognizes that, despite the burden of persuasion remaining with the petitioner, "the presumption of validity does not relieve the patentee of any responsibility to set forth evidence in opposition to a challenger's prima facie case which, if left unrebutted, would be sufficient to establish obviousness." *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1353 (Fed. Cir. 2013).

For example, in *Ancor Pharm., Inc. v. Iancu*, the patent owner made the same argument that Horizon makes here, claiming that the Board improperly shifted the burden. 889 F.3d 1372, 1382 (Fed. Cir. 2018). But this Court rejected that argument, observing that "the Board expressly and repeatedly stated that it was the petitioner's burden to show[] by a preponderance of the evidence" that the challenged claims were unpatentable. *Id.* This Court further rejected the premise that the Board implicitly shifted the burden, explaining: "[t]hat argument, however, does not suggest that the Board shifted the burden of proof to [patent owner], but instead is directed to the question whether there was substantial evidence to support the Board's finding of obviousness." *Id.* For the same reasons, Horizon's burden-shifting argument lacks merit.

Here, the Board considered all of Horizon's evidence, and found it unavailing. That is not burden shifting, nor is it a misapplication of the law of obviousness. Horizon's attempt to label its appeal of factual issues as one involving legal issues thus fails.

#### b. The Need For Additional Versatility Is Legally And Factually Sufficient Motivation In This Case

Horizon contends that the need for additional versatility is "legally insufficient" to support a motivation to combine in all cases. Hor.Br. at 36. But this flatly contradicts *KSR*. *KSR* explained:

> When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability. …
>
> Often, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue. … As our precedents make clear, however, … a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ.

*KSR*, 550 U.S. at 417-18.

In this case, as discussed above and found by the Board, express market conditions drove the need for having the additional versatility of a hitch mounting system that could natively accommodate multiple types of hitches as well as other vehicle equipment and accessories. Thus, the claimed invention is the product of ordinary skill and "market demand" "without real innovation." *Id.* at 419.

This Court has likewise observed that "broadly applicable motivation may be sufficient as long as it is supported by more than conclusory expert testimony." *Volvo Penta of the Am., LLC v. Brunswick Corp.*, 81 F.4th 1202, 1209 (Fed. Cir. 2023). That is certainly the case here, as the testimony cited and discussed above supports.

Horizon relies on *ActiveVideo Networks Inc. v. Verizon Communications Inc.*, 694 F.3d 1312 (Fed. Cir. 2012), but that case is easily distinguishable. There,

the issue was not whether the concepts of "efficiency" and "market demand" were sufficient motivations to support an obviousness combination. *Id.* at 1327. Rather, the Court found the expert testimony supplying these motivations to be "generic" and "bear[ing] no relation to any specific combination of prior art elements." *Id.* at 1328. For all the reasons discussed above, the evidence in this case, including the expert testimony and the prior art itself, specifically points to motivations to combine specific elements of the prior art, including a desire for versatility and market demand.

### B. Substantial Evidence Supports The Board's Weighing Of Horizon's Weak Secondary Considerations Evidence

Horizon offered three alleged secondary considerations of non-obviousness. The first two—industry praise and commercial success—rely on a commercial product that Horizon claims it makes for Ford. Hor.Br. at 59-60. The third—copying—relies on a product purportedly sold by General Motors. Appx33-34. For all three, the Board found no nexus, and even if there were some nexus, the Board properly gave this evidence little to no weight. Appx30-34. These findings are supported by substantial evidence.

### 1. Substantial Evidence Supports The Board's Finding Of Little To No Commercial Success

#### a. Horizon Failed To Establish Nexus Between The Commercial Product It Makes For Ford And Claims 16-20

"To be relevant such a secondary consideration must have a legally and factually sufficient connection (nexus) to the claimed invention." *Yita LLC v. MacNeil IP LLC*, 69 F.4th 1356, 1364 (Fed. Cir. 2023); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538-39 (Fed. Cir. 1983). The "patentee bears the burden of showing that a nexus exists." *Teva Pharm. Int'l GmbH v. Eli Lilly and Co.*, 8 F.4th 1349, 1360 (Fed. Cir. 2021).

Horizon contends that it is entitled to a presumption of nexus. Hor.Br. at 58. But Horizon is only "entitled to a presumption of nexus when it shows that the objective evidence is tied to a specific product that embodies the claimed features, and is coextensive with them." *Volvo Penta*, 81 F.4th at 1210. Horizon never tried to make such a showing. Appx31 ("We find that Patent Owner has not established nexus and has not made a meaningful attempt to do so").

Contrary to Horizon's assertions, it never established that any commercial product made for Ford actually embodied claims 16-20 of the '585 patent. Instead, Horizon sought to rely on its expert's and inventor's comparison of various "conception" drawings to the claims. Appx3280-3283(¶¶ 80-86) (Walstrom expert declaration discussing Exhibits 2013 and 2020 "as establishing conception");

Appx3343-3346(¶¶ 22-23) (Stanifer inventor declaration discussing conception CAD drawings); Appx3980(83:16-20) (Stanifer inventor testimony that Exhibit 2020 is "embodied in the '585 patent").

On appeal, Horizon continues to point to and rely on this same conception evidence, although Horizon now re-names this conception document a "product drawing." Hor.Br. at 59 (citing Appx3281-3283, Appx3343-3346, Appx3873, and Appx3980). But, misleading labels aside, as the Board expressly found, this "evidence of conception and diligence" is not by itself sufficient to tie some alleged commercial product to the claims. Appx31. As the Board explained, there is a fundamental disconnect between conception drawings and what was ultimately offered and sold to Ford. *Id.* ("All that those documents would tend to show is what plans Patent Owner was offering to Ford. There is no evidence showing what was sold…"). There was thus no "credible evidence" connecting the conception documents to the commercial product sold to Ford. Appx32.

Horizon relies on *Polaris Industries, Inc. v. Arctic Cat, Inc.*, but that case further highlights the *lack* of nexus here. 882 F.3d 1056, 1073 (Fed. Cir. 2018). In *Polaris*, the patentee's expert testified that he had "reviewed" and "compared" the asserted patent claims to the patentee's commercial product, and concluded that the product embodies "each element recited in" the claims. *Id.* The only question there was whether the expert's testimony was too conclusory. *Id.* By contrast,

here, Horizon's expert never reviewed any commercial product and never compared any such product to the challenged claims. The *only* comparison made was to a conception document that Horizon never tied back to a final commercial product or to any specific sales.

Horizon also argues that the Board required evidence of a product sold to Ford's customers, rather than evidence about the product that Horizon sells to Ford. Hor.Br. at 60. This is strawman. The Board never made any such distinction—nor is there. The product Horizon sells to Ford is the same product that Ford sells to customers with its pick-up trucks. The Board's reference to "no evidence showing what was sold" referred to the product that Horizon sold to Ford. Appx31. Again, that is because the Board was distinguishing the only evidence offered—a conception drawing that was not tied to the finished commercial product. *Id.*

As such, the Board's ultimate conclusion is correct: "we find that Patent Owner has not established a nexus between the claimed invention and what Ford sold. This rests on the fact that Patent Owner has not directed us to credible evidence or analysis comparing the two." Appx32. This applies equally to commercial success (based on Ford sales) and industry praise (based on a Ford advertisement). The Board did not mince words, calling Horizon's "nexus" evidence "at or near zero." *Id.*

### b. Regardless of Nexus, Horizon's Commercial Success Evidence Was Plainly Insufficient

Even if Horizon established a nexus, its proffered evidence of commercial success was badly lacking. It consisted of a single conclusory paragraph of Horizon's Director of Engineering, who stated: "Patent Owner has sold hundreds of thousands of its products (received millions of dollars in revenues) of its underbed hitch mounting system to Ford from launch to present. Patent Owner has also sold thousands of after-market units during that same time period." Appx3379(¶ 25). When asked about that statement, Horizon's Director of Engineering admitted that he did not retrieve any sales data himself, and that he had no idea where the person who did retrieve the data got it from, or how the data was derived. Appx4056-4057(17:1-18:11) ("No, actually I don't know. How he got the numbers.").

Likewise, when asked about any supposed commercial success, Horizon's expert admitted he did not know specific sales data, market share data, or any other facts:

> Q: Do you believe that the invention of the '585 patent has been commercially successful?
>
> A: Very much so.
>
> Q: And in support of that opinion, did you rely upon any market data?
>
> A: Again, ***I don't have facts*** with me regarding sales dollars or market share or anything else, general speaking market share. Horizon was the only supplier to Ford on this product obviously, ***but I just know***

> that it was a very commercially successful product for the partnership that Horizon Global had with Ford and a very significant part of the Horizon Global business.

Appx4347(200:22–201:9). Walstrom's "I just know" statement that the product was "very commercially successful" is the type of conclusory, unsupported statement of an expert that should be afforded no weight. *See cxLoyalty, Inc. v. Maritz Holdings Inc.*, 986 F. 3d 1367, 1378 (Fed. Cir. 2021) ("We do not accord weight to conclusory expert testimony.").

This conclusory testimony is completely lacking any necessary and important context—something this Court has always required. *B/E Aerospace, Inc. v. C & D Zodiac, Inc.*, 709 Fed.Appx. 687, 695 (Fed. Cir. 2017) (finding that "bare dollar value" "without the introduction of contextual evidence" is weak evidence of commercial success); *see also J.T. Eaton & Co., Inc. v Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997) ("[T]he asserted commercial success of the product must be due to the merits of the claimed invention beyond what was readily available in the prior art"). For example, Horizon offers no evidence about sales to Ford before the '585 patent, how they may have changed after the '585 patent, what sales looked like on an annual basis or over time, about sales of competing products, or about what was driving sales.

The Board as a fact-finder is well within its province to reject all of this evidence, or otherwise afford it little to no weight, particularly on this barren record and lack of critical context.

### 2. Substantial Evidence Supports The Board's Finding Of Little To No Industry Praise

Horizon's "industry praise" argument fares no better. The entirety of the evidence is a single paragraph from Horizon's expert report, which allegedly contained an annotated image of a Ford advertisement. Appx3300(¶ 125).

125. Ford even touts the hitch and gives credit to Reese:




But, as the Board found, Horizon never entered the actual advertisement or publication from where it came into evidence, meaning that Horizon's entire basis for "industry praise" had no evidentiary underpinning. Appx31 (citing 37 C.F.R. § 42.63(a) ("evidence must be in the form of an exhibit")). That alone was enough to "immediately dispose[] of the issue." *Id.* Because this finding is dispositive,

and Horizon's appeal brief fails to argue that the Board abused its discretion in relying on its own evidentiary rules, this Court should affirm on this basis alone.

In any event, the industry praise evidence lacks a nexus to the claimed invention for all the same reasons discussed above with respect to commercial success. Indeed, Horizon's expert admitted he made no effort to compare the product shown in the Ford advertisement to claims 16-20, nor did he offer any evidence tying that product to the "conception" documents discussed above. Appx4349-50(203:23-204:3). Regarding the advertisement itself, Walstrom could not say where it came from or when it was supposedly published. Appx4347(201:10-23). Thus, the fact that Horizon offered "near zero" evidence of nexus for industry praise likewise requires affirmance.

Regardless, the Board did review and consider the Ford advertisement on the merits, but found it did not show the type of "industry praise" that Horizon claimed it showed. Appx32-33. Again, the advertisement was taken completely out of any context, leaving the Board to guess as to its significance. Moreover, as the Board found, the advertisement was unclear whether the "patent-pending" reference was a feature that Horizon developed or instead something that Ford had developed. Appx32. Indeed, as the Board stated, it was more likely that the "patent pending" reference was to Ford's "Custom Accessory" kits and not to the "Gooseneck Hitch Kits by Reese." *Id.*

Regardless, an advertisement by Ford of a Ford product (even one supplied to it by Horizon) is hardly evidence of objective "industry praise." Such self-serving statements are exceptionally weak compared to objective, neutral, third-party praise. *See In re Cree, Inc.*, 818 F.3d 694, 702 (Fed. Cir. 2016) ("While praise in the industry for a patented invention, and specifically praise from a competitor tends to 'indicate that the invention was not obvious,' self-serving statements from researchers about their own work do not have the same reliability"); *see also Bayer Healthcare Pharm., Inc. v. Watson Pharm., Inc.*, 713 F.3d 1369, 1377 (Fed. Cir. 2013) ("self-referential commendation fall well short of demonstrating true industry praise").

Substantial evidence thus supports the Board's finding that the advertisement "does not tend to show praise of Patent Owner's claimed invention." Appx33.

#### 3. Substantial Evidence Supports The Board's Finding Of No Copying

Horizon's "copying" evidence was just as sparse. Horizon relied on a single paragraph from the declaration of its expert Walstrom, which allegedly includes an image of a Chevy Silverado product. Appx3301-3302(¶ 127). Walstrom says, "it is easy to see how similar the designs look." *Id.* From this, Walstrom concludes that GM "decided to copy" Horizon's patent, "and reached out to Northern Stamping to manufacture them for GM." *Id.*

Horizon's expert provides no context for this image, and never offered the underlying document into evidence. Not only that, Walstrom did not know where the images came from (other than it was given to him by Horizon's attorneys). Appx4353-4354(207:13-208:2). The Board thus was correct to refuse the image as evidence. Appx33-34 ("Again, we do not consider improperly filed evidence."); 37 C.F.R. § 42.63(a) ("evidence must be in the form of an exhibit"). Horizon has not appealed this evidentiary ruling either, which is dispositive.

In any event, like the Ford product, Walstrom admits he never compared the GM product shown in the image to the claims of the '585 patent. Appx4352(206:1-3) ("So have I gone through claim by claim and analyzed actually one of these actual hitches? No"). Rather, Walstrom simply concludes, without any formal analysis, that on visual comparison alone, "this representation certainly looks like it's a copy of one of the embodiments of our '585." Appx4351-4352(205:15-5).

Walstrom further admitted that his opinion was based solely on this perceived similarity, and that he had no actual evidence of "efforts to replicate a specific product." Appx4352(206:6-15); *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010) ("Our case law holds that copying requires evidence of efforts to replicate a specific product….").

The mere existence of a competing product and an allegation of infringement is weak evidence of copying at best. *Id.*; *Iron Grip Barbell Co., Inc.*

*v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004) ("Not every competing product that arguably falls within the scope of a patent is evidence of copying. Otherwise every infringement suit would automatically confirm the nonobviousness of the patent").

Thus, there was no nexus and no copying, and the Board's finding in this regard was correct. Appx34.

**4. On The Facts Of This Case, Secondary Considerations Do Not Outweigh A Strong Case Of Obviousness**

Even if Horizon's evidence was not zero, it still had little bearing on the overall question of obviousness. As this Court has observed, "[a]lthough secondary considerations must be taken into account, they do not necessarily control the obviousness conclusion." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1372 (Fed. Cir. 2007). Indeed, in numerous cases "[s]econdary considerations [do] not overcome [a] strong showing of obviousness[.]" *Id.* That is true particularly where, as here, the evidence of secondary considerations is especially "weak." *Genentech, Inc. v. Sandoz Inc.*, 55 F.4th 1368, 1378 (Fed. Cir. 2022); *Wyers*, 616 F.3d at 1246 (finding a predictable combination of known features to be obvious regardless of secondary consideration evidence).

## II. Substantial Evidence Supports the Board's Finding That The Substitute Claims Are Obvious

Horizon also appeals the Board's denial of its motion to amend and the finding that the proposed substitute claims are obvious over the prior art. Hor.Br. at 48. Specifically, Horizon contends that the Board's finding of a motivation to combine Fandrich and Withers '317 was not supported by substantial evidence. *Id.* at 49. But, as set forth below, the Board's motivation to combine finding was supported by substantial evidence.

Horizon does not and cannot dispute that Withers '317 and Fandrich disclose each and every element of proposed substitute claims 21 and 22. Appx41-42 ("Petitioner has shown, and Patent Owner does not dispute, how Withers '317 describes each limitation as arranged in the claim (including the newly-added 'one piece' and 'flange' limitations), with the exception of the transverse members being tubes."); Appx42 ("Fandrich teaches a hitch that uses tubular support members."). The only contested issue before the Board was whether there were "reasons for modifying the cross members of Withers '317 to include [a tubular] shape." Appx42.

On this point, Northern Stamping submitted the following evidence:

First, Northern Stamping's expert testified that it would have been obvious for a skilled artisan at the time of the invention to modify Withers '317 with tubular cross members as taught by Fandrich. *See* Appx4492(¶ 24). As he

explained, tubular cross members were "one of a finite number of predicable shapes for a cross member in an underbed hitch mounting system." Appx4493(¶ 24). The use of tubular cross members in this context has been known since at least 1933. *See* Appx4493(¶ 25) (quoting Appx2872-2875(Fig. 2, 2:17-40). The advantages of using a tubular shape in this context was well known by those of skill in the art, including that tubular members provided "substantial tensile and compressive strength." Appx4493(¶ 24).

Fandrich touts this very same advantage of using tubular cross-members. Appx2853(3:67-4:2) ("tubes **110** are each designed to withstand substantial tensile and compressive loading"); *id.* (4:4-4:8) ("When two frames **106** and two tubes **110** are permanently secured in combination…the resulting assembly 112 acts as a rigid support structure"); *id.* (4:19-20). Other prior art references likewise disclose using tubular members in hitch-mounting systems. Appx2811(4:60–62); Appx2837(3:47–56); Appx4491-94(¶¶ 22–28). Thus, in addition to the testimony of Northern Stamping's expert, the motivation to combine comes directly from the express teachings of the prior art.

Northern Stamping's expert also testified to another advantage to adding tubes to Withers '317. He stated that adding tubular members would allow for easily and inexpensively creating dual-hitch structures having different lengths (so as to accommodate different-sized vehicles):

> A: …with tubular members, you can easily in manufacturing use different lengths. With the stamping you have to create a whole new die. And then have different raw material size. So that's an expensive process to accommodate a different truck width for one design versus another design.

Appx4565(27:15-24).

Even Horizon's expert admitted that one of skill in the art would have considered only a handful of potential shapes for a cross-member in this context, "L Brackets, C Channel, tubing, solid members," and "flat rails." Appx3297(¶ 114); Appx4319(173:12-174:10). He further admitted that "strength in terms of withstanding tensile and compressive loading is an important design consideration" in this context. Appx4322(176:16-25.) And he conceded that in the course of selecting a cross-member, one of skill in the art would have tried different shapes of cross-members to determine which one yielded the desired strength. Appx4320-4322(174:20-176:15). This is textbook obviousness. *KSR Int'l*, 550 U.S. at 421 (obvious where there "are a finite number of identified, predictable solutions" and a "design need" and where a "person of ordinary skill has good reason to pursue the known options within his or her technical grasp").

The Board credited the evidence cited above, finding that "Petitioner has provided evidence that tubes were a known shape in the specific context at issue, truck-bed-mounted trailer hitches, and that such a shape is described as providing 'a rigid support structure,' which is the same purpose as in the proposed

combination." Appx43-44. Thus, "Petitioner has shown that a person of ordinary skill in the art had a reason to select tubular-shaped structures—they were a known, suitable structure for hitch devices like Withers '317." Appx44.

Horizon also argues that it "was error" for the Board to reject its various arguments that one of skill in the art would not combine Fandrich and Withers '317. Hor.Br. at 55. But Horizon merely re-hashes its argument and evidence, without regard to the standard of review. That substantial evidence supports the Board's finding is enough. *Roku, Inc.*, 63 F.4th at 1326 ("As an appellate court, our role is to review the Board's findings for substantial evidence, not to step into its place and make those findings anew.").

Accordingly, the Board's denial of Horizon's motion to amend is supported by substantial evidence and should be affirmed.

## CONCLUSION

As set forth above, the record contains more than substantial evidence that the contested claims of the '585 patent are obvious. The Board considered all the evidence, and properly weighed it in Northern Stamping's favor, concluding that Northern Stamping established obviousness of the contested claims as a whole by a preponderance of the evidence. The Board's decision should be affirmed.

To the extent the Court does not affirm in its entirety, and depending on how the Court resolves the issues in front of it, any remand to the Board should include instructions to consider Northern Stamping's anticipation grounds. *See* Appx36.

December 19, 2023

Respectfully submitted,

*/s/ Dennis J. Abdelnour*

Dennis J. Abdelnour
HONIGMAN LLP
155 North Wacker Drive, Ste. 3100
Chicago, IL 60606
(312) 701-9300

*Counsel for Appellee Northern Stamping, Inc.*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on December 19, 2023, I caused to be electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notice of such filing to all registered users.

Respectfully submitted,

By: */s/ Dennis J. Abdelnour*
Dennis J. Abdelnour
HONIGMAN LLP
155 North Wacker Drive
Suite 3100
Chicago, IL 60606
(312) 701-9300

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2) because it contains 13,964 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(f) and the type style requirements of Fed. R. App. P. 32(b)(2) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Respectfully submitted,

By: *_/s/ Dennis J. Abdelnour_*

Dennis J. Abdelnour
HONIGMAN LLP
155 North Wacker Drive
Suite 3100
Chicago, IL 60606
(312) 701-9300